**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **GEL BLASTER, INC. F/K/A GEL BLASTER, LLC,** | |
| Plaintiff, Counter-Defendant, | Civil Action No. 1:22-cv-00828-LY |
| v. | **JURY TRIAL REQUESTED** |
| HASBRO, INC., | |
| Defendant, Counter-Plaintiff. | |

**HASBRO, INC.'S IDENTIFICATION OF EVIDENCE IN OPPOSITION TO GEL BLASTER, INC.'S MOTION FOR PRELIMINARY INJUNCTION**

A.  **Hasbro Did Not Breach the Confidentiality Agreement or Use Any Trade Secret**

1. The Non-Disclosure Agreement specifically <u>excludes</u> from protection information that: "is or becomes generally available to the public other than as a result of disclosure by the Recipient." DX-2 at 1.

2. Before it ever talked to Gel Blaster, Hasbro already knew how to design switches hit by the firing mechanism, and pros/cons of designs for same. Hr'g Tr. at 160:9-164:4; 170:17-24.

3. Gel Blaster's Mr. Cline agreed that the Hasbro NERF Haven Stampede (which pre-dates Gel Blaster) had a physical "switch that [was] used to provide semi and auto." Hr'g Tr. at 140:7-9.

4. The PISCA was not, and is not, secret. Mr. Cline agreed that "a year before the motion for preliminary injunction was filed, the PISCA was publicly known to anybody with a screwdriver who wanted to open up the Gel Blaster" Surge. *Id.* at 103:6-18, 101:19-103:5.

5. This Gel Blaster Surge showed – to anybody with a screwdriver - the <u>combination</u> of the PISCA and a switch holder – *i.e.* a placeholder for a switch to be added. A non-party video opening the Surge points to the switch holder and states that the PISCA "would come back and hit a switch right here." *See* DX-72 at 3:17-3:52 (see image below).

| Publicly Available Gel Blaster Surge (DX-72) (annotated) | Allegedly Confidential PFM (PX-24) |
|---|---|
|  | |

6. Mr. Cline agreed that it was "likely" that a physical switch would fit into protrusion to the left of the PISCA in the publicly available Surge. H'rg Tr. at 145:19-146:7.

7. Gel Blaster never treated the *combination* of the physical switch and a PISCA as a trade secret. Gel Blaster's opening brief and declarations never mention the word "PISCA" and never assert that using a PISCA is any better than the plunger directly contacting the switch. Dkt. 29, 30-1, 30-8. This new combination theory appeared for the first time only after Gel Blaster saw the numerous illustrations of publicly known plunger-contacting-switch based blasters in Hasbro's briefing.

8. The pre-litigation evidence confirms that Gel Blaster never treated the use of a PISCA and a switch in combination to be a valuable secret. One year before this lawsuit, Mr. Guinn wrote to Mr. Tino identifying multiple reasons why the PFM in Gel Blaster's CAD drawing (that included the PISCA and switch combination) was an <u>inferior</u> firing mechanism as compared to the well-known "<u>timing</u>" mechanism (which Gel Blaster uses in all its current products and concedes is not a secret). DX-36 at 2; Hr'g Tr. at 66:6-68:7. DX-36 at 2.

1

**B. <u>Hasbro Did Not Use Any Gel Blaster Confidential Information</u>**

1. Nicholas Tino testified under oath that the Mythic blaster did not "incorporate anything learned from Gel Blaster during the due diligence." Hr'g Tr. at 147:19-22.

2. Mr. Tino further testified that the process used to develop the Mythic "was a standard process that we typically use for developing a blaster." *Id.* at 148:1-6. For the initial Hasbro Mythic design (DX 300, shown below), Mr. Tino testified that he started with the mechanism from the publicly available Anstoy AKM-47 and "meshed it with Hasbro's initial design input from [Hasbro's] NERF design team." *Id.* at 158:18-159:10.

3. Mr. Tino testified that nothing in the initial CAD drawing came from Gel Blaster, and "no part of th[e] [Hasbro] CAD drawing … shows what [Gel Blaster] refer[s] to as a PISCA." H'rg Tr. at 158:18-159:18. *See* Drawings below.



| Hasbro Initial Design (DX 300) | Allegedly Confidential PFM (PX-24) |
|---|---|

4. Mr. Tino testified that to provide select fire functionality, he "originally propose[d] using a timing method," *id*. at 160:19-24, but changed his recommendation to a physical switch because "[u]pon discussion with the rest of my development team, our electronics engineer was more familiar with the physical switch and using that to detect the location of a component." *Id.* at 160:25-161:7.

5. Mr. Tino testified that Hasbro's prior experience using physical switches included the NERF Stampede released in 2009. *Id.* at 161:12-162:9. For the Mythic, Mr. Tino "put the physical switch on top of the plunger mechanism" because "[t]hat's where there was space to do so." *Id.* at 170:9-12.

6. Mr. Tino testified that Hasbro's design in the Mythic was a "horizontally" oriented switch created with *progressive* contact for "durability" to "extend[] the life of the part." Hr'g Tr. at 170:13-24. By contrast, Gel Blaster's alleged trade secret has a perpendicularly oriented switch that is contacted directly, not progressively. *Id.*, at 134:18-135:17.

7. <u>Gel Blaster presented no evidence that Hasbro used the alleged confidential information and presented no evidence that contradicts Mr. Tino's testimony</u>. In fact, Gel Blaster's Mr. Cline identified the substantial design differences between the alleged secret and the Mythic at least with respect to: (1) the location of the motor, *see id.* at 133:8-12; (2) the location and orientation of the gearbox, *id.* at 133:11-16; (3) the shape of what Gel Blaster refers to as the "PISCA," *id.* at 135:1-12.

2

8. With respect to the alleged PISCA plus PFM combination itself, Mr. Cline agreed that the manner in which the alleged "PISCA" in the Mythic contacts the physical switch differs from that in the CAD drawings that Gel Blaster shared with Hasbro, *id.* at 135:13-17; *see also* Dkt. 45-4 (comparing PFM and Mythic).

C. **Gel Blaster Has Not Shown Value or Harm**

1. Money damages are sufficient. Mr. Cline testified that no Gel Blaster product uses the alleged trade secret. Hr'g Tr. at 111:13-21. Mr. Guinn admitted that the Mythic does not have any of the advantageous features purportedly allowed by the alleged trade secret. Hr'g Tr. at 69:3-21.

2. Mr. Cline testified that regardless of whether Hasbro used the alleged trade secret or not, the Mythic "would have the same look to the customer." *Id.* at 119:16-21.

3. Mr. Kleinman testified that to "whatever extent the Mythic is using a switch mechanism and firing control that has not led to customers particularly being impressed with the firing performance of the Mythic." Hr'g Tr. at 192:15-22; *see also id.* at 191:23-192:8.

4. Mr. Kleinman testified that Gel Blaster has "about … three times the market share of Hasbro." Hr'g Tr. at 193:18-22 and that "Gel Blaster, the brand, was number one at about 47 percent" and "NERF was around 15." *Id.* at 193:7-17. Mr. Kleinman also testified that there are multiple competitors in the market for Gel Blaster. *See* Kleinman at 193:23-194:3 (agreeing that "if Hasbro left the gel ball market tomorrow," "Gel Blaster, the company [would] still have competition for gel ball blasters.)"

D. **Hasbro and Its Retailers Will Be Harmed by an Injunction**

1. Mr. Kleinman testified that "removing [the Mythic] from the shelf, to the consumer it would look like a recall and would have recourse against the rest of our business and would tarnish the NERF brand," H'rg Tr. at 199:21-200:7.

2. Mr. Kleinman testified that "remov[ing] the product from the shelf … would make it more difficult for [Hasbro] to convince a retailer to take [Hasbro's] product in the future." *Id.* at 202:17-24; *see also* Dkt. 45-2 ¶¶ 9-11 (detailing harm to Hasbro's retailer relationships).

3. Retailers rely on "planograms" for their shelf space that are set far in advance. H'rg Tr. at 200:18-201:3 (Kleinman).

E. **Any Injunction Should Be Narrowly Tailored**

1. If issued, an injunction should be limited to use of the specified confidential information in a commercial product. *See* Dkt. 29-17 (Gel Blaster's proposed order) at 4-5; H'rg Tr. at 64:12-14; 118:15-18. In light of the substantial financial impact to Hasbro (*see* Dkt. 45-2 ¶ 21 (under seal)), the bond should at least be commensurate with this calculated harm.

Dated: February 3, 2023

Respectfully Submitted,

FISH & RICHARDSON P.C.

By: */s/ David M. Hoffman*
    David M. Hoffman
    Texas Bar No. 24046084
    hoffman@fr.com
    111 Congress Avenue, Suite 810
    Austin, TX 78701
    Tel: (512) 472-5070
    Fax: (512) 320-8935

    David Barkan (*admitted in W.D. Tex*)
    California Bar No. 160825
    barkan@fr.com
    Olivia T. Nguyen (*pro hac vice*)
    onguyen@fr.com
    500 Arguello Street, Suite 400
    Redwood City, CA 94063
    Tel: (650) 839-5070
    Fax: (650) 839-5071

    Ethan J. Rubin (*pro hac vice*)
    erubin@fr.com
    Alexander Pechette (*pro hac vice*)
    pechette@fr.com
    One Marina Park Drive
    Boston, MA 02210-1878
    Tel: (617) 542-5070
    Fax (617) 542-8906

**COUNSEL FOR DEFENDANT AND COUNTER-PLAINTIFF, HASBRO, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) on February 3, 2023, and was served via CM/ECF on all counsel of record.

*/s/ David M. Hoffman*
David M. Hoffman
