```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                         AUSTIN DIVISION

 3   GEL BLASTER, INC.,                    ) AU:22-CV-00828-LY
                                           )
 4       Plaintiff,                        )
                                           )
 5   v.                                    ) AUSTIN, TEXAS
                                           )
 6   HASBRO, INC.,                         )
                                           )
 7       Defendant.                        ) JANUARY 24, 2023

 8           ********************************************
                  TRANSCRIPT OF MOTIONS HEARING
 9             BEFORE THE HONORABLE LEE YEAKEL
             ********************************************
10

11   APPEARANCES:

12   FOR THE PLAINTIFF:   ANDREW J. BROADAWAY
                          CORNELL SMITH MIERL AND BRUTOCAO
13                        1607 WEST AVE
                          AUSTIN, TEXAS 78701
14
                          LANA M. ROWENKO
15                        WILLIAM CREEGER PETIT
                          IVAN F. MORALES
16                        KELLEY DRYE & WARREN LLP
                          515 POST OAK BOULEVARD, SUITE 900
17                        HOUSTON, TEXAS 77027

18                        SCOTT W. DOYLE
                          KELLEY DRYE & WARREN LLP
19                        3050 K STREET NW, SUITE 400
                          WASHINGTON, D.C. 20007
20
     FOR THE DEFENDANT:   DAVID M. HOFFMAN
21                        FISH & RICHARDSON P.C.
                          111 CONGRESS AVENUE, SUITE 810
22                        AUSTIN, TEXAS 78701

23                        ETHAN J. RUBIN
                          JEFFREY A. SHNEIDMAN
24                        FISH & RICHARDSON P.C.
                          ONE MARINA PARK DRIVE
25                        BOSTON, MASSACHUSETTS 02210
```

```
 1                         DAVID M. BARKAN
                           FISH & RICHARDSON P.C.
 2                         500 ARGUELLO STREET, SUITE 400
                           REDWOOD CITY, CALIFORNIA 94063
 3
     COURT REPORTER:       ARLINDA RODRIGUEZ, CSR
 4                         501 WEST 5TH STREET, SUITE 4152
                           AUSTIN, TEXAS 78701
 5                         (512) 391-8791

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by computerized stenography, transcript

25   produced by computer.
```

1                         **EXAMINATION INDEX**

2    COLIN GUINN
          DIRECT BY MR. PETIT . . . . . . . . . . . . . . . . 30
3         CROSS BY MR. HOFFMAN  . . . . . . . . . . . . . . . 60
          REDIRECT BY MR. PETIT . . . . . . . . . . . . . . . 75
4
     VINCENT CLINE
5         DIRECT BY MR. DOYLE . . . . . . . . . . . . . . . . 76
          CROSS BY MR. HOFFMAN  . . . . . . . . . . . . . . .100
6         REDIRECT BY MR. DOYLE . . . . . . . . . . . . . . .140
          RECROSS BY MR. HOFFMAN . . . . . . . . . . . . . . .145
7
     NICHOLAS TINO
8         DIRECT BY MR. HOFFMAN . . . . . . . . . . . . . . .147
          CROSS BY MR. DOYLE . . . . . . . . . . . . . . . . .172
9         REDIRECT BY MR. HOFFMAN . . . . . . . . . . . . . .189
          RECROSS BY MR. DOYLE  . . . . . . . . . . . . . . .190
10
     ADAM KLEINMAN
11        DIRECT BY MR. BARKAN  . . . . . . . . . . . . . . .191
          CROSS BY MR. PETIT . . . . . . . . . . . . . . . . .204
12

13

14

15

16

17

18                         **EXHIBIT INDEX**

19                                                 OFFD/ADM
     Plaintiff
20    2                                            43   43

21    19                                          208  208

22    22                                           43   43

23    24                                           79   80

24    25-31                                        85   86

25    34                                          212  212

**EXHIBIT INDEX (CONT'D)**

|  | OFFD/ADM |
|---|---|
| Defendant | |
| 1 | 153  155 |
| 2 | 151  151 |
| 3 | 154  155 |
| 4 | 130  130 |
| 5 | 162  162 |
| 6 | 113  114 |
| 7 | 164  164 |
| 8 | 166  166 |
| 9 | 169  169 |
| 10 | 168  168 |
| 12 | 170  170 |
| 36 | 71   71 |
| 41 | 135  136 |
| 43 | 130  130 |
| 50 | 130  130 |
| 60 | 153  155 |
| 62 | 155  155 |
| 63 | 155  155 |
| 65 | 113  114 |
| 72 | 146  146 |
| 300 | 158  158 |

| | | |
|---|---|---|
| 09:33:06 | 1 | (Open court) |
| 09:33:06 | 2 | THE COURT:  I can tell that I did not properly |
| 09:33:08 | 3 | analyze this case, because there's way too many people here for |
| 09:33:12 | 4 | a preliminary hearing such as the ones I have in front of me. |
| 09:33:20 | 5 | But we're here on the motions in Cause Number 22-CV-828, |
| 09:33:24 | 6 | *Gel Blaster, Incorporated v. Hasbro, Inc.* |
| 09:33:28 | 7 | Let me start with the plaintiff, and tell me who is |
| 09:33:32 | 8 | here, please. |
| 09:33:33 | 9 | MR. BROADAWAY:  Yes, Your Honor.  This is Andrew |
| 09:33:35 | 10 | Broadaway of Cornell Smith on behalf of Plaintiff Gel Blaster. |
| 09:33:38 | 11 | I also bring with me my colleagues from the law firm of Kelley |
| 09:33:42 | 12 | Drye, Scott Doyle, Will Petit, Lana Rowenko, and Ivan Morales. |
| 09:33:51 | 13 | THE COURT:  All right.  Thank you.  And for the |
| 09:33:53 | 14 | defendant? |
| 09:34:00 | 15 | MR. HOFFMAN:  Good morning, Your Honor. |
| 09:34:00 | 16 | David Hoffman from Fish Richardson on behalf of Hasbro.  I |
| 09:34:05 | 17 | bring with my colleagues, also from Fish, Mr. Ethan Rubin, |
| 09:34:06 | 18 | Mr. David Barkan, Mr. Jeff Schneidman, as well as |
| 09:34:11 | 19 | Mr. Adam Kleinman from Hasbro and Mr. Nicholas Tino from |
| 09:34:16 | 20 | Hasbro. |
| 09:34:16 | 21 | THE COURT:  All right.  Thank you-all. |
| 09:34:18 | 22 | I have initially in front of me here a couple of |
| 09:34:27 | 23 | motions to appear pro hac in this case from Mr. Schneidman and |
| 09:34:31 | 24 | Mr. Gold.  They appear to be in order, so I'm signing these |
| 09:34:36 | 25 | orders at this point and the pot will be right on anybody who |

| | | |
|---|---|---|
| 09:34:41 | 1 | gets up to speak. |
| 09:34:45 | 2 | Our order of business today will be we're going to go |
| 09:34:48 | 3 | straight through this morning until 11:30.  We -- won't take a |
| 09:34:53 | 4 | break unless something comes up between now and then.  And then |
| 09:35:00 | 5 | recess until 1:30 and then come back and finish up. |
| 09:35:05 | 6 | Again, I know that I didn't give you as much time as |
| 09:35:10 | 7 | you had requested, but I gave you more time than I could |
| 09:35:16 | 8 | conveniently give you.  For those of you from out of town, you |
| 09:35:23 | 9 | could not have a case in a worse court docket-wise to try to |
| 09:35:31 | 10 | have anything done on a hurry up basis.  We are underwater here |
| 09:35:35 | 11 | in Austin.  We haven't had a new judicial position in Austin |
| 09:35:38 | 12 | since 1991.  And unless you've been living in a cave somewhere, |
| 09:35:46 | 13 | you know that Austin's population and the Austin Division |
| 09:35:49 | 14 | population has more than doubled during that period. |
| 09:35:52 | 15 | Your Congress has no sympathy or even any interest in |
| 09:35:57 | 16 | the business of the courts.  And neither party has any stomach |
| 09:36:04 | 17 | to create new judicial positions, so we are -- if you accept |
| 09:36:08 | 18 | the proposition, and I assure you you should, that the legal |
| 09:36:14 | 19 | activity in an area is pretty much in direct relation to the |
| 09:36:17 | 20 | population in an area, you put more people in an area, more |
| 09:36:22 | 21 | people sue one another, more crimes get committed, our dockets |
| 09:36:28 | 22 | have doubled in those 32 years from 1991, and we're still |
| 09:36:35 | 23 | dealing with them with the same number of people and the same |
| 09:36:38 | 24 | number of judges. |
| 09:36:38 | 25 | So you will not be counted down if you proceed |

```
09:36:42   1   expeditiously and don't take the two and a half hours apiece
09:36:48   2   that I've allotted to you.  So, with that having been said,
09:36:53   3   have you had any discussions about how you want to proceed or
09:36:58   4   the method we should follow, because I'm open-minded on it.
09:37:02   5        MR. BROADAWAY:  Yes, Your Honor.  I believe both
09:37:04   6   parties are in agreement that because the motion for
09:37:06   7   preliminary injunction is the one that we'll both be presenting
09:37:09   8   witnesses on, that we want to proceed straightaway with that
09:37:12   9   and then take up any other ancillary matters after the close of
09:37:18   10  that.
09:37:18   11       MR. HOFFMAN:  We agree, Your Honor.
09:37:19   12       THE COURT:  That's fine.  So let me encourage
09:37:27   13  you-all, because some of you are not normally in this court and
09:37:30   14  are not immediately recognizable to me, each time any lawyer
09:37:33   15  gets up to present, state your name just so the court reporter
09:37:37   16  can have you down.  Now, you don't have to do that after the
09:37:41   17  first time you start examining a witness; you can go back and
09:37:44   18  forth on that.  But we want to make sure we have the record
09:37:47   19  straight on this.
09:37:48   20       So at this time the movant may proceed with evidence
09:37:56   21  on the request for preliminary injunction.
09:38:00   22       MR. BROADAWAY:  Very good, Your Honor.  We've
09:38:01   23  prepared -- Mr. Doyle has prepared a brief opening to frame the
09:38:04   24  issues.  And I understand that --
09:38:06   25       MR. HOFFMAN:  We do as well.  We have a brief opening
```

09:38:08  1  as well.

09:38:09  2          THE COURT:  All right.  That will be fine.

09:38:10  3          And, Ms. Oakes, for clock purposes, the openings and

09:38:14  4  closings as well as the evidence will be on the clock for the

09:38:16  5  parties.

09:38:16  6          MR. BROADAWAY:  Okay.  Thank you, Your Honor.

09:38:18  7          THE COURT:  Thank you.

09:38:20  8          MR. DOYLE:  Good morning, Your Honor.

09:38:33  9          THE COURT:  Good morning.

09:38:34  10          MR. DOYLE:  My name is Scott Doyle, and I'm

09:38:40  11  representing the plaintiff in this action, Gel Blaster.

09:38:46  12          Your Honor, Gel Blaster is seeking extraordinary

09:38:48  13  relief, but it's commensurate with an extraordinary set of

09:38:52  14  facts.  This story is as old as time.  This is a story of a

09:38:59  15  behemoth company, while cloaking itself as a benevolent giant

09:39:04  16  wanting to help a startup, gave the trust of that startup and

09:39:09  17  friendship.  That startup began right here in Austin, Texas,

09:39:14  18  Your Honor, named Gel Blaster.

09:39:17  19          After gaining that trust, Hasbro induced Gel Blaster

09:39:22  20  to share its most valuable trade secrets, literally anything

09:39:27  21  and everything involving Gel Blaster's business, to Hasbro.

09:39:33  22          Now, this was done under a mutual confidentiality

09:39:39  23  agreement.  And so this was all confidential information, and

09:39:41  24  it literally contains Gel Blaster's top trade secrets.

09:39:48  25          When learning the size of the prize and how large

09:39:53   1   this Gel Blaster toy gun market actually is and how explosive

09:39:59   2   the growth is, they took the trade secrets from Gel Blaster,

09:40:05   3   incorporated them into their own gun called a Mythic, and

09:40:12   4   rushed to the market after kicking Gel Blaster to the side,

09:40:17   5   causing unquantifiable loss to its goodwill and reputation in

09:40:24   6   this extremely fast-growing market.

09:40:29   7           But they made a mistake.  One of the key trade

09:40:32   8   secrets called the physical firing mechanism, which we'll go

09:40:36   9   through today, and both Mr. Colin Guinn and Vincent Cline will

09:40:41  10   testify about, was stolen.  They put it in the Mythic so they

09:40:48  11   could get to market quickly.  But this physical firing

09:40:51  12   mechanism has not even been used in a Gel Blaster gun yet.  In

09:40:57  13   fact, it's not in the marketplace at all.  And it's easy to see

09:41:02  14   as we go through these slides.

09:41:06  15           This is a depiction of the Gel Blaster Surge.

09:41:12  16   Gel Blaster was founded by Colin Guinn in Austin, launching its

09:41:18  17   first product at the end of 2020.  Gel Blaster was disruptive.

09:41:26  18   They had a grassroots effort, drove around in a van from park

09:41:30  19   to park, store to store in Austin, trying to get headway and

09:41:36  20   get these stores to sell the Gel Blaster.

09:41:40  21           Well, in these two years they've become extremely

09:41:44  22   successful.  They are now the market leader, and they sell

09:41:47  23   their products in some of the largest outlets in the

09:41:51  24   United States, including Walmart, Target, Costco, and online on

09:41:58  25   amazon.com and on its own website.

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
| 09:42:01 | 1  | So what are those blasters?  What do they do?  Well, |
| 09:42:05 | 2  | they shoot water beads.  These water beads can be shot with a |
| 09:42:10 | 3  | high velocity, but they're safe.  They dissolve instantly on |
| 09:42:16 | 4  | impact and they can go multiple rounds per second.  Gel |
| 09:42:21 | 5  | Blaster's products are a market improvement on paint ball or |
| 09:42:24 | 6  | foam dart products because the water-based ammunition |
| 09:42:29 | 7  | disintegrates on contact, it doesn't leave any stain, and |
| 09:42:33 | 8  | there's no cleanup. |
| 09:42:34 | 9  | The blaster we're looking at here is called the |
| 09:42:38 | 10 | Surge, but Gel Blaster also offers other toy guns, including |
| 09:42:46 | 11 | the Gel Blaster StarFire. |
| 09:42:50 | 12 | Well, Hasbro took notice.  Hasbro, the maker of NERF, |
| 09:42:55 | 13 | one of the largest toy companies in the world, reached out to |
| 09:43:00 | 14 | Gel Blaster in April 2021.  They wanted to license the NERF |
| 09:43:07 | 15 | brand to Gel Blaster and get into this business. |
| 09:43:10 | 16 | Almost immediately the parties began discussing a |
| 09:43:14 | 17 | joint go-to-market strategy with a jointly developed product |
| 09:43:19 | 18 | and moved very quickly to bring this product to market in the |
| 09:43:23 | 19 | spring of 2022.  As part of that effort, Hasbro brought its |
| 09:43:35 | 20 | very senior executive, including now-president Eric Nyman and |
| 09:43:39 | 21 | its head of licensing, Casey Collins and they flew to Texas. |
| 09:43:41 | 22 | Over a two-day period over at the Factory at the Omni, they |
| 09:43:46 | 23 | reached principle deal terms.  Hasbro would pay $12 million to |
| 09:43:51 | 24 | Gel Blaster.  In exchange, Hasbro would receive a 25 percent |
| 09:43:56 | 25 | equity stake in Gel Blaster. |

| | | |
|---|---|---|
| 09:44:00 | 1 | After they reached the deal, they had a good ol' |
| 09:44:06 | 2 | time.  They went on a boat, did wake skiing.  They also here |
| 09:44:11 | 3 | had a lot of fun with the Gel Blasters in the backyard of a |
| 09:44:15 | 4 | Gel Blaster investor, at the invitation of Colin Guinn, the CEO |
| 09:44:19 | 5 | and founder of Gel Blaster. |
| 09:44:21 | 6 | You can see Mr. Collins on the left in his light blue |
| 09:44:25 | 7 | shirt, and you can see Mr. Nyman, who is now the president of |
| 09:44:29 | 8 | Hasbro, in the black shirt enjoying, having a great time.  It |
| 09:44:33 | 9 | was a fabulous weekend, and it really cemented a tight, close |
| 09:44:38 | 10 | relationship between the parties. |
| 09:44:39 | 11 | In fact, two days later, Eric Listenberger, head of |
| 09:44:43 | 12 | product development for Hasbro, sent out this e-mail.  He said, |
| 09:44:48 | 13 | This is shaping up to be a killer partnership.  He agreed that |
| 09:44:52 | 14 | we are one team now working together to get this product to |
| 09:44:57 | 15 | market as quickly as possible. |
| 09:45:00 | 16 | Two of the Hasbro core members that were working with |
| 09:45:04 | 17 | Gel Blaster, Adam Kleinman, an executive, and Nick Tino, one of |
| 09:45:10 | 18 | the engineers, with Gel Blaster through this entire process, |
| 09:45:16 | 19 | they're here in the courtroom today, and Hasbro is putting them |
| 09:45:20 | 20 | as witnesses. |
| 09:45:21 | 21 | Now, one thing that Hasbro did -- I'm sorry -- that |
| 09:45:29 | 22 | Gel Blaster did, they had a meeting set up with Walmart to get |
| 09:45:33 | 23 | guns -- toy guns into the markets across the United States. |
| 09:45:39 | 24 | Gel Blaster was kind enough to bring Hasbro along and to go |
| 09:45:43 | 25 | through the outline and the strategy for bringing this jointly |

09:45:48  1   developed product to market.  Here's a rendering that was made

09:45:52  2   at the time, showing this Gel Blaster and Hasbro NERF Pro

09:45:59  3   Gel Blaster and this was provided to the Walmart buyer.

09:46:04  4           I think Hasbro really woke up during this meeting

09:46:08  5   because the -- the Walmart buyer said, You-all, I'm not sure

09:46:14  6   you, Hasbro, can make enough of these to fill our shelves.  In

09:46:19  7   2023 she wanted over 2 1/2 million Blaster products to be put

09:46:25  8   on the Walmart shelves.  Hasbro at this time finally got the

09:46:30  9   size of the prize.

09:46:36  10          At this point in time Hasbro started really asking

09:46:39  11  for anything and everything, and Gel Blaster was fine with that

09:46:46  12  because they now were a partnership working together, good

09:46:49  13  friends.  But they still wanted a mutual confidentiality

09:46:55  14  agreement, and they got it.  And this is a very strong

09:46:58  15  agreement, Your Honor.

09:46:59  16          This says essentially that any confidential

09:47:02  17  information that was provided by one party to a recipient

09:47:07  18  remain confidential.  And any notes, evaluation, analysis, or

09:47:13  19  any derivative information would also be confidential.

09:47:16  20          Not only that, but it had very strong nonuse clauses.

09:47:23  21  It said the purpose of this material is for evaluation only for

09:47:26  22  a transaction.  You may not use it in your own gun and compete

09:47:33  23  with the other company with the confidential information of the

09:47:36  24  other party.

09:47:37  25          Both parties understood this language, and this is

09:47:40   1   the strong language in the confidentiality agreement on the

09:47:43   2   screen now.

09:47:45   3         As a result of that, Hasbro requested Gel Blaster

09:47:53   4   comply by providing its deepest secrets on everything.  CAD

09:47:58   5   drawings, computer-aided design, I liken these to the

09:48:02   6   architectural plans for a house.  They're two inches thick that

09:48:08   7   show all the designs, all the measurements, how all the

09:48:13   8   components operate, the functional flow, everything you need to

09:48:19   9   build a Gel Blaster on your own.

09:48:20   10        And over and over there's e-mails asking for testing

09:48:26   11   results, Gel Blaster's market strategies.  Gel Blaster

09:48:30   12   introduced Hasbro to its contacts in China who could actually

09:48:35   13   make Gel Blasters.  Pricing information and clients.  All of

09:48:40   14   this was provided by Gel Blaster under the terms of the

09:48:45   15   agreement.

09:48:49   16        Well, after providing all this information and having

09:48:53   17   this partnership, Hasbro came back and tried to re-trade the

09:48:59   18   deal.  They provided much more onerous client terms,

09:49:05   19   essentially, half of what they had originally promised in the

09:49:08   20   term sheet.  Gel Blaster could do nothing but say no.

09:49:13   21        But I will say this:  Colin Guinn will testify today

09:49:20   22   about saying that he was amicable.  The breakup was amicable.

09:49:25   23   Gel Blaster was fine competing with Hasbro in the marketplace

09:49:32   24   fairly.  And that's unfortunately where this story starts to

09:49:39   25   take a dark and ominous turn.

09:49:43    1          And I guess, perhaps Gel Blaster should have had
09:49:47    2    notice of this when Eric Nyman, the president of Hasbro, sent a
09:49:53    3    nice little snippet over to Colin and said:  Life's a journey.
09:50:00    4    Great pleasure meeting you.  Hope we cross paths again.  And
09:50:04    5    then, strangely enough, as you invent new things, think of
09:50:10    6    Hasbro.  Very strange at the termination of a relationship.
09:50:16    7    Hasbro is essentially still asking for Gel Blaster's
09:50:20    8    inventions.
09:50:21    9          Now, I will say the mutual confidentiality agreement
09:50:24   10    remains in place until 2024.  So those terms are still in
09:50:29   11    effect, Your Honor.  Well, what happened?
09:50:33   12          Well, taking a step back, and it's not a subject yet
09:50:38   13    of this lawsuit, but there's patents.  You might have seen that
09:50:43   14    Hasbro asserted two patents against Gel Blaster.  Now, these
09:50:49   15    patents, it's interesting, because Hasbro during this tight
09:50:53   16    relationship with Gel Blaster said, You know what?  We found
09:50:59   17    these two patents from some company called Spin Master.  Could
09:51:03   18    we work with you-all and see if we can defend against these
09:51:07   19    patents before we enter this market?
09:51:10   20          Gel Blaster said sure.  And they spent hours and
09:51:15   21    hours working with an attorneys, looking for noninfringement
09:51:21   22    positions, speaking with chemical experts, and also looking for
09:51:24   23    prior art to invalidate the patents.  Hasbro was impressed.
09:51:33   24    They said, We agree with you.  These patents are defensible,
09:51:37   25    and they're not that strong.  In fact, Hasbro signed a common

09:51:40  1  interest agreement with Gel Blaster to come up with joint

09:51:46  2  defenses and work together and share privileged information to

09:51:51  3  defend against these patents.

09:51:55  4         So imagine the shock and betrayal when, all of a

09:52:00  5  sudden, they may wake up in July, well, Hasbro went behind the

09:52:06  6  chicken coop and secretly purchased these patents from Spin

09:52:12  7  Master.  They took an exclusive license, and they sued

09:52:16  8  Gel Blaster on the very same patents that they're in a common

09:52:22  9  interest agreement, which still exists today because they never

09:52:24  10  got out of it, to defend against the patents.  Peyton Healy the

09:52:31  11  COO of Gel Blaster, thought it was a joke.  And I must say, in

09:52:36  12  my 30 years of practice, I have never heard of anything like

09:52:39  13  this.  To add insult to injury, Your Honor, not only that, but

09:52:45  14  they introduced -- they got to the market quickly, and this is

09:52:49  15  actually on all the shelves and stuff in September of this

09:52:52  16  year, with something called the NERF Gelfire Mythic.

09:52:59  17         Well, when this came out, Gel Blaster went and

09:53:04  18  ordered a copy, four copies to be exact, looked at it, and

09:53:09  19  said, Wow.  When they took it apart, they said this looks just

09:53:15  20  like ours.  In fact, the physical firing mechanism we're going

09:53:19  21  to speak about in a minute, what is a Gel Blaster innovation,

09:53:22  22  which still hasn't made it to the market and nobody else has

09:53:26  23  ever done this before, is right there in the Mythic.  And

09:53:31  24  that's how this baby works.

09:53:38  25         I will be brief in my discussion of what this is,

09:53:41  1  Your Honor.  Looking at this, we actually have an animation on

09:53:49  2  the next slide, but I wanted to point out just a couple of

09:53:52  3  things, Your Honor.  You might see a blue kind of tube-looking

09:53:56  4  device.  That's called a plunger.  And up above that plunger,

09:54:03  5  there's an arm protruding.  It's blue.  It comes straight up

09:54:08  6  from the plunger, and then it does a 90-degree turn to the rear

09:54:10  7  of the gun.

09:54:12  8      Now if you look over to the left, there's a green

09:54:15  9  box.  That's a switch, an electronic switch.  So what happens,

09:54:20  10  Your Honor, this controls the firing of the gun.  So that if

09:54:25  11  you look down, there's a white trigger.  Now, again, this is --

09:54:29  12  this is a CAD drawing rendering that Gel Blaster did of its

09:54:35  13  future gun that was provided to Hasbro.

09:54:39  14      So you'll see that when you pull the trigger, that

09:54:42  15  trigger will hit that orange switch.  When it does that, it

09:54:46  16  sends a signal to a motor.  The motor gets those gears turning.

09:54:51  17  And when those gears start turning, that plunger assembly,

09:54:57  18  which is the tube-looking structure, starts moving backwards.

09:55:00  19      Now, the arm that's above the plunger, we're calling

09:55:06  20  that the plunger-integrated switch contact arm, it will hit

09:55:09  21  that switch over to the left.  When it hits that switch, a

09:55:15  22  signal is sent, the shot is recorded, and a signal is sent to

09:55:19  23  the motor to shut off.  And a fire is -- and a gellet is

09:55:24  24  released from the gun.  That's how it works.  It's simple,

09:55:29  25  inexpensive, and works wonderfully.  And it's very accurate.

| | |
|---|---|
| 09:55:38 | 1 |

The switch is blown up.  That's called a PISCA

switch.  When that little door gets hit by the arm, that's what

sends the signal.  And on the other side is the

plunger-integrated switch contact arm.  I'm going to show you

an animation here if I can figure out how to work this.  There

it goes.

Trigger gets pulled, switch, gears rotate, plunger

goes backwards.  You see the plunger-integrated arm hits it,

signal is sent, turn off the motor.  That's it.  It's a very

straightforward operation.  It's economical, it's reliable, and

guess what?  It's not on the market, and it wasn't on the

market until Mythic and Hasbro, on its Mythic, put it on the

market.  It's a valuable trade secret, Your Honor.

In fact, on the basis of that.

THE COURT:  Stop just a minute.  Tell me what PISCA

stands for again.

MR. DOYLE:  Plunger-integrated switch contact, and I

always remember it as the arm.  Arm is the last -- it's an arm.

It protrudes from the top, goes to the left.  It's an arm that

goes and strikes the switch.

THE COURT:  No.  I understand what it is.  It's just,

in technical cases we get involved with the initialisms and the

acronyms way too much.

MR. DOYLE:  And I apologize, Your Honor.

THE COURT:  That's all right.

09:57:18  1        MR. DOYLE:  When I first got out of college, I was an

09:57:20  2   employee engineer working for the government.  And the acronyms

09:57:23  3   would drive me crazy.

09:57:25  4        But, anyway, Gel Blaster kept this secret.  It was

09:57:30  5   maintained on Gel Blaster's secure servers.  Access was limited

09:57:35  6   to four or five engineers and a couple of executives like Colin

09:57:40  7   Guinn.  Passwords required.  You weren't allowed to talk about

09:57:45  8   the PFM outside of that small group.  It was treated as highly

09:57:52  9   confidential.

09:57:52  10       When it had to be shared with a contractor, for

09:57:55  11  example, the Chinese, who was actually going to make it, there

09:57:58  12  is a nondisclosure agreement.  And, of course, the mutual

09:58:02  13  confidentiality agreement signed between Hasbro and

09:58:07  14  Gel Blaster.

09:58:09  15       Well, lo and behold, look at what we've got here.  On

09:58:16  16  the left side is exactly the Gel Blaster drawings I mentioned

09:58:20  17  before.  Gel Blaster has not put this on the market yet.  They

09:58:24  18  wanted to keep it secret so they could put it in the Surge Pro,

09:58:28  19  which will be released in 2023.  And, Your Honor, when you look

09:58:31  20  to the right, that's the Mythic.  That is the Hasbro gun on the

09:58:38  21  right.

09:58:39  22       Now, let's just take a quick look at that, because

09:58:42  23  this isn't too difficult to understand.  Now that thing we were

09:58:47  24  calling the PISCA, but I'm just going to call it "the arm,"

09:58:52  25  okay?  There's a white arm that comes up from the plunger, and

09:58:59  1  you might see it extends to the left.  There's a 90-degree

09:59:04  2  extension.  That's indicated by the red circle.  And if you

09:59:08  3  look over at Gel Blaster's plans, there's a red circle there.

09:59:14  4          Now, we talked about a switch, how that arm hits the

09:59:20  5  switch.  And in Gel Blaster it's shown with the green circle.

09:59:26  6  Over here there's a green circle around an identical switch.

09:59:31  7  All they did was, instead of having the switch go north, south

09:59:36  8  or up down, they just put it on the side.  But it works the

09:59:40  9  same way.  When the -- when that plunger starts going to the

09:59:48  10  left, that arm hits the switch.  When that switch is hit, a

09:59:52  11  signal is sent to the motor which turns off the motor,

09:59:56  12  indicating the end of the firing cycle.

09:59:58  13          This operation is identical to what I just described.

10:00:08  14  This is the Mythic's firing operation.  User pulls trigger.

10:00:12  15  Down there at the bottom, the trigger contacts a switch, sends

10:00:15  16  a signal to the electronic board, which then sends a signal to

10:00:21  17  get those gears turning, that plunger moves backward, the arm,

10:00:25  18  or the PISCA, contacts the PISCA switch near the back of the

10:00:31  19  blaster, which signals the electronic board that a shot has

10:00:36  20  occurred, and the motor is shut off.  This is identical to the

10:00:41  21  operation of Gel Blaster's trade secret physical firing

10:00:46  22  mechanism.

10:00:49  23          Now you're going to here today Hasbro has worked

10:00:58  24  mightily to go look all over to find something similar.  And

10:01:01  25  they're going to say, you know, we've been doing this for a

| | | |
|---|---|---|
| 10:01:05 | 1 | long time and we looked back at 2014.  And we had some NERF gun |
| 10:01:10 | 2 | called the NERF Stampede.  And that NERF Stampede has |
| 10:01:15 | 3 | something, you know, that's really a plunger-based mechanism. |
| 10:01:21 | 4 | Well, you can just take a look at it, Your Honor.  There's no |
| 10:01:22 | 5 | PISCA.  There's no arm on top of -- there's no arm on top of |
| 10:01:26 | 6 | the plunger.  There's no switch up there.  This is a completely |
| 10:01:31 | 7 | different contraption with all these other components.  Does it |
| 10:01:36 | 8 | work?  Yeah, it works.  But it's not the same.  It's not the |
| 10:01:40 | 9 | trade secret. |
| 10:01:41 | 10 | Then I guess realizing that's not the case, because |
| 10:01:45 | 11 | they also needed to show that the gun could fire single mode, |
| 10:01:51 | 12 | one shot, or automatic, what they did -- and this is |
| 10:01:57 | 13 | incredible -- Hasbro said, Well, you know what?  We actually |
| 10:02:00 | 14 | saw on the Internet somebody named "Darthskids," one of these |
| 10:02:05 | 15 | Internet folks that does stuff.  And I guess this guy or |
| 10:02:09 | 16 | lady -- don't know who they are; they don't work for Hasbro -- |
| 10:02:13 | 17 | they put something up on the Internet how they did some stuff |
| 10:02:19 | 18 | and rearranged some switches, and now they can do automatic |
| 10:02:24 | 19 | mode.  That's not the same either.  And I'm shocked that Hasbro |
| 10:02:27 | 20 | says they actually develop guns based on people that put stuff |
| 10:02:29 | 21 | up on the Internet. |
| 10:02:30 | 22 | Your Honor, Gel Blaster has been and is continuing to |
| 10:02:36 | 23 | be harmed.  The parties agree to this.  In the mutual |
| 10:02:40 | 24 | confidentiality agreement, they agree that money damages |
| 10:02:44 | 25 | wouldn't be sufficient to remedy this breach, and that either |

10:02:47  1  party could seek injunctive relief.  And that's what we're

10:02:51  2  doing here, Your Honor.

10:02:52  3       Hasbro and Gel Blasters are 100 percent direct

10:02:57  4  competitors in this market.  There's not really that many

10:03:02  5  companies, maybe four or five, that have market share.  You'll

10:03:05  6  hear from Colin Guinn today, who will tell you that Hasbro is

10:03:09  7  Gel Blaster's number one competitor.

10:03:16  8       Now, how does this hurt?  Well, Your Honor, this

10:03:19  9  hurts like crazy because Gel Blaster became the market leader

10:03:25  10 based on -- based on its innovation and its reputation for

10:03:30  11 innovation and getting these guns to the market.  In fact, it

10:03:33  12 founded the gel bead market in the United States.

10:03:40  13      As the Walmart buyer said, this market is growing by

10:03:45  14 leaps and bounds.  It's impossible to quantify lost sales.

10:03:51  15 It's impossible to quantify damages.  Gel Blaster needs this

10:04:01  16 injunction to stop the bleeding.

10:04:04  17      Now, this is a really busy slide.  I hate it.  But it

10:04:10  18 really depicts something.  I have to admit I'm not really of

10:04:13  19 this cool Internet age.  My daughter is.  She's 15.  She loves

10:04:19  20 a fellow named Mr. Beast.  He's what's called an Internet

10:04:23  21 influencer.  Well, Hasbro has paid him a bunch of money to do

10:04:29  22 these little videos with the Hasbro Mythic, and then the Mythic

10:04:33  23 is going to be updated, and they're going to have a gun called

10:04:38  24 Mr. Beast.  Both of these include Gel Blaster's firing

10:04:42  25 mechanism.

```
10:04:43   1          Your Honor, if you look down right underneath the
10:04:45   2   picture of Mr. Beast, this is shocking to me and it floored me,
10:04:51   3   101,563,353 views.  Over 101 views of this guy's ad.  This
10:05:09   4   guy's an influencer.  He's stealing, and Hasbro is stealing,
10:05:14   5   customers from Gel Blaster.  One month before this number of
10:05:19   6   101 million views, it was 70 million.  In one month it went up
10:05:24   7   by 30, also showing the direct competition.
10:05:28   8          Look over to the left.  That's -- on the very
10:05:31   9   left-hand side, that's the Target signal, Target meaning the
10:05:34  10   store.  If you look at the very top, you see the Gel Blaster.
10:05:38  11   That's Gel Blaster's Surge.  Right underneath it is Gel
10:05:44  12   Blaster's StarFire.  But guess what?  Right underneath that is
10:05:48  13   the Hasbro Mythic containing all of our innovations that we
10:05:53  14   haven't even been able to put on the marketplace yet.  There it
10:05:56  15   is.
10:05:57  16          And on the right-hand side you'll see accessories,
10:06:01  17   Your Honor.  They haven't put up any argument about this.  But
10:06:06  18   they're able to now reach in and slow our market with respect
10:06:10  19   to the gellets, the tubs for holding gellets, and everything
10:06:15  20   else.
10:06:19  21          Balance of harm, there's no doubt here.  This Mythic
10:06:22  22   Gelfire product for Hasbro is a drop in a bucket.  Hasbro, as
10:06:28  23   you know, has hundreds and hundreds of products.  It's a huge
10:06:32  24   company, multi-billion dollar company, whereas Gel Blaster's
10:06:37  25   entire business, its reputation is gel-based blasters.  That's
```

10:06:42  1    it.  They don't sell anything else.

10:06:46  2              Finally, with the bond, Hasbro says, oh, we need a

10:06:51  3    huge bond.  This is going to kill us, $20 million.  Well

10:06:57  4    Gel Blaster's net income for 2022 was only 2 1/2 million.  It

10:07:04  5    can't afford a bond.  And given the egregious nature of the

10:07:08  6    stealing that's gone on here, there should be no bond that

10:07:10  7    large.

10:07:11  8              Your Honor, I now submit my time.  Thank you very

10:07:14  9    much.  I hope that was clear and understandable.  Thank you.

10:07:18  10             THE COURT:  Thank you.

10:07:32  11             MR. HOFFMAN:  Your Honor, I have a paper copy of my

10:07:35  12   slides.  May I approach?

10:07:36  13             THE COURT:  Yes.  Good.  I was going to ask for a

10:07:44  14   copy of the other slides also.  Thank you.

10:08:02  15             You may proceed, Mr. Hoffman.

10:08:04  16             MR. HOFFMAN:  Thank you, Your Honor.  I appreciate

10:08:06  17   it.  I'll just be relatively brief, Your Honor.

10:08:09  18             I just want to start off by saying that Hasbro

10:08:12  19   disagrees with almost everything that Gel Blaster just said

10:08:19  20   about the dynamics between the parties.  The discussions

10:08:22  21   between Gel Blaster and Hasbro regarding an investment were

10:08:24  22   proceeding well until the parties reached one issue.  And while

10:08:28  23   Gel Blaster asserts that it is an innovator here, as it

10:08:33  24   mentioned, during the diligence, multiple patents were

10:08:36  25   uncovered that were owned by a company called Spin Master.

10:08:38  1  Those patents cover the core aspects of Gel Blaster's products.

10:08:45  2          When Hasbro inquired of Gel Blaster, what its

10:08:48  3  response was or if it had a license to these patents,

10:08:51  4  Gel Blaster told Hasbro:  Don't worry about it.  Let's just go

10:08:55  5  to market.

10:08:57  6          Well, Hasbro -- you know, Hasbro does worry about it.

10:09:01  7  Hasbro worries about willfully infringing the patents of

10:09:06  8  others..  So the deal broke down.  And as the parties agreed,

10:09:10  9  they went their separate ways, and Hasbro proceeded to develop

10:09:13  10  its own blaster.

10:09:16  11         Now, unlike Gel Blaster, before selling that blaster

10:09:20  12  to the market, Hasbro proceeded to get a license from Spin

10:09:25  13  Master.  To be clear, we -- Hasbro doesn't own these patents.

10:09:30  14  It has a license to the patents.  Unlike -- excuse me -- then,

10:09:35  15  in corporation with the patent owner, Hasbro filed suit in the

10:09:41  16  ITC against not just Gel Blaster, but ten different companies

10:09:48  17  that were infringing the patent, seven Chinese manufacturers

10:09:51  18  and three domestic companies.

10:09:55  19         The entire case -- this entire case, Your Honor, is a

10:09:59  20  response to Spin Master and Hasbro calling out Gel Blaster's

10:10:05  21  infringement.  But that's not the issue that we're here to

10:10:09  22  worry about today.  The issue today is whether or not

10:10:14  23  Gel Blaster has met the stringent requirements to receive the

10:10:17  24  most extraordinary relief possible: having its products removed

10:10:22  25  from store shelves before having a day in court before a jury.

```
10:10:27   1   And the answer to that is clearly no.
10:10:30   2           Gel Blaster's arguments are high on rhetoric, they're
10:10:34   3   high on accusations, but they don't focus and they don't make a
10:10:38   4   sufficient showing under any of the factors for establishing a
10:10:43   5   preliminary injunction.
10:10:50   6           Your Honor, I imagine you've heard of Hasbro.  I
10:10:52   7   think most people have.  But just for a little baseline, Hasbro
10:10:56   8   was founded in 1923.  They're a global play and entertainment
10:11:02   9   company.  They have many historic brands we've all heard of: My
10:11:05  10   Little Pony, Transformers, Play-Doh, Monopoly.  They are a
10:11:10  11   leader in the active toy market under the NERF brand.
10:11:15  12           So what are you going to hear today, Your Honor?
10:11:16  13   Well, you're going to hear focus from Hasbro on the four
10:11:20  14   factors that matter in determination of whether or not there
10:11:23  15   should be a preliminary injunction, and the evidence is going
10:11:25  16   to show, and the briefing showed, that Gel Blaster can't
10:11:30  17   establish its case on any of those factors.
10:11:33  18           Next slide, please.
10:11:35  19           So, Your Honor, we're here today, I'm sure about the
10:11:40  20   purported trade secret.  Originally in the complaint there was
10:11:44  21   nothing provided for the trade secret.  In the motion for
10:11:47  22   preliminary injunction, it was identified as a PFN, which is a
10:11:53  23   physical switch.  And then in the reply a new term, "PISCA,"
10:11:57  24   started showing up.  To be clear, this PISCA term was nowhere
10:12:01  25   in the complaint, it's nowhere in the original motion.  It only
```

10:12:05 1  shows up in the reply.  But it doesn't make a difference

10:12:08 2  whether or not it's a PFM or it's a PISCA, Hasbro did not use

10:12:15 3  Gel Blaster's confidential information.  There is no trade

10:12:19 4  secret here.

10:12:20 5         What they purport to be a trade secret has no value,

10:12:23 6  and they haven't quantified any damage at all to Gel Blaster.

10:12:28 7  The alleged PFM, the PISCA, they're not secret.  They are

10:12:33 8  well-known features in the industry.

10:12:40 9         Next slide, please.

10:12:41 10        And as I said, there's no -- there's no irreparable

10:12:46 11 harm here.  There's no way to meet the irreparable harm

10:12:48 12 standard.  As Mr. Doyle admitted, they don't use this purported

10:12:53 13 secret in any of their products.  They claim it's valuable, and

10:12:59 14 yet since the discussions 16 months ago, Gel Blaster has

10:13:02 15 released six different products.  None of them have the

10:13:07 16 physical switch.

10:13:08 17        They told Hasbro during the diligence that timing was

10:13:12 18 a far better way than using a physical switch.  They haven't

10:13:17 19 still identified a target date to release a product.  And,

10:13:20 20 indeed, again, until the reply brief, they hadn't even

10:13:24 21 identified a name for a product.  Their potential purported use

10:13:33 22 is just speculative.

10:13:39 23        And then if you look at this purported harm, their

10:13:42 24 actions, Your Honor, speak louder than words.  Mr. Doyle

10:13:44 25 admitted that they got ahold of a -- of a Mythic early on, and

10:13:48   1  we'll find out in the evidence how early on.  And he says they

10:13:52   2  opened it up immediately, and they say they saw the physical

10:13:55   3  switch in there.

10:13:56   4          All right.  This product was released -- announced by

10:13:58   5  Hasbro in July.  They waited three months from when they filed

10:14:06   6  their complaint before they approached the court for injunctive

10:14:09   7  relief.  Mr. Doyle says that they saw it immediately, and yet

10:14:12   8  they did nothing for almost 13 weeks.  And now they claim its

10:14:15   9  presence is irreparable.

10:14:17   10         But beyond that you'll here Gel Blaster has pled no

10:14:22   11 actual irreparable harm.  Their main argument is that the

10:14:29   12 confidentiality agreement somehow waives the requirement for

10:14:31   13 irreparable harm.  You'll see it simply doesn't, Your Honor.

10:14:34   14 What it does is it says they have a right to pursue injunctive

10:14:39   15 relief.  Obviously, they do.  We're all here.  No one disputes

10:14:42   16 that.  It doesn't relieve them of the need for them to show

10:14:46   17 irreparable harm, and they don't.

10:14:49   18         Beyond that, beyond this reliance on the -- on the

10:14:52   19 contract, the only harm they claim is that Hasbro and

10:15:02   20 Gel Blaster will be competing against one another during the

10:15:04   21 holiday season.  They focus on the holidays in the brief.  Even

10:15:08   22 putting aside that we're now in January, they filed their

10:15:10   23 motion November 14th under the default deadlines.  They weren't

10:15:14   24 going to get any relief until after Black Friday -- I mean,

10:15:17   25 even have a hearing until after Black Friday.

10:15:21  1          And as to Hasbro being a competitor, there's no basis
10:15:24  2   in the law to say that merely being a competitor is irreparable
10:15:30  3   harm.  And, indeed, while Gel Blaster asserts that Hasbro is, I
10:15:35  4   guess they say, their number one competitor, Hasbro is one of
10:15:38  5   many competitors in this space.  There is no evidence on the
10:15:44  6   record, none, that Gel Blaster has suffered any particular
10:15:48  7   harm, even a single lost sale.
10:15:52  8          Mr. Doyle says that it's incalculable.  Well, they
10:15:56  9   haven't tried to calculate it all.  You're not going to hear
10:15:59  10  evidence of any calculated -- any losses for sales.  And those
10:16:04  11  aren't even irreparable.  They don't identify a single lost
10:16:07  12  sale, and you'll hear that.
10:16:08  13         As to the balance of the harms factor, it's not even
10:16:11  14  close here, Your Honor.  Gel Blaster's only argument is that
10:16:15  15  they're a small company and Hasbro is a big company.
10:16:19  16         But that's far from the end of this story.  As you
10:16:22  17  heard them say, Your Honor, Gel Blaster sells more gel ball
10:16:27  18  blasters than Hasbro does.  In this space they are the bigger
10:16:30  19  company.  Gel Blaster has identified in their briefing no
10:16:35  20  specific financial harm that they've -- well, that they'll
10:16:42  21  suffer in the market, any lost sales in the market.
10:16:46  22         Hasbro, on the other hand, has presented and will
10:16:49  23  present quantifiable and considerable evidence that, if the
10:16:54  24  Mythic is -- about what happens if the Mythic is enjoined.
10:16:58  25  You'll hear about losses in prepurchased parts and inventory;

```
10:17:03   1   that even if Hasbro ultimately wins, will not be resalable.
10:17:06   2   You'll hear about losses in prepurchased advertising.  You'll
10:17:10   3   hear about losses of goodwill for an entire company if major
10:17:16   4   retailers are forced to pull products off the shelves.  You'll
10:17:19   5   hear about irreparable harm to reputation of the entire Hasbro
10:17:23   6   line if products are pulled off the shelves.
10:17:26   7          The economy is trending down again, and Gel Blaster
10:17:31   8   seeks to inflict tremendous financial loss on Hasbro.  All of
10:17:34   9   this is balanced against the generic assertion by Gel Blaster
10:17:39  10   that they're a small company.  And, as the Court will see, this
10:17:43  11   factor is just not even a close call.
10:17:46  12          With regard to the public interest, Your Honor,
10:17:49  13   again, not a close call.  The factor tilts towards Hasbro.
10:17:53  14   Removing Hasbro from the market would harm third-party
10:17:56  15   retailers, would harm consumers.  Planograms, which you'll hear
10:18:00  16   about, which are the way store shelves are set up to sell
10:18:05  17   products.  Those planograms are set months in advance.
10:18:09  18   Purchasing decisions have already been made for these
10:18:11  19   retailers.  If products are pulled off the shelves, there will
10:18:15  20   be potentially gaps in the shelves, it will hurt -- it will
10:18:18  21   hurt the retail market, it will hurt the consumer.
10:18:21  22          So across the board, Your Honor, you're going to
10:18:24  23   hear, and you can see from the briefing, that every factor here
10:18:28  24   tilts toward denying this motion.  There is no likelihood of
10:18:32  25   success on the merits you'll hear.  There's no secret here.
```

| | | |
|---|---|---|
| 10:18:36 | 1 | There's no trade secret.  There's no confidential information. |
| 10:18:39 | 2 | Even if there was, it's not being used by Gel Blaster -- I |
| 10:18:42 | 3 | mean, by Hasbro.  There's irreparable harm to Gel Blaster. |
| 10:18:46 | 4 | They can't show anything.  Balance of the harms, you're going |
| 10:18:50 | 5 | to see it tilts towards Hasbro and the public interest. |
| 10:18:54 | 6 | Thank you, Your Honor. |
| 10:18:54 | 7 | THE COURT:  Thank you. |
| 10:19:01 | 8 | Is Gel Blaster ready to present evidence? |
| 10:19:04 | 9 | MR. BROADAWAY:  Yes, Your Honor. |
| 10:19:04 | 10 | THE COURT:  All right.  You may proceed. |
| 10:19:18 | 11 | MR. PETIT:  Your Honor.  My name is Will Petit for |
| 10:19:21 | 12 | Gel Blaster.  We're going to call Colin Guinn to the stand. |
| 10:19:24 | 13 | While we're doing that, Mr. Guinn is coming up, I've |
| 10:19:25 | 14 | got a little stopwatch here.  I hope the Court doesn't mind it |
| 10:19:28 | 15 | may make a small beep. |
| 10:19:31 | 16 | THE COURT:  It's not going to bother me.  You'll be |
| 10:20:08 | 17 | lucky at my age if I hear it. |
| 10:20:08 | 18 | (Witness sworn) |
| 10:20:08 | 19 | THE COURT:  You may proceed. |
| 10:20:10 | 20 | **COLIN GUINN,** |
| 10:20:10 | 21 | having been first duly sworn, testified as follows: |
| 10:20:10 | 22 | **DIRECT EXAMINATION** |
| 10:20:10 | 23 | **BY MR. PETIT:** |
| 10:20:10 | 24 | Q.  Mr. Guinn, will you please introduce yourself to the |
| 10:20:13 | 25 | Court. |

GUINN - DIRECT                                                    31

```
10:20:13   1    A.   Yes, sir.  My name is Colin Guinn.

10:20:16   2    Q.   Mr. Guinn, do you hold a position at Gel Blaster?

10:20:20   3    A.   Yes, I do.  CEO.

10:20:22   4    Q.   And can you generally describe your responsibilities as

10:20:25   5    CEO?

10:20:26   6    A.   I oversee all operations of the company but with a

10:20:29   7    specific focus on innovation, product, and the sales and

10:20:33   8    marketing efforts.

10:20:33   9    Q.   Are there any aspects of the business with which you are

10:20:37  10    not involved?

10:20:38  11    A.   There's certain aspects that I'm much more involved in,

10:20:42  12    but I do oversee all aspects of the business.

10:20:45  13    Q.   Okay.  What does Gel Blaster do, briefly?

10:20:48  14    A.   Well, we try to get kids off their video games and outside

10:20:54  15    in the yard playing.  That's our mission.  And so we developed

10:20:58  16    a fun, safe eco-friendly way to go out in the yard and blast

10:21:04  17    with your -- with your parents or your siblings.  And so we

10:21:09  18    create these toy blasters that are pretty innovative and

10:21:15  19    battery powered and fully automatic and shoots a really

10:21:19  20    low-cost ammo.  And the company has been growing really well

10:21:23  21    over the last couple of years.

10:21:24  22    Q.   So those blasters you're talking about, are they referred

10:21:27  23    to as the Gel Blaster Surge and StarFire?

10:21:30  24    A.   Yes, they are.

10:21:31  25    Q.   Very briefly, what distinguishes the Surge and the
```

GUINN - DIRECT                                                    32

10:21:32  1   StarFire from other blasters in the market, for example, foam

10:21:36  2   darts or water guns or things like that?

10:21:39  3   A.   Sure.  So we basically wanted to create a blaster that was

10:21:42  4   really easy and fun to use, that was safe, that was still

10:21:46  5   exciting.  So what differentiates them is that we shoot this

10:21:51  6   hydrogel, kind of water-based ammo, that's low cost and, you

10:21:55  7   know, eco friendly.  And, you know, we were the first company

10:21:58  8   to kind of bring that into the United States market.

10:22:03  9   Q.   And does Gel Blaster sell any products other than these

10:22:06 10   gel-based blasters and their accessories?

10:22:09 11   A.   No, we don't.

10:22:10 12   Q.   And when I refer to accessories, I may refer to them as

10:22:13 13   tag-along products.  Do you understand what I'll mean?

10:22:16 14   A.   Yes, sir.

10:22:16 15   Q.   What kind of tag-along products does Gel Blaster sell?

10:22:20 16   A.   Well, obviously, replacement ammo or what we call gellets,

10:22:24 17   which is kind of like a gel-based pellet or a gellet.  We have

10:22:27 18   different colors.  And as you'll see on the Surge, there's

10:22:30 19   these fins and the barrel tip on the front that are green in

10:22:34 20   the box, but you can switch them with blue or pink or yellow or

10:22:37 21   red.  The goal there is to have different teams and have it be

10:22:42 22   very colorful and family friendly.  So we have different

10:22:45 23   colored packs that you can use.

10:22:47 24            We also created what we call a gellet depot, which is

10:22:51 25   a bucket that allows you to hydrate the ammo, to strain out the

GUINN - DIRECT                                                    33

10:22:55  1  excess water, to speed load into your hopper.  So kind of just

10:22:59  2  accessories that make the whole experience easier.

10:23:02  3  Q.   Okay.  How would you describe Gel Blaster's reputation in

10:23:05  4  the market?

10:23:06  5  A.   Well, first and foremost, I would say that we're the

10:23:09  6  company that has a reputation for being really family friendly.

10:23:13  7  You know, the -- the initial competitors that came out on the

10:23:16  8  market are BB gun companies like Daisy, where they sell a

10:23:20  9  little bit more of realistic-looking, you know, rifle,

10:23:25 10  gun-looking product.  It's very important to us that ours look

10:23:28 11  very, you know, toy-like, "toyetic," almost like something you

10:23:34 12  would see in *Star Wars*.

10:23:36 13       So we're known as a family-friendly blaster, but

10:23:38 14  we're also known as the most innovative company in the space,

10:23:42 15  because I believe we're actually the only company in this kind

10:23:44 16  of gel ball category that is actually engineering our own

10:23:49 17  product.  We're not going to a factory and saying, hey, we'll

10:23:51 18  take one of those.  Put this -- put this name on it.  You know,

10:23:55 19  we have -- we take our engineering very, very seriously.  We're

10:23:58 20  actually born from an engineering company that started by

10:24:01 21  building drones and robots, and we're using that engineering

10:24:05 22  know-how to create a better experience for our product.

10:24:08 23  Q.   Okay.  And you were jumping ahead to my next question, but

10:24:12 24  I really do want you to explain to the Court a little bit about

10:24:16 25  how Gel Blaster earned that reputation for innovation.

10:24:19  1  A.   Sure.  Well, I think primarily we just really, really

10:24:23  2  focused on the user experience of the product.  And so there

10:24:26  3  was a lot of -- you know, some of the competing products have

10:24:31  4  these external batteries and these cables you have to use and

10:24:35  5  take the batteries out.  And, you know, we wanted everything to

10:24:38  6  be built in and have a smoother user experience.

10:24:40  7        So we have a build-in lithium-ion battery.  We've got

10:24:44  8  a USB-C charging port.  We actually run power out to the barrel

10:24:48  9  tip so we can have different flashlights and laser designators

10:24:54  10  that draw power from the blaster.  We were the first hand

10:24:57  11  blaster to figure out a way to do semiautomatic firing mode as

10:25:01  12  well as fully automatic.

10:25:03  13        So there's several different ways that we also

10:25:05  14  created a way of doing glow-in-the-dark, where we have

10:25:10  15  phosphorous-infused ammo.  And then we've got these UV LED

10:25:15  16  lights that add UV light into the phosphorous ammo, so you have

10:25:18  17  this incredible nighttime experience, where you're seeing 10

10:25:22  18  shots per second of those brightly glowing balls.  Kids

10:25:25  19  absolutely love it.

10:25:28  20  Q.   You mention Daisy as a competitor in the marketplace, and

10:25:31  21  I want to kind of differentiate between pre and post Hasbro

10:25:35  22  entering the market.  So before Hasbro, who were Gel Blaster's

10:25:39  23  primary competitors?

10:25:40  24  A.   I guess I would say Daisy with their brand SplatRBall.

10:25:45  25  But we were very, very different, and I think they were going

10:25:45  1  for a little bit of an older audience.  You know, we were kind

10:25:48  2  of more the family-friendly one.  So, you know, we are

10:25:50  3  competitors, technically, but Hasbro's directly competing for

10:25:54  4  our customer for sure.

10:25:55  5  Q.   And so now that Hasbro has entered the market with the

10:25:59  6  Mythic, would you characterize Hasbro as Gel Blaster's primary

10:26:03  7  competitor?

10:26:04  8  A.   Oh, of course, yeah.  There's no question.

10:26:06  9  Q.   Now, does Gel Blaster continue to work on improving the

10:26:09  10  design and function of its products?

10:26:11  11  A.   Absolutely.  It's probably the area that we spend the most

10:26:15  12  amount of our money.

10:26:16  13  Q.   Okay.  And there are new iterations of Gel Blaster's

10:26:19  14  products that are coming to the market, even this year?

10:26:20  15  A.   Yes.

10:26:21  16  Q.   And what are those?

10:26:22  17  A.   So what we're ultimately trying to do is kind of marry the

10:26:27  18  best of video games and paintball.  So, you know, I know that

10:26:31  19  for my kids, to get them off of their devices and outside

10:26:34  20  playing, you know, shooting each other with these gel balls is

10:26:38  21  cool.  But if you could have a video game-like experience,

10:26:41  22  where there's a digital referee, you can do hit detection

10:26:44  23  wearing these vests, you can do hit attribution with these

10:26:48  24  smart blasters, and you can kind of create this digital referee

10:26:53  25  so there's no he said, she said about did I hit them or did

GUINN - DIRECT                                                    36

10:26:55   1    they hit me, it's all just digitally scored.

10:26:57   2            We want that -- we want that application to be able

10:27:00   3    to control the blaster and to be able to control whether or not

10:27:04   4    it can fire.  So, if you've been hit, your blaster just stops

10:27:07   5    working until you go back to your space and you respawn with a

10:27:10   6    new life or something like that.  So that's the products that

10:27:12   7    we're working on that are coming out this year.

10:27:14   8    Q.   And we're going to talk about this in a little bit more

10:27:16   9    detail later.  But when we're talking about the physical firing

10:27:20   10   mechanism, is that mechanism important to those iterations that

10:27:23   11   you're talking about.

10:27:25   12   A.   It's paramount to that product line.  Yes, sir.

10:27:27   13   Q.   Okay.  I'm going to switch gears here and move to the

10:27:30   14   relationship with Hasbro.  When did Hasbro first approach

10:27:34   15   Gel Blaster about a partnership?

10:27:35   16   A.   It was in April of 2021.

10:27:38   17   Q.   Okay.  So not that long ago?

10:27:40   18   A.   No, sir.

10:27:40   19   Q.   Okay.  Did those discussions move quickly?

10:27:43   20   A.   Well, initially they didn't move that fast because they

10:27:46   21   had originally reached out to us about licensing us their NERF

10:27:51   22   name, for us to put their name on our blaster and pay them a

10:27:55   23   license fee for their name.  And those discussions were -- you

10:27:59   24   know, kind of went on for a couple of months, pretty slowly.

10:28:03   25            And then it was in July that they kind of flipped

GUINN - DIRECT                                          37

10:28:06  1  that on its head and said, hey, actually, maybe we should go

10:28:09  2  ahead and license the Gel Blaster name and we'll do the

10:28:12  3  manufacturing, we'll do the selling, we'll do the logistics,

10:28:16  4  and you guys can keep focusing on innovating.  You've got these

10:28:21  5  teams of engineers that have built drones and flying cars.  You

10:28:25  6  guys do all the engineering and innovation, and we'll make the

10:28:28  7  product and sell it and do all the kind of, you know, boring

10:28:32  8  stuff.  So that was in July.  And once that happened, the

10:28:35  9  conversation started progressing much more quickly.

10:28:38 10  Q.    Do you know whether Hasbro was in a hurry in these

10:28:41 11  conversations?

10:28:42 12  A.    Yeah.  There was definitely a sense of urgency the entire

10:28:45 13  time.  And I think that was two-part.  One, we already had a

10:28:49 14  meeting set up with the Walmart buyer, and -- and this new

10:28:52 15  category of product is actually in the sporting goods section

10:28:56 16  at Walmart.  So Hasbro, being a toy company, has great

10:29:00 17  relationships with the toy buyers but maybe not such a good

10:29:03 18  relationship with the sporting good buyers.

10:29:06 19        And so we had worked very hard to get this meeting

10:29:10 20  with the sporting good buyer that was selling the Daisy product

10:29:14 21  at the time.  And so they wanted to have an agreement in place

10:29:16 22  with all the agreed-upon terms in place so that we could meet

10:29:21 23  with -- with Walmart and meet with the buyer as a team that was

10:29:25 24  technically in -- in contract with each other.  So it was very

10:29:28 25  important for us to quickly come to an agreement around the

GUINN - DIRECT

| | | |
|---|---|---|
| 10:29:32 | 1 | terms of the partnership so that we could have that meeting |
| 10:29:35 | 2 | with Walmart as a team. |
| 10:29:37 | 3 | Q.   Okay.  Do you know why Hasbro chose Gel Blaster? |
| 10:29:41 | 4 | A.   What they stated to us is that they had tried out the |
| 10:29:44 | 5 | different products on the market.  They felt like we had the |
| 10:29:48 | 6 | best product; that we were innovating; that we were engineering |
| 10:29:51 | 7 | our own stuff; and that it kind of, quote/unquote, fit their |
| 10:29:54 | 8 | mold, I think because it was family friendly, it was safe, it |
| 10:29:57 | 9 | was kind of designed for kids. |
| 10:29:59 | 10 | Q.   Were you personally involved in discussions with Hasbro? |
| 10:30:02 | 11 | A.   Absolutely.  Very closely. |
| 10:30:05 | 12 | Q.   How would you describe those discussions?  Where did they |
| 10:30:14 | 13 | occur? |
| 10:30:14 | 14 | A.   Well, so initially they made an offer of a certain license |
| 10:30:16 | 15 | fee percentage, a certain investment amount.  And the offer |
| 10:30:20 | 16 | wasn't good enough for us to entertain, because we felt like we |
| 10:30:23 | 17 | had a pretty big opportunity in front of us.  So we said no. |
| 10:30:27 | 18 | We said no to those terms.  And then they said, well, we really |
| 10:30:30 | 19 | want to find terms that work for everybody, and we really want |
| 10:30:34 | 20 | to do this deal. |
| 10:30:34 | 21 |       So they put several of their executives, including |
| 10:30:37 | 22 | now-president Eric Nyman on their private jet, flew down to |
| 10:30:42 | 23 | Austin, Texas.  We met right down the street at the Omni at |
| 10:30:45 | 24 | Capital Factory.  We spent a couple of days, you know, hashing |
| 10:30:50 | 25 | out these terms that would work for us and that would work for |

GUINN - DIRECT                                          39

10:30:52  1  them.

10:30:53  2           And, actually, it was -- it was before they even flew

10:30:57  3  down to Austin that they brought up these patents.  This was

10:31:00  4  not something that was discovered during diligence later in the

10:31:04  5  deal.  And, while we sat at the Omni down the street and we

10:31:07  6  talked through the terms of the deal, one of the terms is that

10:31:10  7  we would agree to pay for a third of the legal fees in fighting

10:31:15  8  these patents, and they would pay for two-thirds of the legal

10:31:19  9  fees.  And that we would even take a portion of the investment

10:31:21  10 they were making in Gel Blaster and put it into an escrow

10:31:24  11 account to fight these legal fees that would arise from these

10:31:27  12 patents.  So these were very well known.

10:31:30  13 Q.   But the patents were not some aha moment?

10:31:33  14 A.   No.  Absolutely not.  They knew that before they ever even

10:31:37  15 came to Austin.

10:31:38  16 Q.   So when they flew down to meet with you guys, you

10:31:40  17 negotiated the deal across the street, did they go to your

10:31:43  18 house?

10:31:44  19 A.   They came to my house.  We broke bread together.  I have a

10:31:47  20 friend that has a sushi restaurant in town called Uchiko.  They

10:31:52  21 set aside a private room for us.  They printed up menus with

10:31:56  22 their logo and our logo, and we were kind of celebrating this

10:31:59  23 new partnership.  I had them over to another close friend of

10:32:03  24 mine's house who was an early investor in Gel Blaster, where we

10:32:06  25 all played in the yard and had a good time.  I actually took

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

10:32:09   1   their team out on my boat on Lake Austin and taught them how to

10:32:13   2   wake surf, kind of show them, you know, what Austin has to

10:32:18   3   offer.

10:32:18   4          It was a very close time, and I think we built, you

10:32:20   5   know, a very close relationship very quickly.  And I think one

10:32:23   6   of the things that was important for us is that once we agreed

10:32:27   7   on the terms of the deal, it was not -- the deal terms were

10:32:32   8   never in question.  It was either -- it was a binary.  We were

10:32:35   9   either going to go forward with the deal if we all felt

10:32:39  10   comfortable working around these patents, or we were not going

10:32:42  11   to go forward with the deal.  But we weren't going to change

10:32:45  12   the terms of the deal.  And that's -- that's why we opened up

10:32:48  13   the kimono, so to say, and allowed them access to all of our

10:32:53  14   information during the diligence period.

10:32:55  15   Q.   So after the two parties agreed to the terms of the deal,

10:32:58  16   and after they left Austin and flew back to Rhode Island, did

10:33:02  17   the parties then begin to work together?  And what I'm asking

10:33:05  18   is:  To do what?  To bring what to market?

10:33:08  19   A.   Yes.  So there was actually two joint efforts going on.

10:33:12  20   Our development teams immediately began working together on a

10:33:16  21   daily basis on the design of this joint product that was going

10:33:20  22   to be called the NERF Pro Gel Blaster.

10:33:23  23   Q.   And let me stop you there.

10:33:24  24          MR. PETIT:  If we could please bring up Exhibit

10:33:26  25   Number 22, please.

| | | |
|---|---|---|
| 10:33:28 | 1 | THE WITNESS:  Yep. |
| 10:33:46 | 2 | MR. PETIT:  And we're going to show that exhibit on |
| 10:33:48 | 3 | the screen.  Your Honor, I've got a paper copy.  Actually, you |
| 10:33:50 | 4 | have a paper copy in a binder in front of you. |
| 10:33:52 | 5 | Q.   But on the screen, is this a rendering of the NERF Pro Gel |
| 10:33:56 | 6 | Blaster? |
| 10:33:57 | 7 | A.   Yeah.  These are some of the concepts that they came up |
| 10:34:00 | 8 | with the -- the marriage of the two logos, the NERF Pro and |
| 10:34:03 | 9 | Gel Blaster logo and kind of what the packaging might look |
| 10:34:07 | 10 | like. |
| 10:34:07 | 11 | THE COURT:  Pardon me.  This is Exhibit Number what |
| 10:34:10 | 12 | again? |
| 10:34:10 | 13 | MR. PETIT:  Twenty-two. |
| 10:34:11 | 14 | THE COURT:  All right. |
| 10:34:14 | 15 | MR. PETIT:  And the reason we're starting at 22, |
| 10:34:16 | 16 | Your Honor, is because attached to our briefing we have |
| 10:34:18 | 17 | exhibits, I believe, 1 through 18.  And these may not go |
| 10:34:22 | 18 | necessarily in order, but that's how we've premarked them. |
| 10:34:26 | 19 | THE COURT:  No.  You did that because that's what |
| 10:34:28 | 20 | lawyers do. |
| 10:34:32 | 21 | MR. PETIT:  I was trying to make somebody's job |
| 10:34:34 | 22 | easier.  We'll see if that worked. |
| 10:34:38 | 23 | Q.   In other words, this wasn't an abstract idea? |
| 10:34:40 | 24 | A.   No, no.  So there was two efforts going on.  The product |
| 10:34:43 | 25 | teams were working very, very closely together as if the deal |

GUINN - DIRECT

10:34:47  1  was already done, because we needed to get molds cut as quickly

10:34:51  2  as possible.  And coming out of the call with Walmart where she

10:34:55  3  said, My biggest concern is that you, Hasbro, are not going to

10:34:59  4  be able to make enough inventory for me.  And after that call,

10:35:03  5  the Hasbro team said, wow, in all of our years selling to

10:35:07  6  Walmart, we've never had a call go like that.  And I think

10:35:10  7  instead of making four sets of stainless steel molds, I think

10:35:14  8  we're going to need to make eight sets of stainless steel

10:35:17  9  molds.  We've got to get on top of this quick.

10:35:19  10         And so there's diligence happening in the background.

10:35:23  11  But meanwhile, as you saw, you know, Eric on their team said,

10:35:24  12  We are operating as one.  We are one team.  And so we were

10:35:27  13  freely sharing information between our engineering department

10:35:29  14  and our product development department, our manufacturing team.

10:35:33  15  We were giving them samples and having them visit our factories

10:35:37  16  in China.

10:35:37  17         So that was happening on the product side.  On the

10:35:41  18  other side --

10:35:42  19  Q.   Let me stop you there, because we're getting a little

10:35:44  20  ahead of ourselves.  What I'd like to go ahead and show is

10:35:45  21  Exhibit Number 2, which is the mutual confidentiality

10:35:49  22  agreement.  This is Exhibit Number 2 that's already attached to

10:35:52  23  our briefing.

10:35:53  24         All of this information sharing that you're talking

10:35:55  25  about right now, did this confidentiality agreement precede

GUINN - DIRECT                                                   43

10:35:59   1   that?

10:35:59   2   A.   Yes.  Absolutely.

10:36:00   3   Q.   I that was entered on August 21st of 2021; is that right?

10:36:07   4   A.   Yes.

10:36:18   5           MR. PETIT:  And, Your Honor, I'd like to go ahead and

10:36:20   6   offer Exhibit 22 into the record.  And Exhibit 2, I believe, is

10:36:24   7   already in the record.

10:36:28   8           THE COURT:  Well, it's not in the record in this

10:36:29   9   hearing.

10:36:30  10           MR. PETIT:  Okay.  I'm going to go ahead and offer

10:36:32  11   into the record this Exhibit 2, which is the mutual

10:36:34  12   confidentiality agreement.

10:36:36  13           MR. HOFFMAN:  No objection, Your Honor.

10:36:37  14           THE COURT:  Gel Blaster's Exhibits 22 and 2 are

10:36:40  15   admitted.

10:36:44  16   Q.   (BY MR. PETIT) Okay.  Mr. Guinn, was obtaining a

10:36:47  17   confidentiality agreement important for Gel Blaster?

10:36:50  18   A.   Of course.  Very important.

10:36:52  19   Q.   Would you have shared any of this information with Hasbro

10:36:54  20   without a confidentiality agreement?

10:36:56  21   A.   Absolutely not.  In fact, we had several of our advisors

10:36:59  22   and early investors were quite concerned, because apparently

10:37:02  23   Hasbro has had some reputation of coming in and working with

10:37:05  24   those young startups and, you know, kind of taking their

10:37:09  25   innovations.  And so we were a little bit apprehensive about

GUINN - DIRECT                                                    44

```
10:37:12   1   that, so we wanted to have a confidentially agreement in place.
10:37:15   2           MR. PETIT:  Okay.  I want to move to I think it's
10:37:21   3   page 4 of the PDF, but page 3 of the exhibit, of the document.
10:37:27   4   Q.   And if you look in the third paragraph from the bottom,
10:37:32   5   there's a provision there, and I'll just point it out, that it
10:37:36   6   is further understood and agreed that money damages would not
10:37:39   7   be a sufficient remedy for any breach of this letter agreement
10:37:42   8   by either party.
10:37:43   9           Do you see that?
10:37:45  10   A.   Yes, sir, I do.
10:37:48  11   Q.   And that both parties should be entitled to seek the
10:37:51  12   equitable relief that we're seeking today; is that right?
10:37:55  13   A.   Yes.
10:37:55  14   Q.   Okay.  Is that provision important to Gel Blaster?
10:37:58  15   A.   Yes.  That provision was very important to us.
10:38:01  16   Q.   What makes you believe that money damages would not be a
10:38:04  17   sufficient remedy for a breach of the confidentiality
10:38:07  18   agreement?
10:38:07  19   A.   Because this new segment of the blaster category is so new
10:38:12  20   and is growing so fast, it's not -- it's not an ongoing, you
10:38:19  21   know, foam dart category or your segment of the blaster
10:38:22  22   category that's kind of doing a similar amount of revenue every
10:38:25  23   year.  Because this new category, this new segment, is growing
10:38:29  24   so fast, getting early market share, you know, in this next
10:38:38  25   kind of 18- to 24-month window, could lead to billions of
```

10:38:41  1  dollars of market capitalization or company value.

10:38:44  2        And so I think it would be very difficult to even

10:38:47  3  determine what those monetary damages would be if our, you

10:38:54  4  know, innovations were taken from us and made to, you know,

10:38:57  5  look like they were Hasbro's.

10:38:58  6  Q.   Mr. Guinn, are we asking for anything today that Hasbro

10:39:03  7  hasn't already agreed to?

10:39:04  8  A.   No.  Absolutely not.

10:39:06  9  Q.   Now, under this confidentiality agreement, you were

10:39:10  10  beginning to talk about the kinds of information that

10:39:12  11  Gel Blaster shared with Hasbro.  Can you briefly describe the

10:39:14  12  extent of that information.

10:39:17  13  A.   I mean, the only thing I can say is, especially because

10:39:21  14  they were purchasing 25 percent of the company, so it was

10:39:26  15  anything and everything, even including my own personal

10:39:29  16  finances and my own personal financial statements.  They wanted

10:39:33  17  to see everything, and we shared it all with them.  So that

10:39:35  18  included all of engineering information, sales data,

10:39:38  19  strategies, market strategies, client lists, buyers, who are

10:39:43  20  influencers were that we're working with, how we should launch

10:39:46  21  the product.  I mean, literally everything.

10:39:49  22  Q.   And, to be clear, that included CAD files and CAD models

10:39:53  23  for products then under development, correct?

10:39:56  24  A.   That's exactly right.

10:39:57  25  Q.   Okay.  You mentioned the patents earlier.  What kind of

10:40:00  1  information did the parties share with another, and what kind

10:40:03  2  of information did Gel Blaster share with Hasbro with respect

10:40:05  3  to the Spin Master patents that Mr. Hoffman referred to in his

10:40:09  4  opening statement?

10:40:10  5  A.   Yes.  So that was kind of the second thing that was

10:40:13  6  ongoing.  We had our engineers and our product team working

10:40:16  7  together on the product, and then there was another group of us

10:40:19  8  that were working very closely together to figure out how we

10:40:24  9  could navigate these patent that were -- that were -- you know,

10:40:28  10  had been filed back in 2012.

10:40:30  11          And so, actually, Adam Kleinman and I were working

10:40:33  12  very closely together on whether, you know, these patents were

10:40:36  13  enforceable, what they really meant.  Hasbro hired I think a

10:40:41  14  couple of different law firms.  We hired a law firm.  We found

10:40:45  15  chemical engineering experts.  We were openly sharing

10:40:48  16  everything that we found, they were sharing with us some of the

10:40:51  17  things they found, and we were collaborating to figure out

10:40:54  18  if -- if this was a case of willfully infringing.

10:40:59  19          Even during this discussion, Eric Nyman mentioned to

10:41:02  20  me a couple of different times on the phone that it's not a

10:41:05  21  matter of changing the terms of the deal, it's just we're

10:41:08  22  either going to do it if we feel comfortable or we're not going

10:41:11  23  to do it if we don't feel comfortable.

10:41:14  24          And said, you know, look, even if we think -- even if

10:41:17  25  we determine that these patents are strong, then I can always

GUINN - DIRECT                                                    47

10:41:20  1   just call up the guys at Spin Master, I know them, and we can

10:41:23  2   negotiate a license deal.  And I said, Okay.  Well, if that's

10:41:28  3   what needs to happen, then that's what we'll do.  I have no

10:41:30  4   problem with that.

10:41:31  5            But we determined during that time that the patents

10:41:34  6   were defensible, that there was lots of prior art, that they

10:41:37  7   were totally indefinite, and that, ultimately, they were kind

10:41:40  8   of rubber-stamped patent that didn't have any back-and-forth

10:41:45  9   with the patent office, and that they were weak patents.  And

10:41:46  10  so they came back to us and said in late October, Okay.  We

10:41:49  11  feel comfortable.

10:41:50  12           They even said that they were waiting for a big

10:41:53  13  report from the law firm that they hired to do this search, to

10:41:58  14  search for prior art, to look for the strength of the patent.

10:42:03  15  And after they received that in late October, they came back

10:42:04  16  and said, Okay.  We're good to go.  We want to go forward with

10:42:07  17  this deal.  But now that we're going to go forward with the

10:42:11  18  deal, we want to adjust the deal terms a little bit.

10:42:14  19  Q.   Okay.  So I'm going to come back to that.  But real quick,

10:42:16  20  what we were talking about, all of the information that you

10:42:18  21  shared from Gel Blaster to Hasbro, in what form did that

10:42:23  22  information take?  How was that information shared.

10:42:25  23  A.   I mean, in almost every way that you can share

10:42:27  24  information, maybe other than fax.  But we shared information

10:42:35  25  via electronic cloud-based document storage solutions.  We

GUINN - DIRECT                                                    48

```
10:42:37   1   shared information via e-mail.  There was a Microsoft Teams
10:42:40   2   group chat set up that information was shared in.  And Hasbro
10:42:43   3   even has their own file document upload program called Blast,
10:42:49   4   and they requested that we upload a lot of our CAD documents
10:42:53   5   and files into their Blast file sharing system.
10:42:57   6   Q.   And so that's important.  Does Gel Blaster currently have
10:43:00   7   access to the files that it transferred to Hasbro?
10:43:03   8   A.   We have access to those files, but we don't have access to
10:43:07   9   their Blast system anymore.  So we can't see exactly which
10:43:09  10   engineers uploaded what documents on what days.  But they
10:43:13  11   would, of course, be able to see that.
10:43:15  12   Q.   Okay.  And do you have access to their Microsoft Teams
10:43:19  13   channel any longer?
10:43:20  14   A.   No.  No, we don't.
10:43:21  15   Q.   Okay.  If you take all of this information that
10:43:24  16   Gel Blaster shared with Hasbro, you take it all and wrap it up
10:43:27  17   and bundle it up, how much work did your team put in to develop
10:43:33  18   that package of information that was transferred to Hasbro?
10:43:39  19   A.   Well, I mean, from the inception of Gel Blaster as a
10:43:41  20   company, all of the work that we had done for years was all
10:43:47  21   shared with them.  But, really, the team that developed the
10:43:49  22   Gel Blaster product has been engineering things for 10 years
10:43:53  23   and has been working together for 10 years.  So it was actually
10:43:56  24   the culmination of many, many, many years of engineering
10:43:58  25   know-how and user experience design that went into the product
```

GUINN - DIRECT

10:44:04  1  that we now had that were sharing with them.

10:44:09  2  Q.   So that information that you shared, do you generally know

10:44:12  3  what they were doing with that information?

10:44:15  4  A.   My understanding is that they were using it to evaluate to

10:44:18  5  make sure that we met their safety standards and that, you

10:44:21  6  know, the product design was sound, and that they were using it

10:44:24  7  to, you know, create this new NERF Pro Gel Blaster in

10:44:30  8  conjunction with our team.

10:44:32  9  Q.   Is Gel Blaster privy to all of the Hasbro communications

10:44:36  10 in terms of their actual use of it?

10:44:38  11 A.   No.   Absolutely not.

10:44:40  12 Q.   Okay.   So you were beginning to talk about going your

10:44:44  13 separate ways, and, ultimately, that happened.   Was that in

10:44:48  14 early November of 2021?

10:44:50  15 A.   That was at the very beginning of November 2021.

10:44:52  16 Q.   Okay.   What happened?   You heard from Mr. Hoffman.   He

10:44:57  17 said it was because of the patents.   Why do you think it

10:44:59  18 happened?

10:45:00  19 A.   Well, they came back -- Adam came back to me in late

10:45:03  20 October and said, Hey, we want to get this deal done.   We want

10:45:06  21 to move forward as partners here and go build a great business

10:45:09  22 together, and, you know, we feel comfortable moving forward.

10:45:12  23 But we want to adjust the terms of the deal to just kind of

10:45:17  24 make it fair for everyone.   And this was the first time there

10:45:21  25 was any notion of re-trading the deal and having different deal

10:45:25  1    terms than we had decided on six weeks earlier.

10:45:28  2         And, essentially, they basically cut the deal in

10:45:31  3    half.  And I don't know if that was because they thought the

10:45:33  4    market was double the size that they originally thought and

10:45:35  5    that, you know, based on their calculus, that was enough money

10:45:39  6    to get me to agree to do the deal.  But there was no real

10:45:43  7    strong reasons given.  The reasons that were given were things

10:45:47  8    like we only had supplemental registry trademark for

10:45:52  9    Gel Blaster and not the principal registry, which obviously we

10:45:56  10   do now have principal and we knew we were going to, and that we

10:46:00  11   might lose first-mover advantage because we had to slightly

10:46:04  12   adjust the design of the blaster.

10:46:05  13        And so there was kind of, it felt like, no real

10:46:07  14   reason to cut this deal in half.  And so I just said, you know,

10:46:12  15   this is the same deal terms that I said no to six weeks ago.

10:46:18  16   We're going to still say no to them today.

10:46:20  17   Q.   To be clear, Mr. Kleinman or nobody at Hasbro ever told

10:46:24  18   you that it was because of the patents?

10:46:25  19   A.   No.  Absolutely not.  We were past the patents.

10:46:29  20   Q.   Okay.  I'd like to move this along a little bit.  I'm

10:46:32  21   going to talk about the physical firing mechanism.

10:46:34  22        Your declaration states that Hasbro had access to

10:46:35  23   Gel Blaster's physical firing mechanism and contact with the

10:46:42  24   engineers that worked on its development.  That's the

10:46:44  25   declaration attached to our briefing.  Can go you confirm that

GUINN - DIRECT

10:46:46   1   the physical firing mechanism was in fact disclosed and

10:46:49   2   discussed with Hasbro?

10:46:51   3   A.   Yes, it was.

10:46:51   4   Q.   Okay.  Your declaration also talks about that Gel Blaster

10:46:56   5   developed the physical firing mechanism to control the firing

10:47:00   6   of the blaster's gellets.  As CEO, are you familiar with

10:47:05   7   development of that PFM or physical firing mechanism?

10:47:09   8   A.   Yes, I am.

10:47:09   9   Q.   Okay.  Mr. Doyle gave a brief overview of that in his

10:47:12   10  opening statement.  We're also going to hear from your VP, vice

10:47:14   11  president of engineering, and that's Vincent Cline.  He's going

10:47:16   12  to talk about it in more detail.

10:47:18   13          For now, though, can you tell us why the PFM or

10:47:25   14  physical firing mechanism, how it operates and why it's

10:47:27   15  important to your future blasters.

10:47:35   16  A.   Sure.  And I think what would be good is to just set the

10:47:37   17  context of what we were trying to solve for with this

10:47:39   18  innovation.  And before that you could apply a current to a

10:47:43   19  motor and have the motor spin, and while you're holding the

10:47:44   20  trigger, the motor is spinning and you're shooting 10 shots per

10:47:48   21  second, right?  And we knew for the future of our blasters, we

10:47:51   22  wanted to be able to control how fast it shot, whether it shot

10:47:57   23  one shot every time you pulled the trigger, or if it shot five

10:48:00   24  shots per second, or 10 shots per second.  If somebody hit you

10:48:07   25  and your blaster shouldn't be working anymore, we wanted to be

GUINN - DIRECT                                                    52

10:48:09   1    able to turn that down and stop your blaster from working.  So

10:48:12   2    for all these things, we were going to need to know exactly how

10:48:14   3    many gellets were shot for this new digital version of our

10:48:19   4    blasting game.

10:48:23   5         And so while other products on the market dating back

10:48:25   6    to 2014 or other -- other competitors on the market had the

10:48:29   7    ability to shoot semiautomatic mode or fully automatic mode,

10:48:34   8    most of those are done by actually using a different gear in

10:48:37   9    the gearbox.  We didn't have the time to redesign our gearbox.

10:48:42   10   We also don't have the space in our gearbox, because we have a

10:48:46   11   much smaller blaster, to do it in that methodology.  So we

10:48:49   12   needed to find a clever solution to be able to know every time

10:48:54   13   a gellet had left the barrel.

10:48:56   14        And it was in -- we have weekly brainstorming

10:49:01   15   sessions with our engineers, our product developers, our

10:49:03   16   manufacturing partners.  And it was through these brainstorming

10:49:07   17   sessions that there was kind of a eureka moment that, oh, wow,

10:49:11   18   we could actually use the same type of switch that we use for

10:49:14   19   the trigger and we could put it up inside the chamber, inside

10:49:17   20   the top of the blaster.  And then every time the button was

10:49:21   21   pushed, we would know that a gellet was fired.

10:49:24   22        And that would allow us to be -- to be able to count

10:49:26   23   the number of gellets and to be able to decide, when you pull

10:49:31   24   the trigger, we want one gellet to fire or five gellets to

10:49:35   25   fire.  And we would have that ability to do that.

10:49:37  1   Q.   So was this a cost-efficient way of doing it?

10:49:39  2   A.   Yeah.   It was very cost-efficient.

10:49:41  3   Q.   Space-efficient?

10:49:41  4   A.   Very space-efficient.

10:49:43  5   Q.   Reliable?

10:49:43  6   A.   Very reliable.

10:49:44  7   Q.   Does it take a lot of bandwidth from your circuit board?

10:49:52  8   A.   And that's a key point.   And there's some talk about,

10:49:55  9   well, why aren't you using this now?   You're not even using

10:49:58  10  this in your current blaster.   Our current blaster is a much

10:50:02  11  more simple design, and, you know, there's not a lot of

10:50:05  12  computation happening on the printed circuit board.   And so

10:50:08  13  we're able to use some of that computational power to just do a

10:50:12  14  timing solution to accomplish the same goal of a semiautomatic

10:50:18  15  firing mode for now.

10:50:20  16        Now, as we move forward into our future generation of

10:50:23  17  blasters that are coming out this year, we need all of the

10:50:28  18  processing power and all the bandwidth possible available to us

10:50:31  19  to run the game mechanics.   And so using the physical firing

10:50:35  20  mechanism actually does two things for us:   One, it gives us a

10:50:39  21  much more accurate account of exactly how many gellets are

10:50:43  22  being fired.   So if you want to show a statistic of a player to

10:50:46  23  say how accurate were you during this round, how many times did

10:50:50  24  you fire a gellet and how many times did you hit one of your

10:50:54  25  opponents, we can give those types of statistics.   But also it

GUINN - DIRECT                                                54

10:50:56   1    takes that processing power that's used right now to do the

10:51:00   2    timing algorithm off of the processor so that the processor can

10:51:04   3    now be doing the job of a digital referee and saying you

10:51:08   4    captured other team's flag and you're now holding it, or you

10:51:11   5    have three lives remaining and you have to go back to the base.

10:51:15   6              And so that's why this physical firing mechanism and

10:51:18   7    the way we've developed it is so critical to the future of our

10:51:22   8    product.

10:51:24   9    Q.   Did you maintain it a secret?

10:51:26   10   A.   Yes.  Absolutely.

10:51:29   11   Q.   Okay.  Very briefly, who within Gel Blaster knew about

10:51:31   12   this information.

10:51:32   13   A.   Only the people that needed to know: the engineers, the

10:51:34   14   product developers, myself, just a couple others.

10:51:39   15   Q.   Okay.  And then are there any physical files associated

10:51:42   16   with this physical firing mechanism?

10:51:44   17   A.   There are digital files.

10:51:46   18   Q.   And how are they kept?

10:51:47   19   A.   They're kept in a secured online document storage solution

10:51:51   20   behind -- you know, each individual person that had access to

10:51:55   21   those files had their own log-in, their own password.  So

10:51:58   22   they're kept secured.

10:51:59   23   Q.   Did your marketing team, sales team --

10:52:00   24   A.   No.

10:52:01   25   Q.   -- other teams have access to this information?

10:52:02  1    A.    The marketing team doesn't have access, sales doesn't have

10:52:04  2    access, finance doesn't have access.  It's just the people

10:52:08  3    engineering the product.

10:52:13  4    Q.    Okay.  Now, you've just discussed the advantages of the

10:52:16  5    PFM.  In addition to those advantages and what Gel Blaster

10:52:20  6    intends to do with that physical firing mechanism in its

10:52:23  7    upcoming generation of Gel Blasters, are there additional

10:52:26  8    reasons why the PFM is valuable to Gel Blaster?

10:52:30  9    A.    Sure.

10:52:32  10   Q.    In time? innovation? your reputation?

10:52:39  11   A.    Yeah.  I mean, that's, you know, one of the key elements

10:52:42  12   and, you know, really what we have built our reputation on and

10:52:46  13   build our brand on, is the fact that we're actually engineering

10:52:49  14   our own stuff and we're innovating our own product, that we're

10:52:54  15   an innovative tech startup in Austin, Texas.

10:52:57  16         And, you know, we're proud to be the first blaster

10:52:59  17   that had a hand blaster that allowed you to do semiautomatic

10:53:03  18   and full automatic mode in this space.  And, you know,

10:53:08  19   obviously that's all taken away as soon as Hasbro uses our

10:53:11  20   innovation and claims it as their own and says, Hey, look at

10:53:15  21   this awesome innovation from Hasbro when they're really just

10:53:18  22   using the stuff that we shared with them.  Now we don't get to

10:53:21  23   be able to say that we're the innovative company in the space.

10:53:24  24         Or at least when we do, customers are going to say,

10:53:27  25   oh, I was one of the 100 million people that saw Mr. Beast

10:53:31  1  showing off that same -- that same feature in his video months

10:53:35  2  ago.

10:53:40  3  Q.   Can you value the impact that Hasbro's use of the physical

10:53:41  4  firing mechanism will have on the sale or success of

10:53:43  5  Gel Blaster's future blasters.

10:53:45  6  A.   I think that would be too difficult to do because of how

10:53:48  7  fast this market is growing.

10:53:49  8  Q.   Okay.  Tell us about that.  What -- where is the market

10:53:53  9  today, and where do you expect it to be?

10:53:56  10  A.   Well, I can tell you the market two years ago was zero.

10:53:59  11  And according to our discussions with Hasbro here at the Omni,

10:54:05  12  they believed that the gel category could be as big as a

10:54:08  13  $2 billion annual market within just a few years.

10:54:11  14       So between, you know -- I think this in 2022 is

10:54:16  15  probably about a $200 million market, so there's still room for

10:54:20  16  it to grow by another 10 times over the next couple of few

10:54:24  17  years.  And so by using our information, by using our designs,

10:54:29  18  and by getting our product in the market sooner, they get to

10:54:33  19  start sharing in that upside as the market goes up.

10:54:39  20       And so even if they were to take only 10 percent of

10:54:41  21  that market share away from us, that could equal $200 million

10:54:44  22  in annual revenue two or three years from now.  So because it's

10:54:48  23  such a new category, for them to be able to come out and say,

10:54:52  24  Look how innovative we are, we created this new space, that --

10:54:56  25  there's no way to put a number on that.

10:55:00  1  Q.   How does Hasbro and NERF's introduction of the Mythic, how

10:55:04  2  does that affect your sale of the accessory products we talked

10:55:08  3  about earlier, the tag-along products.

10:55:10  4  A.   Sure.  Well, obviously, if somebody makes a purchase

10:55:15  5  decision to buy a NERF-branded product, they're more likely to

10:55:18  6  buy their refill ammo, they're more likely to buy their face

10:55:21  7  masks, they're more likely to buy their accessories.

10:55:24  8       In addition, I personally have spent probably over a

10:55:27  9  $1,000 on NERF products myself as my kids grew up.  They make

10:55:32  10 great foam blasters.  And because I started buying NERF foam

10:55:38  11 dart blasters, I never once have bought an Adventure Force

10:55:43  12 blaster, I never have once bought a Zuru blaster.  Even though

10:55:45  13 they make foam dart blasters, too, I'm loyal to the NERF brand

10:55:50  14 foam dart blaster.

10:55:51  15      So as this new category is getting created and these

10:55:54  16 100 million people are seeing Mr. Beast's cool, new, gel-fire

10:55:58  17 blaster and that becomes the first blaster that they buy in

10:56:01  18 this category, those parents are more likely to continue buying

10:56:04  19 gel-fire blasters as they -- as they keep, you know, growing

10:56:08  20 and this category keeps going.

10:56:13  21 Q.   Mr. Guinn, does Gel Blaster -- I'm going to switch gears

10:56:17  22 here and talk about issues relevant to the bond.

10:56:19  23      Does Gel Blaster have any revenue stream other than

10:56:22  24 from the sale of gel-based products?

10:56:25  25 A.   No, we don't.

10:56:25   1   Q.   Okay.  And you have visibility in Gel Blaster's financial
10:56:30   2   position, right?
10:56:31   3   A.   Yes, sir.
10:56:31   4   Q.   Okay.  Can you tell the Court what Gel Blaster's net
10:56:34   5   income was in 2022?
10:56:35   6   A.   Our net income was about 2 1/2 million.
10:56:38   7              MR. PETIT:  Okay.  And, Your Honor, that's based on
10:56:40   8   an unaudited financial statement that I've got and I can
10:56:43   9   introduce it as an exhibit.  I'd rather not do that right now
10:56:46  10   because I'd like to make a motion and introduce that under
10:56:49  11   seal.  If the Court would like any more information about
10:56:53  12   Gel Blaster's financial position, we would ask that that be
10:56:55  13   done either in camera or at another opportunity under seal.
10:56:59  14              THE COURT:  Well, we'll see about that.  I am not
10:57:02  15   favorably disposed to exhibits under seal.  That doesn't mean
10:57:05  16   you can't talk me into it.  But I think that's part of what you
10:57:09  17   get in an open and transparent legal system.  And so I
10:57:14  18   generally on documents that are just filed, on things that I'm
10:57:17  19   going to rule on in chambers, on exhibits I'm a little more
10:57:22  20   open to under seal.
10:57:25  21              MR. PETIT:  Well, for that reason, that's why I just
10:57:27  22   wanted to elicit that information right now in testimony.
10:57:29  23              THE COURT:  That's fine.
10:57:31  24   Q.   (BY MR. PETIT) And then let me ask one final question,
10:57:33  25   Mr. Guinn.  If the injunction is granted, Hasbro is asking this

10:57:37  1   Court to impose a bond on Gel Blaster north of $20 million.

10:57:42  2   Could Gel Blaster post such a bond?

10:57:44  3   A.   No.  Of course not.  We don't -- we're like almost just a

10:57:49  4   two-year-old company.  We could never pay that amount of money.

10:57:52  5   Q.   Hasbro know that?

10:57:53  6   A.   Yeah.  Of course they know that.  They've looked at all

10:57:56  7   our financials.

10:57:58  8              MR. PETIT:  I'll pass the witness.

10:57:59  9              THE COURT:  Let me ask one question before you pass

10:58:01  10  the witness.  We've heard about the negotiations between

10:58:05  11  Gel Blaster and Hasbro and that they had reached an agreement

10:58:10  12  and then the agreement was sought to be altered.

10:58:13  13             Is there any written verification of what that

10:58:16  14  original agreement was?

10:58:18  15             MR. PETIT:  Yes, Your Honor.  Do you want the witness

10:58:21  16  to testify?

10:58:21  17             THE COURT:  Well, were you going to testify about it,

10:58:23  18  or were you going to present it as an exhibit, the written

10:58:26  19  confirmation that they had an agreement?

10:58:29  20             MR. PETIT:  I don't believe, if memory serves, that

10:58:33  21  that is an exhibit to our briefing.  But the fact that they

10:58:36  22  reached a deal, it was memorialized in a term sheet, and the

10:58:42  23  term sheet was subject to a diligence period.  But we're not

10:58:46  24  here today suing under that term sheet.  We're not saying that

10:58:49  25  they breached a deal.  It was --

| | | |
|---|---|---|
| 10:58:51 | 1 | THE COURT:  All right. |
| 10:58:53 | 2 | MR. PETIT:  Does that answer your question? |
| 10:58:55 | 3 | THE COURT:  Yes. |
| 10:58:58 | 4 | MR. PETIT:  I'll pass the witness. |
| 10:59:18 | 5 | MR. HOFFMAN:  And we have some witness binders that |
| 10:59:23 | 6 | we'd like to pass out to assist with the examination. |
| 10:59:54 | 7 | **CROSS-EXAMINATION** |
| 10:59:54 | 8 | **BY MR. HOFFMAN:** |
| 10:59:54 | 9 | Q.  Good morning, Mr. Guinn. |
| 10:59:56 | 10 | A.  Good morning. |
| 10:59:56 | 11 | Q.  I wanted to start by clarifying some of the assertions |
| 10:59:59 | 12 | you've made in your direct testimony. |
| 11:00:02 | 13 | Gel Blaster did not invent the idea of using a |
| 11:00:04 | 14 | hydrogel-based ammunition in a toy gun; is that right? |
| 11:00:08 | 15 | A.  That's correct. |
| 11:00:10 | 16 | Q.  And prior to Gel Blaster's even existence, these toy guns |
| 11:00:16 | 17 | that shoot hydrogels were popular in Asia and Australia, right? |
| 11:00:23 | 18 | A.  Actually, only Australia.  And they were modified Airsoft |
| 11:00:27 | 19 | guns. |
| 11:00:27 | 20 | Q.  That used hydrogel-based ammunition, right. |
| 11:00:31 | 21 | A.  That's correct. |
| 11:00:32 | 22 | Q.  And gel Blaster introduced its first gun in 2020, correct? |
| 11:00:35 | 23 | A.  Correct. |
| 11:00:36 | 24 | Q.  That first gun wasn't a homegrown design, right?  That was |
| 11:00:38 | 25 | something you got from a vendor? |

GUINN - CROSS

11:00:39  1  A.   That's correct.

11:00:40  2  Q.   Okay.  And that same year that Gel Blaster introduced its

11:00:44  3  first gun, a company called SplatRBall introduced a gun into

11:00:48  4  the U.S. that used hydrogel-based ammunition, correct?

11:00:51  5  A.   That's correct.  At the very end of that year.

11:00:57  6  Q.   Okay.  Now, you also talked about the engineering

11:00:59  7  experience of your company, and you said there are 10 years of

11:01:01  8  experience.  You're not asserting that your engineers had 10

11:01:04  9  years of experience related to firing mechanisms in toy guns or

11:01:08  10  even real guns for that matter, correct?

11:01:11  11  A.   No.  I'm not making that assertion, although some of our

11:01:15  12  engineers do have that experience in real guns.

11:01:18  13  Q.   Now, you talked about Gel Blaster having automatic and

11:01:25  14  semiautomatic firing in its products.  Do you recall that a few

11:01:28  15  minutes ago?

11:01:29  16  A.   Yes.

11:01:29  17  Q.   And Gel Blaster and Hasbro are not the only hydrogel-based

11:01:34  18  products on the market today with those features, correct?

11:01:34  19  A.   Yeah.  I just said that, yeah.

11:01:35  20  Q.   And, in fact, the Gel Blaster product that today does

11:01:38  21  automatic and semiautomatic implements those features without

11:01:43  22  use the PFM, the alleged trade secret?

11:01:46  23  A.   Yeah.  We talked about that as well.  Yes, sir.

11:01:49  24  Q.   Okay.  Now, Mr. Guinn, you're here in court today because

11:02:00  25  you believe that the PFM is an innovative solution that's

11:02:04  1  significantly better than other approaches to a firing control

11:02:07  2  mechanism in a gel-based blaster, right?

11:02:11  3  A.   I'm actually here in court today because Hasbro took all

11:02:15  4  of our company information and is using it against us to try to

11:02:17  5  compete against us.

11:02:19  6  Q.   But the one we're talking about today, the specific

11:02:21  7  information we're talking about today, is related to this PFM,

11:02:24  8  right?

11:02:24  9  A.   Yes, sir.

11:02:25  10 Q.   As we sit here today, you're not talking about any other

11:02:27  11 technical feature in the Hasbro Mythic that you believe is a

11:02:32  12 trade secret taken by Hasbro, right?

11:02:34  13 A.   I actually think the entire internals of it were taken

11:02:38  14 from us and that the PFM, and the PISCA specifically, is the

11:02:41  15 proof that they used our CAD files, because we didn't actually

11:02:44  16 ship that in our product.

11:02:46  17 Q.   Let's talk for a minute about what a trade secret is,

11:02:49  18 Mr. Guinn.  You understand that whatever was in the gel blaster

11:02:55  19 product that was out in the market in December of 2021, when

11:02:57  20 you're having those discussions, that was public, right?

11:02:59  21 A.   Yes.  Absolutely.

11:03:00  22 Q.   And anybody could take that gun and open it up, unscrew

11:03:03  23 the case, and look inside.  And whatever they learned, that's

11:03:07  24 available to the public.  That's not a trade secret, right?

11:03:09  25 A.   That's my whole point.

GUINN - CROSS                                              63

11:03:11  1   Q.   So all we're talking about is what was in the CAD file

11:03:13  2   that was not in the product that was out in the market, right?

11:03:16  3   A.   Well, also our CAD files are also trade secrets.  So while

11:03:20  4   somebody could buy our product and open it up and then use 3-D

11:03:24  5   scanners to try to scan all the gears and try to redesign the

11:03:28  6   entire thing, it would be like walking into a house and saying

11:03:30  7   go build that exact house and you have no plans versus here is

11:03:33  8   all the architectural drawings, now go build the house.  So our

11:03:39  9   architectural drawings of our product are our trade secrets.

11:03:42  10  Q.   Mr. Guinn, you're not a mechanical engineer, are you?

11:03:45  11  A.   No, I'm not.  But I did go to mechanical engineering at

11:03:48  12  University of Texas, but I graduated with a business degree.  I

11:03:50  13  switched majors.

11:03:51  14  Q.   And you're not an expert in laser scanning techniques,

11:03:54  15  correct?

11:03:54  16  A.   That could be argued.  I've been in the drone space for 15

11:03:58  17  years doing lidar scanning all over the world.  So yeah.

11:04:01  18  Q.   Okay.  So you're presenting yourself as an expert with

11:04:03  19  your business degree on whether people that know how to do

11:04:06  20  laser scanning could reproduce a physical device from what they

11:04:11  21  open up when they buy a toy blaster?

11:04:13  22  A.   Yeah.  I'm saying that they could do that.

11:04:15  23  Q.   They could do that?

11:04:16  24  A.   They could that, yeah.  That's right.  But it would take a

11:04:18  25  lot of work.

11:04:18  1   Q.   Okay.  Now, you told the Court that you believed the PFM

11:04:27  2   and the PISCA is a more cost-efficient, more space-efficient,

11:04:31  3   and more reliable approach to a firing mechanism.  That was

11:04:35  4   your testimony, right?

11:04:36  5   A.   As an approach to be able to know how many shots are

11:04:39  6   fired, yes.

11:04:40  7   Q.   Okay.  What was the alternative approach that was used in

11:04:44  8   Gel Blaster's products both in September 2021 and today?

11:04:47  9   A.   So what we ended up using in our interim products was a

11:04:51  10  timing solution that ran on a -- on a small chip, an IC, on the

11:04:56  11  printed circuit board.

11:04:57  12  Q.   And timing solutions were well known in the industry in

11:05:00  13  2021?

11:05:00  14  A.   I mean, actually, I don't know how well known they were.

11:05:05  15  Q.   And you're not claiming the timing solution is a trade

11:05:09  16  secret, correct?

11:05:10  17  A.   No.

11:05:10  18  Q.   Okay.  Now the CAD files Gel Blaster sent Hasbro, that was

11:05:17  19  not a timing mechanism or a timing-based solution that was used

11:05:21  20  in those CAD files, correct?

11:05:23  21  A.   That's right.

11:05:23  22  Q.   That was the PFM approach?

11:05:26  23  A.   Yes.

11:05:26  24  Q.   And shortly after those CAD files were sent to Hasbro, you

11:05:31  25  told Hasbro not to implement the PFM part of the CAD drawings;

GUINN - CROSS

| | | |
|---|---|---|
| 11:05:36 | 1 | isn't that right? |
| 11:05:37 | 2 | A.   Yeah.   We said that, for this line of blasters, it made |
| 11:05:40 | 3 | more sense to use a timing solution. |
| 11:05:42 | 4 | Q.   You didn't just say it made more sense.   You said that |
| 11:05:47 | 5 | timing in the code was actually better than using the sensor, |
| 11:05:52 | 6 | the PFM, for semiautomatic shooting, correct? |
| 11:05:56 | 7 | A.   It was less expensive. |
| 11:05:58 | 8 | Q.   That's not what you told Hasbro, though.   You didn't talk |
| 11:06:02 | 9 | about expense, did you? |
| 11:06:03 | 10 | A.   I mean, I guess we can read the e-mail.   I'm sure it's in |
| 11:06:07 | 11 | there. |
| 11:06:07 | 12 | Q.   In fact, what you told Hasbro was you had actually tried |
| 11:06:10 | 13 | and tested the PFM approach and found that timing was better to |
| 11:06:14 | 14 | prevent double shots, right? |
| 11:06:17 | 15 | A.   Is that e-mail in here? |
| 11:06:21 | 16 | Q.   Sure.   We can look at it. |
| 11:06:22 | 17 | A.   I think there was more double shots with timing than there |
| 11:06:25 | 18 | is with PFM. |
| 11:06:27 | 19 | Q.   See, that's not what you told Hasbro. |
| 11:06:29 | 20 | Please turn to tab 12 in your binder. |
| 11:06:33 | 21 | MR. HOFFMAN:   Your Honor, this is Exhibit 36. |
| 11:06:42 | 22 | Q.   And as you turn to tab 12.   This is a full e-mail string, |
| 11:06:45 | 23 | and we'll be focusing on an e-mail at the bottom of the second |
| 11:06:49 | 24 | page of the exhibit. |
| 11:06:50 | 25 | THE COURT:   Just a minute.   I don't have anything |

| | | |
|---|---|---|
| 11:06:52 | 1 | that has a 36 in it. |
| 11:06:53 | 2 | MR. HOFFMAN:  It's tab 12 in the tab numbers, |
| 11:06:56 | 3 | Your Honor.  The tab numbers unfortunately do not correspond to |
| 11:06:59 | 4 | the exhibit numbers. |
| 11:07:01 | 5 | THE COURT:  I've got it.  Thank you. |
| 11:07:03 | 6 | Q.  (BY MR. HOFFMAN) And if you would turn to the bottom of |
| 11:07:05 | 7 | the second page of the exhibit, Mr. Guinn, there's an e-mail at |
| 11:07:12 | 8 | the bottom of the page that starts From Colin Guinn, sent |
| 11:07:16 | 9 | September 22nd, 2021, Nick Tino, and then copies a number of |
| 11:07:21 | 10 | other people do.  You see that? |
| 11:07:28 | 11 | A.  Yes.  I'm seeing it now. |
| 11:07:30 | 12 | Q.  And you agree this is an e-mail you sent Mr. Tino and |
| 11:07:33 | 13 | others on September 22nd, 2021, correct? |
| 11:07:36 | 14 | A.  Yes.  And I'm happy to walk you through this e-mail. |
| 11:07:39 | 15 | Q.  Okay.  Why don't we start here.  If you would look, |
| 11:07:44 | 16 | please, sir, at the third sentence that starts, "We had one of |
| 11:07:48 | 17 | Wallace's engineers ..."  Do you see that? |
| 11:07:49 | 18 | A.  Uh-huh. |
| 11:07:50 | 19 | Q.  Who is Wallace? |
| 11:07:51 | 20 | A.  Wallace is one of our consultants in China, one of our |
| 11:07:55 | 21 | engineering consultants, that I worked with at DJI. |
| 11:07:59 | 22 | Q.  And referring to Wallace and his team, in the next |
| 11:08:02 | 23 | sentence you say, "Essentially, they found a better way to |
| 11:08:04 | 24 | accomplish the semiauto firing mode (one trigger pull equals |
| 11:08:08 | 25 | one gellet fired) through timing in the code instead of using |

GUINN - CROSS

11:08:11  1  the sensor."  Do you see that sentence?

11:08:13  2  A.   Yes, I do.

11:08:14  3  Q.   Your reference to the sensor there is the PFM that was in

11:08:18  4  the CAD file?

11:08:19  5  A.   To the switch itself.

11:08:20  6  Q.   To the switch that's part of the PFM, right?

11:08:22  7  A.   Uh-huh.

11:08:23  8  Q.   And then you say, "We initially spec'd" --

11:08:26  9        That means put into a specification?

11:08:28  10  A.   Yes.

11:08:29  11  Q.   -- "the sensor" --

11:08:31  12        That's the PFM, right?

11:08:32  13  A.   Yes.

11:08:33  14  Q.   -- "thinking that it would be the most consistent, but in

11:08:36  15  testing it was found that the timing approach was superior to

11:08:40  16  prevent double shots."  Those were your words, right?

11:08:43  17  A.   Yes, they were.

11:08:44  18  Q.   Okay.

11:08:44  19  A.   And the reason that those are my words is because I was

11:08:47  20  relaying the information that was just shared to me by Wallace

11:08:50  21  and his team.

11:08:51  22  Q.   Sure.  That was the evaluation of your manufacturing

11:08:54  23  partner, right?

11:08:55  24  A.   They're not a manufacturing partner.

11:08:57  25  Q.   Or vendor or consultant you used in China?

GUINN - CROSS

11:09:00  1   A.   A consultant that's right.

11:09:01  2   Q.   And then you go on to say, "Also, this way" --

11:09:04  3        You mean the timing mechanism, right?

11:09:06  4   A.   Yep.

11:09:06  5   Q.   -- "there is no chance of the sensor wearing out and

11:09:09  6   failing," right?

11:09:10  7   A.   That's right.

11:09:10  8   Q.   Okay.

11:09:11  9   A.   So while this makes more sense for the current product,

11:09:16  10  because there is no physical wear on the sensor, that has

11:09:19  11  nothing to do with the ability to be able to count gellet shots

11:09:22  12  for our future products.

11:09:24  13  Q.   Okay.  And you had that PFM approach and the supposed

11:09:31  14  ability to count gellet shots in September of 2021, right?

11:09:35  15  A.   Yes.

11:09:35  16  Q.   And even with your great engineering team and their 10

11:09:38  17  years of experience, you didn't bring it to market in 2021,

11:09:41  18  right?

11:09:41  19  A.   We haven't launched our digital blasters yet.

11:09:44  20  Q.   And you didn't bring it to market in 2022, right?

11:09:46  21  A.   Oh.  Sorry.  In 2021, yeah, that's correct.  We did not

11:09:49  22  bring it to market in 2022.

11:09:50  23  Q.   And not 2021 and not 2022, and you still don't have a firm

11:09:55  24  date that you've told the Court that this feature is going to

11:09:57  25  be brought to market, right?

| | | |
|---|---|---|
| 11:09:58 | 1 | A.   I did not -- I was not aware of that.  Our plan is to |
| 11:10:01 | 2 | bring it to market this year by Q4. |
| 11:10:05 | 3 | Q.   By the end of 2023? |
| 11:10:06 | 4 | A.   Yes, sir.  The PFM and the PISCA allows us to count gellet |
| 11:10:11 | 5 | shots.  The product that we're developing takes a tremendous |
| 11:10:15 | 6 | amount of software engineering and electrical engineering to |
| 11:10:21 | 7 | create the Wi-Fi mesh network, the mobile app, the hit |
| 11:10:24 | 8 | detection, the hit attribution.  All of that is a significant |
| 11:10:25 | 9 | amount of engineering effort that, just because we didn't |
| 11:10:28 | 10 | release the PISCA in 2021 or 2022 doesn't mean that it doesn't |
| 11:10:32 | 11 | become a core functionality of the future of our product. |
| 11:10:35 | 12 | Q.   Let me ask you about those, because those features that |
| 11:10:38 | 13 | you just mentioned, and you rattled them off very quickly, |
| 11:10:43 | 14 | those features of the app-enabled blaster and the mobile and |
| 11:10:46 | 15 | the Wi-Fi mesh, Hasbro isn't offering a product with those |
| 11:10:49 | 16 | features, correct? |
| 11:10:50 | 17 | A.   They said they were working on one. |
| 11:10:52 | 18 | Q.   There isn't one in the market now, right? |
| 11:10:54 | 19 | A.   I don't know. |
| 11:10:54 | 20 | Q.   Well, does the Mythic do those features? |
| 11:10:58 | 21 | A.   I don't believe so. |
| 11:10:59 | 22 | Q.   That's right.  So when Gel Blaster puts a product into the |
| 11:11:01 | 23 | market at the very end of the market of this year with those |
| 11:11:04 | 24 | features, it still won't be competing with the Mythic that |
| 11:11:08 | 25 | doesn't have any of those features, right? |

GUINN - CROSS                                                    70

11:11:10   1   A.   Well, I guess we'll still be competing with the Mythic.

11:11:13   2   We'll just hope that our experience is better and people choose

11:11:16   3   our product over the Mythic.

11:11:18   4   Q.   That's right.   The features that you say are enabled by

11:11:20   5   your trade secret aren't going to be used -- aren't used by the

11:11:23   6   Mythic today, and so those features, those supposed advantages,

11:11:27   7   aren't something that Hasbro is using, right?

11:11:29   8   A.   Well, actually, they are using it.   And by using all of

11:11:33   9   our engineering files, they're able to launch their product

11:11:37  10   months, if not a year, earlier than had they designed it

11:11:41  11   themselves.   So they are absolutely using our feature to gain

11:11:45  12   market share and buy -- you know, win our customers ahead of

11:11:49  13   when we can release our product that uses that same technology.

11:11:52  14   Q.   Mr. Guinn, it's important that you be very accurate in

11:11:56  15   your testimony.   The features you just mentioned, the Wi-Fi

11:11:59  16   mesh, the mobile app, those things, that's not in any Hasbro

11:12:02  17   product today, right?

11:12:04  18   A.   I don't know what Hasbro has in their products today.

11:12:07  19   Q.   Have you used a Mythic?

11:12:09  20   A.   I have shot a Mythic maybe one time.

11:12:12  21   Q.   With the features that you just talked about, the Wi-Fi

11:12:15  22   mesh, the --

11:12:15  23   A.   No.   They're not in the gel-fire products.

11:12:17  24   Q.   That's the Mythic?

11:12:18  25   A.   Yeah.

11:12:19    1    Q.    Okay.

11:12:24    2              MR. HOFFMAN:  Your Honor, just so I don't forget, you

11:12:25    3    would like --

11:12:25    4    A.    So is that to say that they're not working on those

11:12:28    5    features and that they're not going to release them by the end

11:12:29    6    of this year?

11:12:31    7    Q.    Mr. Guinn.

11:12:32    8    A.    I know that it's not in their blasters today.

11:12:34    9    Q.    Mr. Guinn, I ask questions, you answer them.  This is not

11:12:36   10    the forum for you to ask questions.

11:12:38   11              MR. HOFFMAN:  Your Honor, as a housekeeping matter,

11:12:42   12    Defendants offer Exhibit 36 at tab 12 into evidence.

11:12:48   13              MR. PETIT:  No objection.

11:12:52   14              THE COURT:  Exhibit Number 36 by Hasbro is admitted.

11:12:56   15    Q.    (BY MR. HOFFMAN) Okay.  Mr. Guinn, I'd like to turn to the

11:13:00   16    confidentiality agreement that you discussed with Mr. Petit in

11:13:03   17    your testimony.  Do you have that in mind?

11:13:05   18    A.    Where is that?

11:13:06   19    Q.    That's in your binder also.  That was admitted, I believe,

11:13:11   20    as Exhibit Number 2.  But it's in the binder you have in front

11:13:14   21    of you at tab number 4.

11:13:34   22              Now, Mr. Guinn, you've been part of confidentiality

11:13:37   23    agreements in your business dealings over time.  I assume this

11:13:39   24    isn't the first one you ever dealt with?

11:13:41   25    A.    My lawyers usually deal with this stuff.  I'm not a

GUINN - CROSS                                                72

11:13:44   1   lawyer.

11:13:44   2   Q.   Okay.  But you understand that, under a confidentiality

11:13:47   3   agreement, in addition to describing what's confidential, they

11:13:52   4   typically include exclusions, information parties agree is not

11:13:55   5   confidential, right?

11:13:57   6   A.   If you say so.

11:13:58   7   Q.   Well, it's common sense.  Parties are going to agree that

11:14:02   8   things that are publicly known are not covered by the

11:14:05   9   confidentiality agreement, right?

11:14:08  10   A.   I guess I didn't know that that was common sense, no.

11:14:10  11   Again, I'm not an attorney.  I just knew that they were saying

11:14:14  12   that any of the information that we shared with them wouldn't

11:14:16  13   be used for their own benefit.

11:14:19  14   Q.   Okay.  Well, let me draw you to the first page of

11:14:21  15   Exhibit Number 2, which is at tab 4 in your binder.  And in the

11:14:26  16   second paragraph -- and if we go down to the second full

11:14:35  17   sentence, it says:  "The term of *evaluation material* does not

11:14:37  18   include information which ..."  Do you see that?

11:14:39  19   A.   Yes, sir.

11:14:39  20   Q.   And there are four categories of information that are not

11:14:42  21   considered confidential and not protected by the agreement.

11:14:47  22   We'll go through them one by one now.

11:14:48  23        The first under (i) is information that is or becomes

11:14:52  24   generally available to the public other than as a result of

11:14:55  25   disclosure by the recipient.  Do you see that?

GUINN - CROSS

| | | |
|---|---|---|
| 11:14:57 | 1 | A.   Yes. |

11:14:58    2    Q.   So things that are out there that are generally known,

11:15:00    3    that's all fair game, right?

11:15:02    4    A.   I mean, is that what you're saying that means?

11:15:05    5    Q.   Do you understand -- did you have that understanding in

11:15:08    6    being part of this confidentiality agreement?

11:15:11    7    A.   Yeah.  It says generally available public information,

11:15:14    8    yes.

11:15:14    9    Q.   The second category is information that was within the

11:15:18    10   recipient's possession prior to being furnished to the

11:15:23    11   recipient.  Stuff each party already knew before they entered

11:15:27    12   into this agreement, right?

11:15:28    13   A.   Okay.

11:15:29    14   Q.   The third category is information that becomes available

11:15:32    15   to the recipient on a nonconfidential basis from a source other

11:15:36    16   the disclosing party.  So information they get

11:15:40    17   nonconfidentially from a third party, right?  That's also fair

11:15:43    18   game?

11:15:43    19   A.   I mean, I'm just trying to follow along with you.  Again,

11:15:48    20   I don't do any of these agreements for us.  My president of

11:15:51    21   Gel Blaster is an attorney and does all these agreements, so,

11:15:53    22   you know, I'm trying to follow along with you as best I can.

11:15:56    23   Q.   Let me ask it this way:  Would you have any problem as a

11:15:59    24   business person if Hasbro used information that a third party

11:16:03    25   made available to it on a nonconfidential basis?

GUINN - CROSS                                                    74

| | | |
|---|---|---|
| 11:16:07 | 1 | A.   I guess I would have to know the circumstances. |
| 11:16:09 | 2 | Q.   Okay.  Fair enough.  And the last category is information |
| 11:16:12 | 3 | that is independently developed by the recipient without any |
| 11:16:15 | 4 | use of the evaluation material provided by the disclosing |
| 11:16:18 | 5 | party. |
| 11:16:19 | 6 | A.   Yeah.  I understand that one.  Yep. |
| 11:16:21 | 7 | Q.   Now, Mr. Guinn, you talked a lot in your testimony about |
| 11:16:57 | 8 | Gel Blaster's reputation.  Do you recall that? |
| 11:17:00 | 9 | A.   Yes, sir. |
| 11:17:00 | 10 | Q.   Okay.  Do you believe that Gel Blaster has a reputation |
| 11:17:05 | 11 | for making products that are safe to use? |
| 11:17:08 | 12 | A.   Yes.  I do believe we have a reputation for making safe |
| 11:17:12 | 13 | products. |
| 11:17:12 | 14 | Q.   In fact, Gel Blaster had to issue a recall on 62,000 units |
| 11:17:18 | 15 | of its Gel Blaster Surge products, right -- |
| 11:17:21 | 16 | A.   Yes, we did. |
| 11:17:22 | 17 | Q.   And that's because there was a risk that the products |
| 11:17:25 | 18 | would overheat and catch on fire, correct? |
| 11:17:27 | 19 | A.   Yes. |
| 11:17:27 | 20 | Q.   And the Consumer Product and Safety Commission required |
| 11:17:30 | 21 | Gel Blaster to make that recall, right? |
| 11:17:32 | 22 | A.   Yes, sir. |
| 11:17:33 | 23 | Q.   And, to date, isn't Gel Blaster the only company in the |
| 11:17:36 | 24 | industry that has done a safety recall? |
| 11:17:39 | 25 | A.   I have no idea. |

| | | |
|---|---|---|
| 11:17:40 | 1 | Q.   Okay.  Thank you, Mr. Guinn. |
| 11:17:47 | 2 | MR. HOFFMAN:  Your Honor, I have no further |
| 11:17:49 | 3 | questions. |
| 11:18:02 | 4 | THE COURT:  Mr. Petit, redirect? |
| 11:18:05 | 5 | **REDIRECT EXAMINATION** |
| 11:18:05 | 6 | **BY MR. PETIT:** |
| 11:18:05 | 7 | Q.   Mr. Guinn, counsel asked you about their Exhibit 36, which |
| 11:18:22 | 8 | was the e-mail describing the use of the different timing |
| 11:18:29 | 9 | mechanism in the current product, right? |
| 11:18:31 | 10 | A.   Yes, sir. |
| 11:18:32 | 11 | Q.   Did that conversation come about because Hasbro noticed a |
| 11:18:37 | 12 | difference between the CAD file they received and the actual |
| 11:18:43 | 13 | prototype of the product that was available? |
| 11:18:45 | 14 | A.   I believe so, yes. |
| 11:18:47 | 15 | Q.   So does that show that they actually received the CAD |
| 11:18:49 | 16 | files of your, you know, under-development products? |
| 11:18:54 | 17 | A.   Of course. |
| 11:18:54 | 18 | Q.   Okay.  So they actually did receive it. |
| 11:18:57 | 19 | Now, those CAD files that we're talking about, under |
| 11:19:00 | 20 | the confidentiality agreement, are those publicly available |
| 11:19:04 | 21 | anywhere? |
| 11:19:04 | 22 | A.   No.  Absolutely not. |
| 11:19:06 | 23 | MR. PETIT:  Okay.  I pass the witness. |
| 11:19:11 | 24 | MR. HOFFMAN:  No further questions, Your Honor. |
| 11:19:13 | 25 | THE COURT:  All right.  You may step down. |

```
11:19:14   1              THE WITNESS:  Thank you, Your Honor.  Should I leave
11:19:15   2   this up here?
11:19:32   3              THE COURT:  As he was leaving the stand, he was
11:19:33   4   asking a question about what to do with the binders he had in
11:19:35   5   front of him.  What do the lawyers want done with the binders.
11:19:37   6              MR. BARKAN:  I think return to counsel, Your Honor.
11:19:40   7              THE COURT:  Well, come get it.  Ms. Oakes, you don't
11:19:43   8   have to do that.
11:20:08   9              MR. DOYLE:  Hello again, Your Honor.  Scott Doyle
11:20:11  10   again on a behalf of Gel Blaster.  And I'd like to call
11:20:13  11   Mr. Vincent Cline to the stand.
11:20:51  12        (Witness sworn)
11:20:51  13                       VINCENT CLINE,
11:20:51  14   having been first duly sworn, testified as follows:
11:20:51  15                    DIRECT EXAMINATION
11:20:51  16   BY MR. DOYLE:
11:20:51  17   Q.   Could you please state your name for the record?
11:20:53  18   A.   My name is Vincent Cline.
11:20:55  19   Q.   And Mr. Cline, what's your current occupation?
11:20:59  20   A.   I am the vice president of engineering at Gel Blaster.
11:21:03  21   Q.   And how long have you been in that role?
11:21:06  22   A.   I joined the organization in March of '22.
11:21:15  23   Q.   How long have you worked in the field of engineering?
11:21:17  24   A.   I have professionally been in the field of engineering
11:21:20  25   since about the middle of 2010.
```

CLINE - DIRECT                                                    77

11:21:22   1   Q.   Do you have -- do you have an engineering degrees?

11:21:26   2   A.   I have two engineering degrees, one in engineering

11:21:29   3   technology from Texas A&M University and then a master's in

11:21:33   4   mechanical engineering from Texas A&M University.

11:21:36   5   Q.   Thank you.  What are your general duties your role as vice

11:21:41   6   president of engineering at Gel Blaster?

11:21:43   7   A.   My primary role is to oversee the product department.  So

11:21:50   8   product development, the things involving compliance,

11:21:56   9   documenting, IP, testing, things along that nature.

11:22:02  10   Q.   Okay.  Now, you mentioned that you started at Gel Blaster

11:22:06  11   in March of 2022, right?

11:22:07  12   A.   That's correct.

11:22:08  13   Q.   So you were not around when the discussions and

11:22:12  14   negotiations were going on between Hasbro and Gel Blaster, were

11:22:17  15   you?

11:22:17  16   A.   I was not.

11:22:17  17   Q.   Okay.  Have you heard of a -- today in the courtroom and

11:22:20  18   before, have you heard of the firing mechanism being referred

11:22:24  19   to as the physical firing mechanism?

11:22:26  20   A.   Yes, sir.

11:22:26  21   Q.   What did you do to familiarize yourself with that physical

11:22:32  22   firing mechanism?

11:22:33  23   A.   Yeah.  So a big part of my role is understanding where

11:22:37  24   we've been with our product development, where we currently

11:22:40  25   are, and then also mapping out our future and the development

11:22:45  1    thereof.

11:22:45  2            So I spent at lot of time looking at our historical

11:22:51  3    documentation, talking with the people that were in the

11:22:53  4    organization at the time working on it to get a good

11:22:57  5    understanding of what that physical firing mechanism was, and

11:23:02  6    at what time that was developed and when the product changed.

11:23:06  7    Q.    Okay.  Great.  Generally, could you please tell the Court

11:23:12  8    what a firing mechanism is.

11:23:14  9    A.    So for a blaster, a firing mechanism is going to be the

11:23:17  10   summation of all of the components that would be put together

11:23:21  11   in order to allow the blaster to fire.

11:23:23  12   Q.    Okay.  And, as part of your role at Gel Blaster, are you

11:23:27  13   familiar with firing mechanisms for blasters?

11:23:32  14   A.    Yes, I am.

11:23:33  15   Q.    And are you familiar with all the different ways of doing

11:23:37  16   firing mechanisms which are on the market?

11:23:39  17   A.    I'm familiar with a variety of them.  I don't know that I

11:23:43  18   can say I'm familiar with all of them.

11:23:45  19   Q.    Okay.  Does Gel Blaster have any firing mechanisms that it

11:23:49  20   has not yet released in a release product?

11:23:53  21   A.    That is correct.

11:23:53  22   Q.    And what is that?

11:23:55  23   A.    So that would be the physical firing mechanism that

11:23:58  24   includes the PISCA and the PISCA switch.

11:24:00  25   Q.    And can you tell us what "PISCA" means.

                                   CLINE - DIRECT

11:24:08    1   A.    PISCA is a plunger-integrated switch contact arm.  So it's

11:24:12    2   the -- it's the protrusion that was pointed out earlier that is

11:24:17    3   in the plunger of the firing mechanism.

11:24:20    4   Q.    And so how does Gel Blaster memorialize firing mechanisms

11:24:29    5   that it has yet not used in a released product?

11:24:32    6   A.    We have a few different ways that we'll document

11:24:35    7   development efforts and designs.  One of the primary ways is

11:24:39    8   through computer-aided design software or CAD software.  That

11:24:44    9   would be where the solid models would exist.

11:24:49   10   Q.    Anything else?

11:24:50   11   A.    We'll have documentation if we've have done testing.

11:24:54   12   Sometimes there can be 2-D sketches or designs that can be

11:24:58   13   stored as well.

11:24:59   14   Q.    Okay.  Are you familiar with the firing mechanism that was

11:25:02   15   shown in the confidential CAD drawings what were provided to

11:25:08   16   Hasbro?

11:25:09   17   A.    I am.

11:25:09   18   Q.    Okay.  And did those CAD drawings describe a firing

11:25:13   19   mechanism that has been referred to as the "physical firing

11:25:16   20   mechanism" in this case?

11:25:19   21   A.    Yes.

11:25:20   22            MR. DOYLE:  All right.  What I'd like to do,

11:25:23   23   Your Honor, is request admission of Exhibit Number 24.  I

11:25:26   24   believe you already have it in front of you.

11:25:32   25            Can we provide counsel with that?

CLINE - DIRECT                                                      80

11:25:33   1              MR. HOFFMAN:  Your Honor, I don't have a copy.  I'm
11:25:35   2  not necessarily going to object, but I don't have a copy.
11:25:38   3              MR. DOYLE:  He's going to get you one.
11:25:43   4              MR. HOFFMAN:  No objection, Your Honor.
11:25:44   5              THE COURT:  All right.  Gel Blaster Exhibit 24 is
11:25:47   6  admitted.
11:25:50   7              MR. DOYLE:  Thank you, Your Honor.
11:25:51   8  Q.   What is this?
11:25:54   9  A.   This is a cross-section of the model of the Surge blaster
11:26:00  10  at the time it existed when Gel Blaster was communicating with
11:26:04  11  Hasbro.
11:26:05  12  Q.   Okay.  And what are the components of this Gel Blaster
11:26:10  13  firing mechanism?
11:26:11  14  A.   There's several components in this view.  And the best way
11:26:16  15  to -- to explain it, I'll try to hold it up and show, this is
11:26:20  16  showing a cross-section of the blaster and the gearbox.
11:26:23  17  There's a plunger system in this region here.  This orange
11:26:28  18  shell would be the gearbox.  There's a trigger, a trigger
11:26:31  19  switch.  There's a motor.  These are the gears inside the
11:26:34  20  gearbox.  There's a T-Piece.  There's a PISCA on the plunger.
11:26:41  21  There's the PISCA switch.  There's a mode selector switch and a
11:26:44  22  power switch.
11:26:45  23  Q.   Okay.  Thank you.  What does single-fire mode mean?
11:26:50  24  A.   Single-fire mode would be, when you pull the trigger, the
11:26:54  25  blaster would fire one round.

CLINE - DIRECT                                          81

11:26:56  1  Q.   Okay.  And are you familiar with how the PISCA and the

11:26:59  2  PISCA switch operate and interact together?

11:27:04  3  A.   Yes.

11:27:04  4  Q.   Using the exhibit again, and maybe going a little bit

11:27:07  5  slower for the Court, would you mind explaining how the PISCA

11:27:10  6  and the PISCA switch interact?

11:27:13  7  A.   Yes.  So the user would pull the trigger.  This trigger

11:27:17  8  would then hit this microswitch.  That would send a signal to

11:27:22  9  the electronics board, which is not shown in the lower portion

11:27:25  10  of this.  That would then tell -- the board would then send

11:27:28  11  current to the motor which would cause the motor to start

11:27:31  12  turning.  That would in turn cause the gears to turn.  That

11:27:35  13  would then pull back the plunger system.

11:27:38  14        When the -- when this central plunger piece would

11:27:43  15  reach the rear of its stroke, the PISCA on top of it would

11:27:46  16  contact this microswitch, the PISCA switch, and then send a

11:27:51  17  signal back to the electronics board to indicate that a firing

11:27:54  18  action had taken place.

11:27:56  19  Q.   Okay.  Is that the methodology for the single-fire mode

11:28:00  20  that you just described?

11:28:02  21  A.   Yes.

11:28:03  22  Q.   Okay.  At what part of the firing cycle does the PISCA

11:28:10  23  activate the PISCA switch?

11:28:12  24  A.   So in the firing cycle, when the plunger system reaches

11:28:15  25  the rear of its stroke, that's when it would activate the

11:28:18  1   switch.

11:28:18  2   Q.   Okay.  And once the switch is activated, what happens

11:28:22  3   then?

11:28:22  4   A.   It will send a signal to the electronics board.

11:28:26  5   Q.   Okay.  Switch gears momentarily.

11:28:29  6        Are you aware of how the PISCA and the PISCA switch

11:28:35  7   compare with other firing mechanisms in the market?

11:28:39  8   A.   Yes.

11:28:40  9   Q.   Are there advantages to using the PISCA and the PISCA

11:28:44  10  switch?

11:28:44  11  A.   Yes, there are.  There are advantages to using it.

11:28:48  12  Q.   What are they?

11:28:49  13  A.   It's a simple method of being able to count individual

11:28:52  14  shots or be able to have a signal for each shot.  It uses a

11:28:57  15  single sensor that's very cost-effective, and it doesn't

11:29:01  16  require any extra components that are engaging with the plunger

11:29:05  17  system.

11:29:05  18  Q.   Okay.  Is the PISCA cost-effective?

11:29:09  19  A.   Yes.

11:29:09  20  Q.   Why is that?

11:29:10  21  A.   It's just built into the mold that -- for the plunger

11:29:14  22  component.  So very minimal additional costs of plastic and the

11:29:20  23  additional machining on the mold one time to put that feature

11:29:23  24  in.

11:29:23  25  Q.   Okay.  And what other advantages exist?

CLINE - DIRECT                                    83

```
11:29:30   1   A.    For the PISCA and the PISCA switch?

11:29:32   2   Q.    Yes.

11:29:32   3   A.    It's a cost-effective, reliable way to -- oh.  So okay.

11:29:41   4   There's -- there's some other things you can do with the

11:29:45   5   information of individual shots.  When we talked about

11:29:50   6   single-fire mode, that was one of the functionalities that

11:29:54   7   existed in the Surge and still does.  But, as far as our

11:29:58   8   future -- some of our future development, we have several other

11:30:02   9   functions that are valuable to us from that.

11:30:07  10   Q.    And what additional functionality are you referring to

11:30:11  11   that will come in future products for Gel Blaster?

11:30:13  12   A.    Sure.  So we're really looking at trying to make the game

11:30:17  13   play as engaging as possible.  And one of the ways we're doing

11:30:21  14   that is to try to make it more interactive, replicate more of

11:30:25  15   some of the things that would happen inside of a video game.

11:30:29  16         So a couple of game play examples that I could walk

11:30:32  17   through would be to have a round count limit.  So you could

11:30:35  18   have a game where everybody's only allowed to shoot 100 rounds

11:30:39  19   before their blaster shuts off.  That makes the game play a

11:30:41  20   different and more dynamic scenario.

11:30:44  21         There's -- you could do something where you could

11:30:49  22   mimic magazine capacities, and there could be different levels

11:30:52  23   of blasters depending on the players or the upgrades they have.

11:30:56  24   So one player may have something that represents a 15-round

11:30:59  25   magazine.  After 15 rounds, there would be a period of time, a
```

CLINE - DIRECT

| | |
|---|---|
| 11:31:03 | 1 |

pause, that would represent, like, a reload time, say three

seconds.  Another player may get an upgrade, and then they

would have a 30-round magazine before their blaster would pause

for three seconds to mimic that reload.

Another thing that we can do with this is have a

handicap for -- for leveling the playing field.  So if we have

some younger children or some, just depending on the skill

level of the player, that player may have -- let's say they

could fire 10 rounds a second.  And then you may have a more

experience player, an older kid or something, and they could be

limited to something like four rounds a second.

So now you can have a play where you have different

skill levels of -- of people interacting and making it more fun

and fair for a group.

THE COURT:  Thank you.  At this time we'll take our

recess.  We'll be in recess until 1:30.

(Recess)

(Open court)

THE COURT:  Anything we need to take up before we

proceed?

MR. BROADAWAY:  I don't think so, Your Honor.

MR. HOFFMAN:  No, Your Honor.

THE COURT:  All right.  Mr. Doyle, you may continue

your direct examination of Mr. Cline.

MR. DOYLE:  Thank you, Your Honor.

13:31:49   1        The first thing I'd like to do, Your Honor, just a

13:31:51   2   little housekeeping -- these are really loud -- is to -- you

13:31:58   3   already have Exhibits 25 through 30, which I plan to use, but

13:32:08   4   I'd like to introduce them into the record if I may.

13:32:11   5        Ivan, do you mind providing a copy to opposing

13:32:14   6   counsel?

13:32:15   7        MR. MORALES:  It's 25 through 31.

13:32:15   8        MR. DOYLE:  Oh.  Excuse me.  Twenty-five through 31.

13:32:32   9        MR. HOFFMAN:  Your Honor, are these marked?  Are they

13:32:34  10   sequential?  Which is which exhibit?

13:32:34  11        THE COURT:  Well, they need to be marked because

13:32:37  12   we've got to know which exhibit is what.  Whatever you're going

13:32:40  13   to put in evidence needs to be marked as an exhibit.

13:32:43  14        MR. DOYLE:  They're marked as Exhibit Numbers 25, 26,

13:32:46  15   27, 28, 29, 30, 31.

13:32:50  16        MR. HICKS:  My copy isn't marked.

13:32:53  17        MR. DOYLE:  You can just let me know which is --

13:32:56  18        MR. MORALES:  They are sequential, yes.

13:32:56  19        MR. HOFFMAN:  So each one -- may I, Your Honor?

13:32:58  20        THE COURT:  Yeah.

13:32:58  21        MR. HOFFMAN:  Each one is a single page?

13:33:00  22        MR. MORALES:  That's correct.

13:33:00  23        MR. HOFFMAN:  And they start from 25 and go through

13:33:04  24   31?

13:33:04  25        THE COURT:  And where are they found in the things I

CLINE - DIRECT                                                    86

```
13:33:06    1   have?

13:33:08    2             MR. BROADAWAY:  Behind tabs 25 through 36.

13:33:11    3             THE COURT:  Well, I know, but they're tabbed

13:33:13    4   different from the exhibit numbers.  What tab do I look under

13:33:17    5   to --

13:33:17    6             MR. BROADAWAY:  Not in ours.

13:33:18    7             THE COURT:  Oh, no.  That's right.

13:33:19    8             MR. BROADAWAY:  In Plaintiff's binder they should be

13:33:22    9   behind --

13:33:22   10             THE COURT:  All right.  I've got you.  Twenty-five

13:33:23   11   through 31.  Never mind.

13:33:38   12             MR. HOFFMAN:  No objection, Your Honor.

13:33:40   13             THE COURT:  Then Plaintiff's Exhibits 25 through 31,

13:33:43   14   inclusive, are admitted.

13:33:54   15             MR. DOYLE:  Thank you, Your Honor.

13:33:55   16   Q.   Good afternoon, Mr. Cline.  We're going to start a new

13:34:01   17   topic after lunch, and I'm going to ask you whether you're

13:34:08   18   familiar with firing mechanisms that use what is called an IR

13:34:13   19   gate system?

13:34:17   20   A.   I am familiar of some blasters that use that type of

13:34:20   21   firing mechanism?

13:34:21   22   Q.   Just briefly, how does the IR gate system operate?

13:34:25   23   A.   So, from what I've seen, it will use an LED that will

13:34:32   24   transmit a light.  There will be a sensor -- sorry.  There will

13:34:35   25   be an IR sensor.  And when something passes between those, it
```

CLINE - DIRECT                                      87

13:34:40  1  will signal -- it will trigger a signal.  So that will be the

13:34:44  2  IR gate function of the overall firing mechanism.

13:34:50  3  Q.   Okay.  And are firing mechanisms with an IR gate system

13:34:55  4  different than the PISCA and the PISCA switch of the physical

13:35:00  5  firing mechanism?

13:35:01  6  A.   Yes.  They use different components in order to get that

13:35:04  7  signal.

13:35:05  8  Q.   And of the firing mechanisms using an IR gate system that

13:35:09  9  you're familiar with, can any shots be recorded?

13:35:13  10  A.   Yes.

13:35:14  11  Q.   Are there any disadvantages to using an IR gate system to

13:35:19  12  record shots fired?

13:35:20  13  A.   Yes.  The disadvantage would be it requires two separate

13:35:28  14  electrical components.  At least the ones I've seen, they're a

13:35:30  15  more complex system and more costs associated with it.

13:35:36  16  Q.   And why are there more cost associated with it?

13:35:39  17  A.   It's a more expensive set of electronics that would be

13:35:42  18  needed instead of just a single microswitch.

13:35:47  19  Q.   Now, have you ever seen an IR gate system that used a

13:35:51  20  PISCA and a physical switch?

13:35:52  21  A.   I have not.

13:35:54  22  Q.   Okay.  Now we're going to turn to timing systems.  And I'd

13:36:00  23  would like to know whether you're familiar with firing

13:36:03  24  mechanisms that use a timing system.

13:36:08  25  A.   Yes, I am.

CLINE - DIRECT

13:36:09   1    Q.   And what is a timing system?

13:36:10   2    A.   The timing system estimates the amount of time for a

13:36:13   3    firing action for the blaster to fire, and that's what's used

13:36:19   4    to drive different firing modes.

13:36:21   5    Q.   Okay.  And are firing systems that use a timing system,

13:36:26   6    are they different from the PISCA and the physical switch?

13:36:30   7    A.   They are different.  They do not have an additional

13:36:33   8    sensor.

13:36:37   9    Q.   How does the timing system work?  What does it do?

13:36:40   10   A.   So it's estimating the time for -- or the time for a

13:36:47   11   firing action is recorded or estimated so that it can, based on

13:36:52   12   a -- that amount of time, can change the functionality so you

13:36:57   13   can do single fire or a multiround burst based on that time.

13:37:02   14   Q.   Okay.  And of these firing mechanisms and the timing

13:37:06   15   systems that you're familiar with, can you -- can any record of

13:37:11   16   shots that have fired be taken?

13:37:13   17   A.   No.  You would not be getting the feedback of actual shots

13:37:17   18   fired.  It would just be a guess based on time.  As the blaster

13:37:22   19   wears out or as the amount of power left in the battery

13:37:26   20   changes, there's variability that is involved in the overall

13:37:30   21   firing system.  So it can deviate from that time that's

13:37:36   22   programmed.

13:37:37   23   Q.   Okay.  And have you ever seen a timing system that used a

13:37:41   24   PISCA and PISCA switch?

13:37:47   25   A.   No.

CLINE - DIRECT                                                89

13:37:48    1    Q.    Okay.   What I'd like to do is change topics now to a

13:37:52    2    Hasbro product called the Stampede.   Are you familiar with the

13:37:56    3    Hasbro Stampede?

13:37:58    4    A.    I am.

13:37:58    5    Q.    And how did you develop your familiarity with the Hasbro

13:38:04    6    Stampede?

13:38:04    7    A.    I learned about it in the brief.

13:38:09    8    Q.    Can you be more specific?   What brief?

13:38:10    9    A.    The one for this injunction.

13:38:12   10    Q.    Okay.   Do you recall whether it was Gel Blaster's brief?

13:38:16   11    A.    Oh.   It was a response from Hasbro.   It was mentioned.

13:38:20   12    Q.    Okay.   Thank you.   Now, does the Stampede have a PISCA?

13:38:24   13    A.    No, it does not.

13:38:25   14    Q.    And PISCA, again, stands for the physical integrated

13:38:31   15    switch control arm; is that right?

13:38:33   16    A.    Yes.   The plunger-integrated switch contact arm.

13:38:36   17    Q.    Great.   Does the Stampede have a PISCA switch to measure

13:38:40   18    how many shots are fired?

13:38:42   19    A.    It does not.

13:38:43   20    Q.    And does the stampede have a dedicated single-fire mode?

13:38:48   21    A.    It does not.

13:38:49   22    Q.    How would you compare the firing mechanism in the Stampede

13:38:55   23    with that which would use the physical firing mechanism

13:38:59   24    comprising the PISCA and the physical switch?

13:39:02   25    A.    They're pretty different in a variety of ways.

CLINE - DIRECT

13:39:05  1  Q.   Can you name some of those ways?

13:39:08  2  A.   Yeah.  I mean, I could -- it might be easier to show, but

13:39:11  3  it's going to have a different set of components.  So the

13:39:13  4  plunger system would not have a PISCA or a PISCA switch.  That

13:39:19  5  Stampede has an additional component that is -- I would refer

13:39:25  6  to it as a trigger lever that contacts the piston system.  So

13:39:32  7  it's -- and also the trigger.  So it's mechanically a different

13:39:37  8  set of components.

13:39:39  9  Q.   Okay.  Maybe it would help if I actually show you the

13:39:43  10  diagram for it.

13:39:44  11  A.   Sure.

13:39:44  12  Q.   Can you go to exhibit -- what's been marked as Exhibit 29,

13:39:48  13  please.

13:39:57  14  A.   Okay.

13:39:57  15  Q.   And what is this exhibit?

13:39:59  16  A.   A Stampede -- a photo of a Stampede that's been partially

13:40:05  17  disassembled.

13:40:05  18  Q.   Okay.  Now, looking at this photo and pointing out in

13:40:09  19  here, how would you compare the firing mechanism of the

13:40:12  20  Stampede with that of a physical firing mechanism using the

13:40:16  21  PISCA and the physical switch?

13:40:18  22  A.   Yes.  So on this -- in this particular blaster, the

13:40:23  23  plunger is of a different construction and also operates in a

13:40:26  24  different manner.  So the piston system here moves forward when

13:40:30  25  operating.  This white piece of plastic, or this thing that I

CLINE - DIRECT

13:40:35  1  had referred to as a trigger lever contacts the plunger system

13:40:41  2  and also the trigger.  And in this case there's a switch that

13:40:46  3  would contact this trigger lever.

13:40:50  4  Q.   Okay.  And how is that different from the physical firing

13:40:54  5  mechanism?

13:40:54  6  A.   There's no -- there's no PISCA, there's no detail

13:40:58  7  integrated with the plunger system, and there's no PISCA

13:41:00  8  switch.

13:41:02  9  Q.   Okay.

13:41:02  10  A.   There's also no dedicated trigger switch, either.

13:41:08  11  Q.   Okay.  Is that system more complex than the physical

13:41:12  12  firing mechanism of Gel Blaster?

13:41:14  13  A.   It has additional components in order to operate, so yes.

13:41:19  14  Q.   Okay.  Have you ever reviewed the Hasbro Stampede that was

13:41:28  15  modified by some user on the Internet called "Darthskids"?

13:41:35  16  A.   Yes.  I'm familiar with that.

13:41:36  17  Q.   Okay.  And does that modify -- do you mind if I call it

13:41:39  18  the modified Stampede?

13:41:41  19  A.   That works.

13:41:42  20  Q.   Does the modified Stampede have a PISCA?

13:41:45  21  A.   It does not.

13:41:46  22  Q.   Okay.  I'd like you to please direct your attention to

13:41:53  23  what's been marked as Exhibit Number 30, please.

13:41:55  24  A.   Okay.

13:41:56  25  Q.   Okay.  How do you know there's no PISCA in that?  Could

CLINE - DIRECT                                                     92

13:41:59   1   you show the Court, please?

13:42:01   2   A.    So there's the same plunger system that was -- that is

13:42:06   3   normally there.  There is no additional PISCA that was added to

13:42:10   4   the plunger system.

13:42:12   5   Q.    Okay.  And what did Mr. Darthskids -- or, you know,

13:42:19   6   whether it's a he or she, Darthskids, what did they do to

13:42:23   7   modify this Stampede?

13:42:26   8   A.    So the point of the modification was to provide different

13:42:28   9   firing modes, so a single-fire and a three-round burst.

13:42:32   10              In order to do that, they had to add a variety of

13:42:35   11   electrical components.  They had to add an electronics board --

13:42:39   12   in this case it was an Arduino -- and rewire the blaster.  They

13:42:44   13   had to relocate one of the switches, basically disable it and

13:42:48   14   put it in another place to act as a trigger switch.

13:42:51   15   Q.    Okay.  During what part of the firing cycle is the switch

13:42:55   16   in the modified Stampede activated?

13:42:58   17   A.    The switch would be activated when the plunger is moving

13:43:02   18   in a forward position.  While it's moving the entire stroke, it

13:43:05   19   would be activated.

13:43:06   20   Q.    And is that different from how the activation works in the

13:43:10   21   physical firing mechanism of Gel Blaster?

13:43:12   22   A.    Yes, it is.

13:43:13   23   Q.    How so?

13:43:14   24   A.    On the firing mechanism, the physical firing mechanism

13:43:19   25   with the PISCA and the PISCA switch, the switch is contacted

CLINE - DIRECT                                              93

13:43:23    1   when the plunger is in the rearward position.

13:43:29    2   Q.   Thank you.  All right.  I'm going to switch directions

13:43:31    3   again.  And are you familiar with the Hasbro Mythic?

13:43:36    4   A.   Yes.

13:43:36    5   Q.   Okay.  If you would -- would you please look at what's

13:43:50    6   been marked as slides 26 -- I mean, not only slides, but

13:43:53    7   Exhibits 26, 27, and 28.

13:43:58    8   A.   Okay.

13:43:59    9   Q.   Have you analyzed the Hasbro Mythic?

13:44:02   10   A.   Yes, I have.

13:44:03   11   Q.   How did you go about doing that.

13:44:11   12   A.   We'll go through a process where we'll test out the

13:44:11   13   blasters, see how it functions, see what kind of features it

13:44:13   14   has, look at the industrial design, just overall fit, finish,

13:44:17   15   how it operates.  We'll look at the velocity of the rounds that

13:44:22   16   come out of it.  And then we'll disassemble it and see what --

13:44:27   17   what makes it work, what's included inside.

13:44:34   18   Q.   Okay.  When did you receive a commercial version of the

13:44:37   19   Hasbro Mythic?

13:44:38   20   A.   I preordered the Mythic at the end of July, and I received

13:44:42   21   the ones I ordered, it was at the end of September -- the very

13:44:46   22   end of September.

13:44:47   23   Q.   Okay.  And once you received that, could you just explain

13:44:51   24   the process by which you did the analysis of the Hasbro Mythic.

13:44:57   25   A.   Yeah.  Sure.  So, again, when we're doing an evaluation of

CLINE - DIRECT                                          94

13:45:01   1   a blaster product, we'll open it up, we'll see what was

13:45:04   2   included with it, we'll test out its functionality, see the

13:45:09   3   features, see how it operates, how the hopper system works,

13:45:15   4   just all of the different things that a user would interface

13:45:18   5   with.  And then we'll go through the process of opening it up

13:45:21   6   and looking at the mechanisms used for operating the blaster.

13:45:25   7   Q.   You keep referring to "we."  Who else did you work on this

13:45:29   8   analysis with of the Hasbro Mythic?

13:45:32   9   A.   So, per the engineering team, we -- we do this on a

13:45:36  10   variety of different products and blasters.  Specifically on

13:45:40  11   this one, I was -- I did this myself.  But, generally, we're

13:45:44  12   doing this as a team, so that's why I refer to "we."

13:45:48  13   Q.   Okay.  And when you were looking at the Hasbro Mythic,

13:45:52  14   what struck you?

13:45:57  15   A.   Yeah.  After opening it up, one of the things I did notice

13:46:01  16   relatively early was something that looked identical to a PISCA

13:46:05  17   and a PISCA switch.  And so that was something that I knew of

13:46:08  18   our relationship with Hasbro and how we had shared a wide

13:46:14  19   variety of documentation and information.  So it was a pretty

13:46:17  20   surprising to me to see something that was pretty specific to

13:46:21  21   the Surge, specifically the configuration that we were sharing

13:46:26  22   with Hasbro at that time, to show up in this production

13:46:29  23   blaster.

13:46:30  24   Q.   Did you go talk about this finding with anybody else in

13:46:33  25   the company?

CLINE - DIRECT                                    95

13:46:34   1   A.    I shared it with Colin and Peyton.  Those were my primary

13:46:39   2   contacts for that.

13:46:40   3   Q.    Okay.  And did you look at other features of the Mythic?

13:46:43   4   A.    Yeah.  There's a lot of different things to look at

13:46:46   5   when -- when evaluating.  So, you know, you open it up, and

13:46:49   6   there's a certain level of complexity there.  Then there's the

13:46:51   7   gearbox that can be opened up.  It's kind of this whole other

13:46:54   8   animal there with different components.

13:46:57   9         But, yeah, we went through -- it took a little bit of

13:47:00  10   time to evaluate all of the features, and then going back and

13:47:03  11   looking at what information we shared and, you know,

13:47:08  12   understanding also what else is -- is in the marketplace as

13:47:11  13   part of the overall evaluation.

13:47:12  14   Q.    And as part of your evaluation, did you look at the secret

13:47:17  15   CAD drawings of Gel Blaster which showed the physical firing

13:47:22  16   mechanism of Gel Blaster?

13:47:23  17   A.    I did.

13:47:24  18   Q.    And did you make a comparison between that and what you're

13:47:27  19   looking at in terms of the actual Hasbro Mythic?

13:47:36  20   A.    I did.

13:47:36  21   Q.    Okay.  Do you recall how long this whole processing took?

13:47:39  22   A.    It would have been at least a few weeks.  You know,

13:47:44  23   there's some back-and-forth.  You know, after we look at

13:47:47  24   something, we may decide, in general, to go back and spend some

13:47:53  25   more effort looking into some more details of certain aspects

13:47:57   1  of it.  Some of it we may document some of, and then we'll

13:48:00   2  realize later we need to document more of.  So then with the

13:48:04   3  back-and-forth with Colin and Peyton, it takes a few weeks.

13:48:08   4  Q.   Okay.  Thank you.  Now let's go ahead and look at the

13:48:13   5  PISCA.  And if we could refer to what's marked as Exhibit 26.

13:48:19   6  A.   Okay.

13:48:19   7  Q.   Okay.  When you look at that, does the Mythic have a

13:48:25   8  PISCA?

13:48:26   9  A.   Yes, it does.

13:48:27   10 Q.   And would you show the Court and maybe circle what that

13:48:31   11 is.

13:48:33   12 A.   So it's this protrusion on the rear of the piston.  It

13:48:38   13 comes up, comes out at a 90-degree angle, and points towards

13:48:42   14 the rear of the blaster.  Let me just circle it here.

13:48:44   15 Hopefully my pen shows up.  It's right here.

13:48:46   16 Q.   Okay.  Thank you.  And how does that compare to the PISCA

13:48:50   17 in the Gel Blaster trade secret design?

13:48:53   18 A.   It's quite similar.  It's very similar.  Almost identical.

13:48:57   19 Q.   Okay.  And does the Mythic have a switch activated by the

13:49:01   20 PISCA?

13:49:02   21 A.   Yes, it does.

13:49:03   22 Q.   Could you explain that operation, please.

13:49:06   23 A.   Yes.  So using this image, again, I'm going to point.

13:49:10   24 This is the PISCA at the rear of the piston.  As the blaster is

13:49:14   25 cycling, the piston is going to move rearward.  Right here --

CLINE - DIRECT

13:49:18   1   and I'll make another circle here; they kind of overlap -- is

13:49:21   2   the PISCA switch that is contacted by the switch when it is in

13:49:25   3   the rearward position.

13:49:26   4   Q.   Is that the same switch --

13:49:27   5   A.   Sorry.  Contacted by the PISCA in the rearward position.

13:49:30   6   Q.   I'm sorry.  Is that the same switch that's used in the

13:49:33   7   physical firing mechanism of the Gel Blaster design?

13:49:38   8   A.   It is, yes.

13:49:39   9   Q.   And why do you say that?

13:49:41   10   A.   It's the same type of microswitch.  It's in a slightly

13:49:45   11   different orientation, but it's the same rear position.  It's

13:49:48   12   contacted in the same manner, when the piston is in the

13:49:51   13   rearward -- moving in the rearward position.

13:49:54   14   Q.   Okay.  And when the -- when that arm -- we'll call it the

13:49:59   15   "protruding arm" here.

13:50:00   16   A.   Okay.

13:50:01   17   Q.   When it's moving backwards and it contacts the switch,

13:50:05   18   what happens?

13:50:06   19   A.   It's going to send a signal to the electronics board.

13:50:10   20   Q.   Okay.

13:50:11   21   A.   And that would be -- that would be the signal used to

13:50:15   22   drive single-fire mode in this case.

13:50:17   23   Q.   Okay.  What I'd like you just very briefly to do, if you

13:50:20   24   could, describe the process using the Mythic of how a shot is

13:50:25   25   recorded in the firing mechanism.

CLINE - DIRECT                                                    98

13:50:27   1  A.   Sure.  So a user would pull the trigger.  The trigger

13:50:33   2  would contact the trigger switch.  And I see a different image

13:50:36   3  here.  Can I point to that to explain it better, because this

13:50:38   4  one is cut off.

13:50:38   5  Q.   Sure.  You may.

13:50:41   6  A.   So this is Exhibit 27.

13:50:49   7  Q.   Thank you.

13:50:49   8  A.   So this is -- this is a partially disassembled Mythic.  It

13:50:54   9  just shows more of the overall blaster.  So the user would pull

13:50:57  10  back the trigger.  It would contact this trigger switch right

13:51:00  11  here.  That's going to send a signal to the electronics board

13:51:04  12  that's going to send current to the motor.  The motor is going

13:51:08  13  to turn the gears in the gearbox, which is going to pull the

13:51:13  14  plunger system into the rearward position and cause the gun to

13:51:16  15  fire.

13:51:16  16       While that's happening, when this piston reaches the

13:51:19  17  rearward position, the PISCA contacts -- or the protrusion on

13:51:24  18  the plunger contacts the PISCA switch.  And that would send a

13:51:27  19  signal back to the electronics board to drive a single-fire

13:51:32  20  mode.

13:51:35  21  Q.   How does the operation of the Mythic using those

13:51:40  22  components compare to the operation of the Gel Blaster trade

13:51:46  23  secret physical firing mechanism?

13:51:47  24  A.   They're the same.

13:51:48  25  Q.   Okay.  Thank you.  Changing course for a minute Mr. Cline,

13:51:58   1   you testified about certain advantages of the physical firing

13:52:00   2   mechanism earlier; is that correct?

13:52:02   3   A.   That's correct.

13:52:03   4   Q.   And were you in the courtroom when Mr. Colin Guinn also

13:52:06   5   testified about the advantages of using a physical firing

13:52:09   6   mechanism?

13:52:10   7   A.   I was.

13:52:10   8   Q.   And some of those advantages, did they -- are they

13:52:14   9   currently implemented in any of the Gel Blaster products which

13:52:18   10  are sold in the market?

13:52:19   11  A.   No.   There's -- there's a lot of work going on within the

13:52:23   12  organization to build out that whole functionality, and that's

13:52:29   13  something we're actively working on.

13:52:31   14  Q.   Okay.   And I believe Mr. Colin Guinn testified earlier

13:52:35   15  about, when that iteration of the Gel Blaster gun would come on

13:52:41   16  the market.   Do you recall that?

13:52:42   17  A.   Yeah.   There's a target for Q4 of this year.

13:52:46   18  Q.   Okay.   And with respect to that introduction, you believe

13:52:50   19  some of these advantages will be associated with the physical

13:52:54   20  firing mechanism in that particular gun?

13:52:56   21  A.   Absolutely.   That's one of the -- the kind of foundational

13:53:00   22  starting points for driving these additional game play

13:53:05   23  functionality aspects within the product.

13:53:08   24  Q.   Okay.   And do you believe that Gel Blaster shared under

13:53:14   25  the confidentiality agreement any of those advantages of new

CLINE - CROSS

13:53:19  1  functionality associated with the physical firing mechanism to

13:53:23  2  Hasbro?

13:53:24  3  A.   Yeah.   That's my understanding.   We had a provisional

13:53:27  4  patent that was submitted and shared with Hasbro that laid out

13:53:32  5  some of these game play advantages that would come from this

13:53:36  6  additional sensor.

13:53:37  7  Q.   Okay.   Thank you very much.

13:53:41  8          MR. DOYLE:   No further questions.

13:53:42  9          THE COURT:   Cross-examination?

13:53:45  10         MR. HOFFMAN:   Yes, Your Honor.   May I have a moment

13:53:47  11  to set up?

13:53:47  12         THE COURT:   You may.

13:53:48  13         MR. HOFFMAN:   Thank you, Your Honor.

13:53:58  14         Your Honor, I have binders.   May I have them passed

13:54:01  15  out?

13:54:01  16         THE COURT:   You may.

13:54:02  17         MR. HOFFMAN:   Thank you.

13:55:36  18         Thanks, Your Honor.   I'm ready to proceed.

13:55:39  19         THE COURT:   You may proceed.

13:55:40  20                   **CROSS-EXAMINATION**

13:55:40  21  **BY MR. HOFFMAN:**

13:55:40  22  Q.   So, sir, I believe I heard you testify to the Court that

13:55:44  23  the PISCA had not yet been released; is that right?

13:55:48  24  A.   I testified that the PISCA and PISCA switch had not been

13:55:51  25  released.

CLINE - CROSS

13:55:52   1   Q.   Okay.  Well, that's an important difference, you would

13:55:55   2   say, right?

13:55:56   3   A.   Sure.  I mean, that's the -- both those things are

13:55:59   4   required for the functionality of this to work.

13:56:02   5   Q.   I understand.  But, sir, I've been listening to the

13:56:06   6   testimony, and I've heard the PISCA mentioned probably dozens

13:56:10   7   of times.  The PISCA, the arm that we've heard so much about,

13:56:15   8   that's publicly known, right?

13:56:21   9   A.   Maybe.  I mean ...

13:56:21   10  Q.   You don't know?

13:56:22   11  A.   Well, I mean, I --

13:56:25   12  Q.   Is the PISCA that we've heard so much about --

13:56:29   13  A.   Yeah, okay.

13:56:30   14  Q.   -- is that publicly known or not, sir?

13:56:32   15  A.   Yes.

13:56:33   16  Q.   Okay.  Why is it publicly known?

13:56:35   17  A.   So in some of the early molds for the Surge product, that

13:56:42   18  feature was still present.

13:56:45   19  Q.   Okay.  When you say early molds, are you familiar with

13:56:49   20  what Gel Blaster calls the Surge Gen2?

13:56:53   21  A.   Yes.

13:56:54   22  Q.   And when you started at Gel Blaster in March of 2022, was

13:57:00   23  the Surge Gen2 on sale publicly?

13:57:03   24  A.   That's a great question.  I believe so.  I mean, we had

13:57:10   25  the 1.5.  There was a transition there.  Yeah.  I believe it

CLINE - CROSS

13:57:14   1   was available.

13:57:15   2   Q.   Okay.  And that March 2022 was months before Hasbro ever

13:57:20   3   sold a single Mythic, right?

13:57:22   4   A.   Yes.

13:57:23   5   Q.   Okay.  I have a Surge Gen2.  I'm going to open it up, a

13:57:32   6   few screws, and place it on the screen, if I can.

13:57:55   7           Right there, sir?

13:57:57   8   A.   I'm not --

13:57:57   9   Q.   That's a PISCA, right?

13:57:58  10   A.   I'm not really able to see this very well.  Is it okay

13:58:01  11   that I could actually see the physical one?  I'm having a hard

13:58:02  12   time seeing it on the screen.

13:58:03  13           MR. HOFFMAN:  Certainly.  Your Honor, may I?

13:58:05  14           THE COURT:  You may.

13:58:05  15           THE WITNESS:  Okay.  I appreciate it.

13:58:11  16   Q.   (BY MR. HOFFMAN) Take a look.

13:58:13  17   A.   Okay.  Thank you.

13:58:16  18   Q.   I thought you might need longer.

13:58:19  19   A.   No.  I appreciate it.  Thank you.

13:58:28  20   Q.   So the PISCA we've heard so much about, you'd agree it was

13:58:32  21   public at least by March of 2022?

13:58:36  22   A.   Yes.

13:58:37  23   Q.   Okay.  Now, you mentioned the Surge 1.5.  That one came

13:58:41  24   out in October of 2021; is that right?

13:58:44  25   A.   I'd have to double-check to be perfectly honest, but that

13:58:49   1   sounds roughly correct.

13:58:50   2   Q.   Okay.  Or at least by November?

13:58:52   3   A.   Sure.  That sounds correct.

13:58:54   4   Q.   Okay.  Did it have a PISCA?

13:58:57   5   A.   Yes.

13:58:58   6   Q.   Okay.  So a year before the motion for preliminary

13:59:04   7   injunction was filed, the PISCA was publicly known to anybody

13:59:08   8   with a screwdriver who wanted to open up the Gel Blaster?

13:59:12   9   A.   Yeah.  The PISCA, though, doesn't do anything by itself.

13:59:17   10   Q.   I understand?

13:59:17   11   A.   We've been talking about a PISCA and a PISCA switch.

13:59:20   12   Q.   We'll get there.

13:59:21   13   A.   Okay.

13:59:21   14   Q.   I want to make sure it's clear.  This arm, more than a

13:59:24   15   year before the motion in this case was filed, this PISCA arm

13:59:28   16   was known to anybody with a screwdriver who wanted to open up a

13:59:32   17   Gel Blaster, right?

13:59:33   18   A.   Yes.

13:59:33   19   Q.   Okay.  And you would agree that in the Surge 1.5 and the

13:59:45   20   Surge 2.0, the PISCA didn't have a function, right?

13:59:51   21   A.   I would agree.

13:59:52   22   Q.   Okay.  And so someone knowledgeable opened it up, would

13:59:59   23   look at it, and it didn't do anything, right?

14:00:01   24   A.   Yeah.  I think it would be pretty hard to determine its

14:00:05   25   purpose.

CLINE - CROSS

14:00:05  1  Q.   There we go.  You think that a person who understands

14:00:10  2  blasters would open up a Surge, see the PISCA, and you think

14:00:15  3  they wouldn't know what it did.  Is that your testimony?

14:00:18  4  A.   There's no switch that it's contacting.

14:00:20  5  Q.   Okay.  I understand.  Sir, I'd like to direct you -- with

14:00:26  6  the Court's permission, I'd like to watch a little small part

14:00:29  7  of the video from -- from YouTube.  It's DX-72.  If we could

14:00:38  8  queue that up and let me shut this.

14:00:40  9       (Video played)

14:01:11  10      (Video paused)

14:01:13  11  Q.   (BY MR. HOFFMAN) Okay, sir.  This is a YouTube video.

14:01:15  12  It's DX-72.  It's by a man that goes by the of "Engineerable"

14:01:21  13  on YouTube.  Are you familiar with him?

14:01:24  14  A.   I am.

14:01:24  15  Q.   And he has something of a hobby of opening up Gel Blaster,

14:01:28  16  in particular, blasters and looking inside?

14:01:30  17  A.   Yes.

14:01:31  18  Q.   You would agree?

14:01:32  19  A.   Uh-huh.

14:01:32  20  Q.   To my knowledge, he doesn't work in the industry, unless

14:01:35  21  do you know any different?

14:01:36  22  A.   I don't know that he does.

14:01:37  23  Q.   I think he's got 9,000 followers.  Probably, I'm guessing,

14:01:40  24  basement.  Maybe I'm wrong.  And he examined the Surge 2.0.

14:01:46  25  All right.  And his analysis of the PISCA begins at time mark

CLINE - CROSS                                                    105

| | | |
|---|---|---|
| 14:01:51 | 1 | 3:17.  So I'm going to play it for you. |
| 14:01:54 | 2 | (Video played) |
| 14:01:54 | 3 | (Video paused) |
| 14:02:32 | 4 | Q.   (BY MR. HOFFMAN) Okay.  So that's the gentleman not in the |
| 14:02:35 | 5 | industry.  He looked at your publicly on sale blaster with a |
| 14:02:39 | 6 | PISCA, and he seemed to have gotten it immediately.  You would |
| 14:02:44 | 7 | agree? |
| 14:02:44 | 8 | A.   Yeah.  And this video is actually one I have seen before. |
| 14:02:47 | 9 | I believe it was released in the neighborhood of about three |
| 14:02:50 | 10 | weeks ago.  And this was a video that was done after he had |
| 14:02:56 | 11 | also done some analysis of a Gelfire Mythic, which shows the |
| 14:03:01 | 12 | functionality of a PISCA and a PISCA switch with its entirety. |
| 14:03:06 | 13 | So somebody who has this kind of expertise, takes |
| 14:03:10 | 14 | apart a lot of blasters, reviews them, shows them how they |
| 14:03:13 | 15 | function.  My understanding is he has an engineering background |
| 14:03:15 | 16 | to some degree.  I didn't validate that or anything.  After |
| 14:03:19 | 17 | seeing that, this would be an easier step to make for sure. |
| 14:03:22 | 18 | Q.   That's your suspicion, sir? |
| 14:03:24 | 19 | A.   Yes. |
| 14:03:25 | 20 | Q.   But there are lots of people in the industry who you would |
| 14:03:28 | 21 | agree likely have a lot more experience with blasters and are |
| 14:03:32 | 22 | able to understand a lot more about them then Mr. Engineerable |
| 14:03:36 | 23 | here? |
| 14:03:36 | 24 | A.   Yeah.  It's kind of a vague statement, but yeah. |
| 14:03:39 | 25 | Q.   Okay. |

14:03:46  1          MR. HOFFMAN:  You can take that off.  Thank you.

14:03:48  2  Q.    And, sir, you joined Gel Blaster in March of 2022?

14:03:52  3  A.    That's correct.

14:03:53  4  Q.    And prior to that, you worked in a variety of industries

14:03:57  5  but not toys?

14:03:58  6  A.    That is correct, yes.

14:04:01  7  Q.    Okay.  In fact, in September of 2021, when Hasbro and

14:04:06  8  Gel Blaster were talking, you worked for a turbine company; is

14:04:11  9  that right?

14:04:11  10  A.    That's correct.

14:04:12  11  Q.    So right now you have less than a year of experience in

14:04:15  12  the toy business?

14:04:15  13  A.    Yeah.  Professionally.

14:04:17  14  Q.    Okay.  I imagine you played with them as a kid.  I'm not

14:04:21  15  doubting that.

14:04:22  16  A.    I've been disassembling my toys since I can remember.  So

14:04:26  17  I'm familiar with a lot of different types of toys and

14:04:29  18  functionality.

14:04:30  19  Q.    But you testified that you had spoken to other people at

14:04:33  20  Gel Blaster, and you had learned about the products that came

14:04:35  21  before your time; is that right?

14:04:37  22  A.    That's correct.

14:04:37  23  Q.    Okay.  So I'd like to talk about when you first saw the

14:04:46  24  Mythic.  You just testified that you saw -- you got your first

14:04:51  25  Mythic in September -- end of September; is that right?

CLINE - CROSS

14:04:54  1   A.   Yeah.   That was -- that was when I ordered and got a

14:04:56  2   production Mythic, was end of September.

14:04:59  3   Q.   I want to make sure I'm clear.   When was first time that

14:05:02  4   you examined the Mythic?

14:05:03  5   A.   So I saw a potentially preproduction version.   This would

14:05:14  6   have been August, I believe.

14:05:15  7   Q.   Okay.   So you -- you ordered one in September on your own

14:05:18  8   credit card, but you saw -- you examined a Mythic in August?

14:05:23  9   A.   Yeah.   To be clear, I ordered it in July.   It showed up in

14:05:26  10  September.

14:05:27  11  Q.   Okay.

14:05:27  12  A.   But, yes, I did examine a potential version of a Mythic.

14:05:34  13  I don't know how to classify it exactly.

14:05:36  14  Q.   Okay.   But it was -- it was -- did it match what you

14:05:39  15  eventually saw?

14:05:40  16  A.   It was pretty close, yeah.

14:05:42  17  Q.   And it was advertised, you understand, to be a Mythic -- a

14:05:46  18  NERF Mythic?

14:05:47  19  A.   Yes.

14:05:47  20  Q.   Okay.   And, again, you started in March, but you were here

14:05:51  21  when the ITC case -- hopefully you weren't here in the

14:05:54  22  courtroom.   You were at Gel Blaster when the ITC case was

14:05:57  23  filed, right?

14:05:58  24  A.   Yeah.   But, in all honestly, that's not something I'm very

14:06:02  25  privy to or have any information.

CLINE - CROSS

14:06:03    1   Q.    I understand.  If you could just listen to my questions.

14:06:05    2   A.    Yeah.  Sure.  I'm just trying to provide information.

14:06:08    3   Q.    I appreciate it.  So you were also at Gel Blaster when

14:06:11    4   this suit was filed, right?

14:06:13    5   A.    Yes.

14:06:13    6   Q.    Okay.  Did you examine that Mythic before or after the

14:06:20    7   suit was filed in this court?

14:06:23    8   A.    I honestly don't know.  I don't know the exact date when

14:06:26    9   this was filed, and I don't remember the exact date when I

14:06:29   10   examined.  So I honestly can't tell you.

14:06:32   11   Q.    Okay.  Do you know if anybody at Gel Blaster had examined

14:06:35   12   a Mythic when this suit was filed?

14:06:37   13   A.    I don't know the answer to that.

14:06:39   14   Q.    Okay.  So it seems as if, if you're so obviously concerned

14:06:46   15   about the Mythic, that you would remember whether or not you

14:06:49   16   saw it before or after the suit was filed, but you don't.

14:06:52   17   A.    I don't know when the suit was filed.

14:06:54   18   Q.    Okay.

14:06:59   19   A.    That's not my function at all.  I'm not involved in most

14:07:03   20   of the legal stuff.

14:07:03   21   Q.    Let's drill down on the date.  Do you believe you saw the

14:07:06   22   Mythic at the beginning of August or the second half of August?

14:07:08   23   A.    I honestly don't know.  I would have to go back and look.

14:07:11   24   I -- I don't know.

14:07:12   25   Q.    But you know it's sometime in August?

CLINE - CROSS

14:07:14   1   A.   It was sometime in August.

14:07:16   2   Q.   So your original analysis was in August?

14:07:19   3   A.   Yes.

14:07:19   4   Q.   And you saw the physical switch being used in the Mythic

14:07:23   5   in August?

14:07:26   6   A.   Yes.  Yeah.  I guess --

14:07:33   7   Q.   My question --

14:07:34   8   A.   Okay.

14:07:34   9   Q.   Do you need to clarify?  I wasn't -- didn't have a pending

14:07:37   10   question.

14:07:37   11   A.   Well, I mean, you're referring to the original one as --

14:07:41   12   as a Mythic, kind of one and the same as what we reviewed in

14:07:45   13   September.  But all that was was something that was the

14:07:49   14   potential to be a Mythic.  We had no idea what was actually

14:07:53   15   going to be on the market or how close or different it would

14:07:58   16   be.  So the real analysis couldn't take place until September

14:08:00   17   when we got a production of Mythic.

14:08:02   18   Q.   I'm just curious.  How did you get a preproduction copy of

14:08:06   19   the Mythic?

14:08:06   20   A.   It showed up at our office.  I don't know exactly where it

14:08:10   21   came from.

14:08:10   22   Q.   You think Hasbro sent you a preproduction version of the

14:08:15   23   Mythic?

14:08:16   24   A.   I honestly don't know where it came from.

14:08:18   25   Q.   You didn't ask?

CLINE - CROSS                                                    110

14:08:19  1   A.   I didn't, no.  We get a lot of different blasters that

14:08:22  2   come in for evaluating.  And so that's not a completely

14:08:30  3   non-normal thing for a different company's blaster to show up

14:08:32  4   that we'll take a look at.

14:08:35  5   Q.   And I guess how do you know it was a preproduction version

14:08:36  6   of the Mythic and not just a Mythic?

14:08:39  7   A.   Because the production Mythics hadn't -- I mean, I had

14:08:46  8   preordered it around the day that they were released, and those

14:08:50  9   hadn't shipped yet, to my knowledge.

14:08:52  10  Q.   Okay.  So we've just seen that obviously the PISCA --

14:08:59  11  while you didn't use it, the PISCA, the structure, all of that

14:09:02  12  was actually in the -- in your blasters starting at least in

14:09:07  13  November of 2021.  But, to be clear, the physical switch part

14:09:16  14  of this hasn't integrated in any of your blasters to date,

14:09:21  15  right?

14:09:21  16  A.   Yeah.  The physical switch that would contact the PISCA

14:09:24  17  has not.

14:09:24  18  Q.   Okay.  You've released, I believe, six different variants

14:09:28  19  of blasters in that intervening 16 months --

14:09:31  20  A.   I'm --

14:09:32  21  Q.   -- and none of them have a switch?

14:09:34  22  A.   We -- so you're asking me about six different blasters.

14:09:39  23  It depends where we differentiating when there's a change.  So

14:09:43  24  I don't want to get too tangled up in that detail, but what was

14:09:48  25  the rest of your question?

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

CLINE - CROSS

14:09:49  1  Q.   Well, how many blasters has Gel Blaster released since,

14:09:53  2  let's say, November of 2021?

14:09:57  3  A.   If you're talking about Surge variants, that would be a

14:10:00  4  little bit more difficult to pin down.  But we have the Surge,

14:10:06  5  the StarFire, the Surge XL, and the StarFire XL.  So those four

14:10:12  6  different blasters.  And then there's been a couple of

14:10:15  7  variations of the Surge.

14:10:15  8  Q.   And then the Surge 1.5, Surge 2.0, and Surge 3.0?

14:10:22  9  A.   Yeah.  There's some external nomenclature, and there's

14:10:27  10  some internal nomenclature.  And where that overlap is

14:10:30  11  sometimes gets a little bit confusing.  But that's roughly

14:10:35  12  correct.

14:10:35  13  Q.   Okay.  So six variants in the last 16 months, none of

14:10:38  14  which include the valuable switch; is that right?

14:10:40  15  A.   Yeah.  The blasters we're providing now have a limited

14:10:44  16  functionality to kind of introduce the type of blaster and game

14:10:50  17  play to the marketplace.  And that's what we're using to help

14:10:55  18  build upon what we're working on internally, to take this kind

14:10:58  19  of to another level, very similar to what Mr. Colin Guinn was

14:11:03  20  talking about, with trying to make the blaster play for video

14:11:07  21  game-esque.

14:11:09  22  Q.   Okay.  In your declaration for the first time, and as

14:11:18  23  mentioned earlier, you mentioned the Surge Pro, right, sir?

14:11:19  24  A.   Yeah.  That's an internal working name for kind of our

14:11:23  25  next-generation blaster that would be utilizing more of a

CLINE - CROSS

14:11:25  1  digital interface.

14:11:28  2  Q.   And when did Gel Blaster come up with the name Surge Pro?

14:11:31  3  A.   Oh, man.  I don't know for sure.  It's been tossed around

14:11:34  4  a few different times.  It's a working name, so we've had a few

14:11:37  5  different ones internally.  So I don't know exactly when that

14:11:40  6  was coined.

14:11:42  7  Q.   You reviewed the declaration of another employee of

14:11:45  8  Gel Blaster, Mr. Davis?

14:11:46  9  A.   Yeah.  I believe I read that.  I don't have it memorized

14:11:50  10  or remember it very closely, but yes.

14:11:52  11  Q.   Okay.  Mr. Davis never mentions the Surge Pro.  He simply

14:11:56  12  says there's some product, I believe he said, was expected?

14:12:00  13  A.   Uh-huh.

14:12:01  14  Q.   Is there a reason why a company, in the motion itself,

14:12:04  15  that Gel Blaster wouldn't mention this Surge Pro?

14:12:08  16  A.   Yeah, sure.  It was a -- it was a loose working name in

14:12:12  17  the earlier stages of this.  So it was -- we've been talking

14:12:17  18  about it, but we didn't have a formal product.  You know, Surge

14:12:21  19  Pro is still our working name.  I wouldn't say it's going to be

14:12:24  20  the formal name on the box when it's released.

14:12:26  21  Q.   Okay.  And right now you're targeting Q4 of 2023 for the

14:12:31  22  Surge Pro?

14:12:32  23  A.   Yes.

14:12:32  24  Q.   So roughly a little over two years since you came up with

14:12:35  25  the -- the PISCA and the switch?

CLINE - CROSS

```
14:12:37   1   A.    Yeah.   I mean, the overall ecosystem that's required to --
14:12:44   2   to have this kind of functionality, so much of it hasn't
14:12:50   3   existed yet.   So it requires a ton of development: software
14:12:54   4   development, electronics development.   We've spent a ton of
14:12:58   5   effort and energy and money in developing the first stages of
14:13:02   6   this with this future product line that we're working on.   It
14:13:07   7   is a not a simple task.
14:13:09   8               MR. HOFFMAN:   Okay.   Before I forget, Your Honor, I'd
14:13:16   9   like to move to admit Defendant's Physical 6, but it's also
14:13:17  10   photographed at Exhibit 65.
14:13:50  11               MR. BROADAWAY:   Which photograph?   You said 65?
14:13:53  12               MR. HOFFMAN:   It's photographed as Exhibit 65.   The
14:13:56  13   photographs aren't in the binder.
14:14:11  14               They've been uploaded, but I didn't -- I don't have a
14:14:14  15   printed picture of the --
14:14:18  16               MR. BROADAWAY:   Can you bring up the picture on the
14:14:20  17   screen.
14:14:21  18               MR. HOFFMAN:   We should be able to, yeah.   I'm happy
14:14:24  19   to.
14:14:49  20               MR. BROADAWAY:   Just those three photos?   So I didn't
14:14:52  21   see any pictures of the breakdown.
14:14:54  22               MR. HOFFMAN:   There is one.   Keep going.
14:15:02  23               THE COURT:   Now, are all of those pictures
14:15:04  24   Exhibit 65?
14:15:05  25               MR. HOFFMAN:   Yes, they are, Your Honor.
```

14:15:14   1                MR. DOYLE:  No objection.

14:15:16   2                THE COURT:  Exhibits -- Hasbro's Exhibits Number 6

14:15:20   3   and Exhibit Number 65 are admitted.

14:15:30   4                MR. HOFFMAN:  Your Honor, it's physical 6?

14:15:32   5                THE COURT:  Yeah.  I admitted that so the record will

14:15:34   6   be clear that we saw that and it was an exhibit when we saw it,

14:15:38   7   even though the photographs are what are going to go to the

14:15:41   8   Circuit.

14:15:41   9                MR. HOFFMAN:  Yes, Your Honor.

14:15:42  10                THE COURT:  If it goes to the Circuit.  But this way

14:15:46  11   the record is clear as it can be as to what we were doing in

14:15:49  12   the courtroom.

14:15:49  13                MR. HOFFMAN:  I understand.  Thank you, Your Honor.

14:15:50  14                THE COURT:  I'm not a big fan of the efficiency of

14:15:54  15   electronically submitting all exhibits to the Circuit.

14:15:57  16   Unfortunately, when I served on the appellate court, we

14:16:01  17   actually got original exhibits and it was quite helpful to be

14:16:04  18   able to touch them and look at them.

14:16:06  19                MR. HOFFMAN:  Thank you, Your Honor.

14:16:07  20                THE COURT:  The world has passed me by.

14:16:10  21                MR. HOFFMAN:  May I proceed, Your Honor?

14:16:12  22                THE COURT:  You may.

14:16:12  23                MR. HOFFMAN:  Thank you.

14:16:13  24   Q.   Sir, you would agree that there are many blasters -- gel

14:16:19  25   ball blasters on the market that offer both semi and auto fire?

CLINE - CROSS

```
14:16:24   1   A.   Yes.   There are some.

14:16:25   2   Q.   I think we heard earlier that Gel Blaster, the company --

14:16:33   3   and maybe I can clarify this.

14:16:33   4         You would agree that "gel blaster" is also used as a

14:16:33   5   generic term in the industry to refer to blasters that fire

14:16:39   6   these gel balls, right?

14:16:42   7   A.   I have heard people refer to it that way.

14:16:45   8   Q.   You -- you know that the term "gel blaster" was used

14:16:49   9   before the company Gel Blaster existed, right?

14:16:51  10   A.   I don't know that for a fact, but that's probably logical.

14:16:54  11   Q.   Okay.   And there are many other gel ball blasters, like I

14:16:59  12   said, on the market that do semi fire and auto fire, right?

14:17:03  13   A.   Uh-huh.

14:17:04  14   Q.   PTT, Prime Time Toys, they make one, right?

14:17:07  15   A.   Okay.

14:17:07  16   Q.   Do you know that?

14:17:08  17   A.   I'm -- yeah.   I've heard of Prime Time Toys.   I'm more

14:17:13  18   familiar with blasters themselves than maybe the companies that

14:17:16  19   make them, but yeah.   Okay.

14:17:18  20   Q.   Okay.   And a company called SplatRBall we have heard a

14:17:21  21   little bit about, they make them?

14:17:23  22   A.   I am familiar with SplatRBall, yes.

14:17:25  23   Q.   And if you turn to Exhibit 17 in your binder, that's

14:17:39  24   Defendant's Exhibit 52.   Do you see that?

14:17:41  25   A.   Yes.   I see that.
```

CLINE - CROSS

14:17:42   1   Q.   It's screenshot -- I mean, a printout from the SplatRBall

14:17:48   2   web page of the SRB400 kit.  Do you see that?

14:17:55   3   A.   I do see it.

14:17:56   4   Q.   And they offer the ability to pick semi or auto?

14:18:00   5        MR. DOYLE:  Your Honor, I'd like to object for lack

14:18:03   6   of foundation.

14:18:04   7        THE COURT:  Well, tell me the relevance of this,

14:18:06   8   Mr. Hoffman.

14:18:07   9        MR. HOFFMAN:  Your Honor, the assertion's been made

14:18:10  10   by both witnesses that somehow the functionality we're

14:18:13  11   addressing, about providing semi and auto, was a unique feature

14:18:16  12   in the industry.  And it simply isn't.  And this is to

14:18:19  13   establish that there are many different companies out there

14:18:22  14   that all offer this same functionality.  It is a well-known

14:18:26  15   functionality to provide semi and auto fire.

14:18:28  16        THE COURT:  The objection is overruled.  You may

14:18:29  17   proceed.

14:18:30  18        MR. HOFFMAN:  Thank you, Your Honor.

14:18:32  19   Q.   Mr. Cline, are you familiar with the SRB400?

14:18:36  20   A.   I am.

14:18:36  21   Q.   Okay.  And the SRB400 also on the market competes against

14:18:41  22   Gel Blaster?

14:18:42  23   A.   So, yeah, it's a broader term.  So competes against --

14:18:48  24   SplatRBall and Gel Blaster aren't competing with each other.

14:18:51  25   This product is a rifle-size product.  It has a particular

CLINE - CROSS

14:18:54  1  size -- a larger size gearbox.  Our first product was the

14:18:58  2  Surge.  That was a pistol or hand blaster.  It had a smaller

14:19:02  3  gearbox.  And the -- one of the unique things about the Surge

14:19:07  4  is there were not options for single-fire mode blasters that

14:19:13  5  were of that size.

14:19:14  6           So, yes, there's other rifle-size blasters that have

14:19:17  7  that functionality.

14:19:18  8  Q.   Okay.  The -- to be clear, the SplatRBall blaster has the

14:19:23  9  functionality?

14:19:23  10 A.   Yes.  This rifle-size blaster has that functionality.

14:19:27  11 Q.   And they use timing.  Are you aware of that?

14:19:30  12 A.   I -- man.  I don't remember this one specifically --

14:19:35  13 Q.   Okay.

14:19:36  14 A.   -- internally.

14:19:37  15 Q.   So you've made a big deal about the size.

14:19:40  16 A.   Uh-huh.

14:19:41  17 Q.   All right.  The timing functionality is performed with

14:19:45  18 circuitry, right?

14:19:46  19 A.   Uh-huh.

14:19:47  20 Q.   Does -- does the circuitry in these blasters, is it

14:19:52  21 extremely large?

14:19:53  22 A.   I mean, no.  I don't know why it's relevant.

14:19:56  23 Q.   So if a blaster uses timing, all it needs is a -- is

14:20:01  24 essentially a timing chip, right?

14:20:04  25 A.   Uh-huh.

CLINE - CROSS

14:20:04  1  Q.    And the timing chip can go in a large blaster, and it can

14:20:07  2  go in a small blaster, right?

14:20:08  3  A.    Yeah.  But nobody had really been doing it on the hand

14:20:11  4  blasters.

14:20:11  5  Q.    So you're saying nobody's made a smaller piece of plastic,

14:20:15  6  is that what you're saying, for the case?

14:20:18  7  A.    The structure is different on the pistol-size blasters.

14:20:23  8  So, you know, before the Surge, I'm not aware of any of the

14:20:27  9  handheld, pistol-size blasters that had that functionality.

14:20:33  10  Q.    Let's talk about the technology, though.

14:20:35  11  A.    Okay.

14:20:36  12  Q.    The technology for doing semi and auto, that's well known

14:20:40  13  in the industry?

14:20:41  14  A.    Yeah.

14:20:41  15  Q.    Okay.  You have no objection -- you had no issue if Hasbro

14:20:45  16  had used timing to provide the semi and auto functionality?

14:20:50  17  A.    Yeah.  I don't think I'd be sitting here right now if that

14:20:52  18  was the case.

14:20:53  19  Q.    Okay.  A consumer that buys a blaster, do you write on the

14:20:56  20  box the type of system it uses for doing semi or auto?

14:20:59  21  A.    I'm -- it's possible that it's done.  Yeah.  That's

14:21:04  22  probably not typical.

14:21:05  23  Q.    You examined the Mythic box, right?

14:21:07  24  A.    Uh-huh.

14:21:08  25  Q.    It doesn't say on there we're doing semi and auto fire

CLINE - CROSS

14:21:12  1   using a physical switch, does it?

14:21:14  2   A.    It does not.

14:21:15  3   Q.    So a consumer, the only way they would know is if they

14:21:18  4   open it up?

14:21:19  5   A.    Yeah.  Well, the consumer knows that the Mythic, which is

14:21:21  6   more of a handheld size blaster, has that functionality.

14:21:25  7   That's on the box.

14:21:26  8   Q.    Is it your opinion that Hasbro would be unable to use,

14:21:32  9   say, timing to provide semi and auto fire if they wanted to?

14:21:35  10  A.    No.  I believe Hasbro has a lot of tools in their toolbox

14:21:40  11  that could have allowed them to provide that, but they didn't.

14:21:42  12  They ended up using the PISCA and PISCA switch oriented in a

14:21:45  13  manner in identical fashion that we had in our design.

14:21:49  14  Q.    Well, we'll get there.

14:21:50  15  A.    Okay.

14:21:50  16  Q.    But, again, the ability to provide this functionality,

14:21:53  17  Hasbro could have chosen a number of ways to provide it, you'd

14:21:57  18  agree, and all would have the same look to the customer, right?

14:22:00  19  A.    Yeah.  They would have the same look to the customer.

14:22:04  20  There might be nuances on functionality that could be

14:22:06  21  different.

14:22:07  22  Q.    So let's talk about the Gel Blaster --

14:22:11  23          MR. HOFFMAN:  You can take that down, please.

14:22:14  24  Q.    -- the Gel Blaster development story.

14:22:16  25          You said something I think was interesting, sir.  You

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

CLINE - CROSS

14:22:18   1   said the Surge was Gel Blaster's first blaster, right?

14:22:21   2   A.   Yeah.  I believe I said that, yes.

14:22:26   3   Q.   Are you sure that's true, sir?

14:22:28   4   A.   No.  That's probably not entirely accurate.  That was kind

14:22:32   5   of our first flagship product that we released.

14:22:34   6   Q.   Surge wasn't Gel Blaster's first blaster, right, sir?

14:22:39   7   A.   Okay.

14:22:40   8   Q.   I'm not the one testifying, sir.  Would you agree with

14:22:43   9   that?

14:22:43  10   A.   Sure.  Yes.

14:22:44  11   Q.   Okay.  And we heard Mr. Guinn say earlier that Gel Blaster

14:22:49  12   doesn't do just reproductions of actual firearms, right?

14:22:54  13   A.   Yeah.  That's the -- part of the foundation of the

14:22:59  14   development we're doing, the direction we're going, is not

14:23:03  15   doing that.

14:23:03  16   Q.   Okay.  But you used to do that, right?

14:23:06  17   A.   So yeah.  We're getting into there's a period of time when

14:23:12  18   Gel Blaster was doing Kick Starter, when Gel Blaster maybe

14:23:19  19   before was -- I don't know if the right term even was a

14:23:22  20   registered company or something.  And some of these dates and

14:23:25  21   timelines are going to be something that I don't have memorized

14:23:28  22   or would be able to speak to in a meaningful manner.

14:23:32  23   Q.   Well, look at tab 8 in your binder, if you will.  That is

14:23:36  24   Defendant's Exhibit 43.

14:23:45  25   A.   Yes.  Okay.

CLINE - CROSS

14:23:45   1   Q.   Do you see that?

14:23:47   2   A.   Yes.

14:23:47   3   Q.   I'll represent to you this is a printout from the Wayback

14:23:50   4   Machine.  Are you familiar with the Wayback Machine?

14:23:52   5   A.   I believe that's a way to see web pages after they -- I

14:23:56   6   guess this stores them in a database, and you can see them

14:23:59   7   after they've been changed or sometime in the future; is that

14:24:02   8   correct.

14:24:02   9   Q.   Yes.  You can look back.

14:24:04  10   A.   Yeah.  Okay.

14:24:04  11   Q.   And I'll represent to you that this is a printout from

14:24:07  12   August 14th, 2020, a little over two years ago, from

14:24:11  13   gelblaster.com.  You can see that in the top of the printout,

14:24:16  14   sir.

14:24:16  15   A.   Okay.

14:24:17  16   Q.   And just for the record, if you click on "Gel Blaster

14:24:20  17   Surge," it says "coming soon."  But that's not the part I want

14:24:24  18   to ask you about.  If you could turn to the fourth page of

14:24:28  19   Exhibit 43.

14:24:32  20        And there are three blasters that you see there.

14:24:35  21   It's under the topic of featured products.  Do you see that?

14:24:39  22   A.   Yes.

14:24:40  23   Q.   And those were actually Gel Blaster's first blasters that

14:24:46  24   it sold?

14:24:46  25   A.   These are SKD's blasters.

CLINE - CROSS

| | | |
|---|---|---|
| 14:24:49 | 1 | Q.   We'll get there. |
| 14:24:50 | 2 | A.   Okay. |
| 14:24:51 | 3 | Q.   They're on Gel Blaster's website.  They're being |
| 14:24:53 | 4 | advertised and sold by Gel Blaster, right? |
| 14:24:57 | 5 | MR. DOYLE:  Objection: lack of foundation. |
| 14:24:58 | 6 | Q.   (BY MR. HOFFMAN) I'm asking the question, sir.  Do you |
| 14:24:59 | 7 | know if these -- you see they're on Gel Blaster's website, |
| 14:25:02 | 8 | right? |
| 14:25:05 | 9 | MR. HOFFMAN:  I withdrew the question.  I didn't |
| 14:25:07 | 10 | realize the objection was pending, Your Honor. |
| 14:25:09 | 11 | MR. DOYLE:  And, again, objection: lack of |
| 14:25:10 | 12 | foundation. |
| 14:25:11 | 13 | Q.   (BY MR. HOFFMAN) May I ask you, sir, are you familiar |
| 14:25:13 | 14 | with -- |
| 14:25:13 | 15 | THE COURT:  The objection is overruled. |
| 14:25:15 | 16 | Q.   (BY MR. HOFFMAN) -- Gel Blaster's website? |
| 14:25:17 | 17 | A.   I'm sorry?  I just got a little confused. |
| 14:25:19 | 18 | Q.   Are you familiar with Gel Blaster's website from August of |
| 14:25:22 | 19 | 2020? |
| 14:25:22 | 20 | THE COURT:  Now, stop just a minute.  Are we talking |
| 14:25:25 | 21 | about -- because I'm confused now -- a website called Gel |
| 14:25:29 | 22 | Blasters or a website that is sponsored by the party to this |
| 14:25:34 | 23 | lawsuit? |
| 14:25:35 | 24 | MR. HOFFMAN:  Yes, Your Honor.  This is exhibit -- |
| 14:25:36 | 25 | THE COURT:  No.  I asked in the disjunctive, so you |

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

CLINE - CROSS

14:25:41  1  can't say yes.  You've got to tell me what you know.

14:25:43  2          MR. HOFFMAN:  It is a printout of an archive of the

14:25:47  3  party's website, Your Honor.

14:25:49  4          THE COURT:  All right.  That's all I needed to know.

14:25:51  5  Go ahead.

14:25:52  6          MR. HOFFMAN:  Okay.  Thank you.

14:25:53  7  Q.  You said earlier that you had spoken to other people at

14:25:55  8  Gel Blaster about former Gel Blaster products, right?

14:25:58  9  A.  Uh-huh.

14:25:59  10  Q.  All right.  Did you speak to them about any of the

14:26:01  11  products we see on -- you know, listed on page 4 of Exhibit 43?

14:26:12  12  A.  Yeah.  I'm very vaguely aware of these.  I know that we

14:26:15  13  dealt some SKD products at one point.  But I don't think

14:26:18  14  internally we've ever referred to these as Gel Blaster products

14:26:21  15  or as our own.  Internally, the Surge was our first product.

14:26:28  16  Q.  Okay.  But would it be correct to say that Gel Blaster,

14:26:31  17  the company, was reselling those SKD blasters?

14:26:36  18  A.  That's what this appears like, yes.

14:26:38  19  Q.  Okay.  Have you looked at one of these SKD blasters

14:26:42  20  before?

14:26:42  21  A.  I did.  I did look at one of those briefly, yes.

14:26:46  22  Q.  Okay.  They're still available on Amazon from SKD,

14:26:50  23  presumably, and I have one.

14:26:52  24  A.  Okay.

14:27:03  25  Q.  This is, for the record, Defendant's Physical Exhibit 4

CLINE - CROSS

14:27:10  1  and Exhibit 63.  It's not in your binder.

14:27:12  2  A.   Okay.

14:27:13  3  Q.   It's a physical.

14:27:45  4           MR. DOYLE:  Your Honor, I'm going to object if you're

14:27:48  5  trying to say that this comes from Gel Blaster or it's a

14:27:50  6  Gel Blaster product.  There's a lack of foundation here.

14:27:55  7           MR. HOFFMAN:  Your Honor, I'm not --

14:27:56  8           THE COURT:  Number one, these are not proper lack of

14:27:59  9  foundation objections.  So your objections that you've

14:28:02  10  repeatedly made to lack of foundation continue to be overruled.

14:28:05  11           But I don't think you've asked a question about this

14:28:10  12  yet.

14:28:11  13           MR. HOFFMAN:  I haven't, Your Honor.

14:28:12  14           THE COURT:  And I think it needs to be identified.

14:28:15  15           MR. HOFFMAN:  Yes, Your Honor.

14:28:16  16           THE COURT:  So the objection is overruled without

14:28:20  17  prejudice to you making it again.

14:28:22  18           MR. DOYLE:  Okay.  Thank you, Your Honor.

14:28:25  19           MR. HOFFMAN:  May I have it back, please?

14:28:34  20           Your Honor, may I approach the witness and provide

14:28:36  21  this?

14:28:36  22           THE COURT:  You may.  And you don't ever have to ask

14:28:39  23  to approach a witness in my court.  If I think you're badgering

14:28:42  24  the witness, I will not hesitate to say something about it.

14:28:49  25  Q.   (BY MR. HOFFMAN) Now, sir, you've examined an SKD CS-007

CLINE - CROSS

14:28:56   1   blaster?

14:28:56   2   A.   I did not say that.   I have evaluated some SKD products.

14:29:00   3   I don't know that I've evaluated this specific one.

14:29:02   4   Q.   In looking at what we see in Exhibit 43, the picture of

14:29:06   5   the blaster on the Gel Blaster website, you would agree that

14:29:14   6   the markings of that blaster and the blaster you have in front

14:29:16   7   of you are the same?

14:29:18   8   A.   Yeah.   The text on it is the same.

14:29:20   9   Q.   Okay.   And SKD is a company that you said you understood

14:29:23   10   that Gel Blaster bought blasters from?

14:29:27   11   A.   Yes.

14:29:28   12   Q.   Okay.   If you could open up the blaster and take a look

14:29:36   13   inside.

14:29:36   14   A.   Uh-huh.

14:29:37   15   Q.   And then if you could turn in your binder to tab 15.

14:30:09   16   Would you agree that you see in Defendant's Exhibit 50 at

14:30:12   17   tab 15, it looks like the internals SKD CS-007 blaster?

14:30:18   18   A.   Yes.

14:30:19   19   Q.   Okay.   So I'd like to ask you a few questions in

14:30:28   20   comparison, if I could, sir.

14:30:30   21   A.   Okay.

14:30:30   22   Q.   You're familiar with the Gel Blaster Surge that we had?

14:31:01   23   A.   I am.

14:31:02   24   Q.   Okay.   We've heard a lot today about Gel Blaster's ideas,

14:31:50   25   the innovation.   You agree that what you see in the SKD blaster

CLINE - CROSS

14:31:54   1  from China, that's nothing that Gel Blaster put together,

14:31:58   2  right?

14:31:58   3  A.   Yeah.  This one here?

14:31:59   4  Q.   Right.

14:32:00   5  A.   It's separate from Gel Blaster, correct.

14:32:02   6  Q.   Okay.  I have in front of you on the screen now the

14:32:05   7  Gel Blaster Surge, all right?  And there is an internal part

14:32:11   8  all surrounded in plastic.  You'd agree, right?

14:32:13   9  A.   Yes.

14:32:14  10  Q.   What do you call that?

14:32:15  11  A.   The gearbox.

14:32:16  12  Q.   The gearbox.  All right.  Can we go --

14:32:18  13  A.   The gearbox assembly.

14:32:19  14  Q.   It's surrounded -- and flip back.  There's equally a

14:32:23  15  gearbox assembly in the one made in China, right?

14:32:26  16  A.   Yes.

14:32:27  17  Q.   Now, looking at the one made in China -- actually, they're

14:32:30  18  both in made in China.  Your Surge is also made in China; is

14:32:33  19  that right?

14:32:34  20  A.   Yeah.  I don't know if that's a relevant question.

14:32:36  21  Q.   Maybe I should be more specific.

14:32:38  22  A.   Sure.  I get it.  SKD versus Gel Blaster.

14:32:41  23  Q.   That works great.

14:32:43  24          THE COURT:  If you-all would just talk one at a time.

14:32:45  25  The court reporter can't get what you're saying.  Let him

CLINE - CROSS

14:32:48  1  finish his question, and then you let him finish whatever

14:32:51  2  statement he's making, Mr. Hoffman.

14:32:53  3          MR. HOFFMAN:  Okay.

14:32:54  4  Q.   The SKD blaster, we see there is a silver motor in the

14:32:57  5  bottom in the handle portion.  Do you see that?

14:33:00  6  A.   Yes.

14:33:00  7          MR. HOFFMAN:  If we'll go back to the Surge?  Thank

14:33:10  8  you, ma'am.

14:33:11  9  Q.   There's also a silver motor of the same shape in the

14:33:14  10  handle portion --

14:33:15  11  A.   Yes.

14:33:15  12  Q.   -- is that right?

14:33:17  13          All right.  If we look again at the Surge, there is

14:33:20  14  a -- that's fine -- if we look at the SKD, there is a switch

14:33:23  15  behind the trigger.  Do you see that?

14:33:26  16  A.   Yes.

14:33:26  17  Q.   There is the same switch in the Surge, right?

14:33:30  18  A.   Yes.

14:33:31  19  Q.   Okay.  You talked earlier about there being a feed tube at

14:33:34  20  the top where the balls come in?

14:33:37  21  A.   Uh-huh.

14:33:37  22  Q.   If we look at the SKD, that's at the top of the plastic,

14:33:41  23  right?  You can see that feed tube, right?

14:33:43  24  A.   Yes.

14:33:44  25  Q.   If we go back to the Surge, there's also a feed tube?

CLINE - CROSS

14:33:48  1    A.    Uh-huh.

14:33:48  2    Q.    Right.  We'll talk about the internals of the Surge.  All

14:33:52  3    right.  There's a gearbox, there's a spring, there's a plunger.

14:33:57  4    A.    Yes.

14:33:58  5    Q.    There also a gearbox and spring and a plunger in the SKD,

14:34:04  6    right?

14:34:04  7    A.    Yep.  And every component you've mentioned is also in the

14:34:06  8    Gelfire Mythic.

14:34:07  9    Q.    Okay.  But the SKD, it came before all of these, right?

14:34:10  10   A.    Yes.

14:34:11  11   Q.    And it was public --

14:34:12  12   A.    Yes.

14:34:12  13   Q.    -- right?

14:34:13  14         Okay.  But let's look beyond even those components.

14:34:16  15   Let's look for example?

14:34:18  16         MR. HOFFMAN:  Going back to the SKD, if we could,

14:34:20  17   ma'am?  Thank you.

14:34:23  18   Q.    Let's look at the screw holes.  Do you see the pattern of

14:34:27  19   the screws.

14:34:27  20   A.    Okay.

14:34:28  21   Q.    There's three screws on the top -- two screws on the top,

14:34:31  22   the little bumps, and then there's one screw on the right-hand

14:34:35  23   side in a circle.

14:34:36  24   A.    Okay.

14:34:36  25         MR. HOFFMAN:  Let's go back to the Gel Blaster, if we

CLINE - CROSS

14:34:38  1  could.

14:34:40  2  Q.   All right.  Bump, bump, and then a circle, right?

14:34:47  3  A.   Yeah.  This one also has a PISCA and it has a T-Piece with

14:34:51  4  a threaded barrel.  And this blaster also has a PTB in it that

14:34:56  5  the SKD does not.

14:34:57  6  Q.   I understand, sir.  I'm trying to identify exactly what

14:35:01  7  Gel Blaster developed versus -- or says they developed versus

14:35:05  8  what was already in existence and provided well before

14:35:09  9  Gel Blaster sold the first Surge.  Do you understand?

14:35:11  10  A.   Okay.

14:35:12  11  Q.   All right.  If you look at the -- the Gel Blaster, all

14:35:17  12  right, on the bottom there's a circle loop on the bottom.  And

14:35:21  13  then there's a -- see that below the motor?

14:35:26  14  A.   Oh, okay.  On the -- on the gearbox housing in the

14:35:30  15  plastic.  Okay.

14:35:31  16           MR. HOFFMAN:  And if we go back to the SKD, if we

14:35:34  17  could, ma'am.  Thank you.

14:35:36  18  Q.   Same shape, same pattern, right, sir?

14:35:40  19  A.   Okay.

14:35:40  20  Q.   Do you agree?

14:35:41  21  A.   Yes.  They're similar looking.

14:35:43  22  Q.   In fact, all the screw holes and the pattern of the

14:35:46  23  gearbox, the plastic, it's all the same between what was prior

14:35:52  24  developed and what Gel Blaster uses?

14:35:55  25  A.   It's not all the same, but there's similarities.

CLINE - CROSS

14:35:58    1            MR. HOFFMAN:  Okay.  You can take that off.  Thank

14:36:07    2    you.  Your Honor, I'd like to move to admit Exhibit 43,

14:36:14    3    Exhibit 50, and physical -- may I get that?  Exhibit 43 and

14:36:25    4    Exhibit 50, Your Honor, to start?

14:36:28    5            THE COURT:  What are we going to do about Exhibit 4?

14:36:31    6            MR. HOFFMAN:  I'm going to move to admit that as

14:36:33    7    well, Your Honor.

14:36:34    8            THE COURT:  Now, was the photograph of the SKD, was

14:36:40    9    it 43 or was it 63?  I had written it down first as 63.

14:36:45   10            MR. HOFFMAN:  The photograph of the SKD was 50, sir.

14:36:48   11            THE COURT:  That's the internal.

14:36:50   12            MR. HOFFMAN:  The internals.  Oh.  The outside

14:36:53   13    photograph of the SKD is Exhibit 43, Your Honor.

14:36:59   14            THE COURT:  All right.  Objections?

14:37:04   15            MR. DOYLE:  Your Honor, we object on authentication.

14:37:07   16            THE COURT:  Overruled.  Exhibits 4, 43, and 50 are

14:37:10   17    admitted.

14:37:16   18            MR. HOFFMAN:  I'm being corrected and told it is --

14:37:18   19    no.  It's 43.  Sorry, Your Honor.

14:37:37   20            THE COURT:  43?  You want to vote?  No.  There's not

14:37:37   21    a 63 that has been offered or admitted according to them.

14:37:42   22            Is it 43 or 63?  Because I had written down when you

14:37:46   23    first started talking about the exterior photograph of the SKD

14:37:52   24    blaster, that you said 63.

14:37:54   25            MR. HOFFMAN:  We're good.  It's 43, Your Honor.

CLINE - CROSS

14:37:56  1      THE COURT:  All right.  Then 4, 43 and 50 are

14:37:59  2  admitted over objection.  Sixty-three is not in the record

14:38:02  3  anywhere.  I'm getting an argument out of my clerk.

14:38:22  4      (*Sotto voce* discussion between the Court and clerk)

14:38:22  5  Q.  (BY MR. HOFFMAN) During Mr. Guinns' testimony, we heard

14:38:28  6  that the things that made Gel Blaster successful are that

14:38:35  7  they're battery-powered, sold in the U.S., fully automatic,

14:38:39  8  shooting a relatively inexpensive ammunition?  Do you remember

14:38:44  9  that?

14:38:44  10 A.  Yeah.  He was talking about the gel ball category and some

14:38:47  11 of the benefits those blasters have over what's been out in the

14:38:51  12 market.

14:38:51  13 Q.  But, Gel Blaster wasn't the first company to sell a

14:38:56  14 battery-powered, gel ball-firing, fully automatic blaster in

14:39:04  15 the U.S., right, sir?

14:39:06  16 A.  I don't know that for sure.

14:39:08  17 Q.  Are you familiar with a company called the Maya Group?

14:39:12  18 A.  I've heard of the Maya Group, yes.

14:39:14  19 Q.  And did the Maya Group have a blaster, the BlasterPro in

14:39:21  20 2011, 2012?

14:39:23  21 A.  I am not familiar.

14:39:25  22 Q.  Okay.  So you wouldn't know if that blaster also was

14:39:30  23 battery-powered, fully automatic, and firing gel balls?

14:39:33  24 A.  I'm not familiar with that blaster.

14:39:36  25 Q.  Okay.  If you -- if you could turn in your binder, sir, to

CLINE - CROSS

14:39:51   1   tab 3.  Sir, tab 3 is marked as Defendant's Exhibit 41.  Do you

14:40:11   2   see, that sir?

14:40:12   3   A.   Yes, I do.

14:40:12   4   Q.   And that has a picture of the Gel Blaster's line on the

14:40:15   5   top and the picture of the Mythic on the bottom.  Do you see

14:40:19   6   that, sir?

14:40:21   7   A.   Yes.

14:40:21   8   Q.   Okay.

14:40:26   9              THE COURT:  Pardon me.  What exhibit are we looking

14:40:28   10  at?

14:40:29   11             MR. HOFFMAN:  Exhibit 41, Your Honor, tab 3.

14:40:42   12  Q.   You would agree, sir, that the Mythic and the Surge don't

14:40:45   13  look much alike, right?

14:40:46   14  A.   Externally, they look very different.

14:40:49   15  Q.   We've heard a lot about pistol, one-handed.  The Mythic is

14:40:54   16  a two-handed design?

14:40:56   17  A.   Based on pistol architecture, that could be argued.  I

14:41:00   18  understand where you're coming from, yes.

14:41:02   19  Q.   It has a post in the front for a second hand, you would

14:41:04   20  agree?  It's not a pistol?

14:41:06   21  A.   Okay.

14:41:07   22  Q.   Would you agree with that?

14:41:08   23  A.   It has a collapsible stock and can be used in a pistol

14:41:12   24  orientation.  That's one of the things that's said on the box.

14:41:15   25  Q.   And the Gel Blaster Surge doesn't have an extendable

CLINE - CROSS

14:41:20  1   stock, does it?

14:41:20  2   A.    No, it does not.

14:41:21  3   Q.    Oh.  And the Mythic has a removable battery, and the Surge

14:41:26  4   doesn't; is that right?

14:41:26  5   A.    That's correct.

14:41:27  6   Q.    Okay.  Now let's look at the inside.  You mentioned that.

14:41:31  7   A.    Okay.

14:41:31  8   Q.    So let's compare the inside to the outside.

14:41:34  9         The motor for the Surge is in the handle, right?

14:41:39  10  A.    Yes.  That's correct.

14:41:41  11  Q.    Okay.  The motor for the Mythic is not in the handle,

14:41:45  12  right?

14:41:45  13  A.    Yeah.  The gearbox is oriented differently.

14:41:47  14  Q.    Okay.  So the -- Hasbro put the gearbox in a different

14:41:51  15  location than in the Surge?

14:41:53  16  A.    Yeah.  They oriented the gears differently.

14:41:55  17  Q.    Have you seen anybody else in the industry that has

14:41:58  18  created a gearbox like Hasbro has and put the motor up into the

14:42:02  19  blaster like that?

14:42:03  20  A.    I have, and I'm not exactly sure who manufactured it.  But

14:42:09  21  DJI had a Rover type product that had a gel ball blaster, and

14:42:16  22  they oriented the gears in a linear fashion.

14:42:18  23  Q.    Okay.  But that's not Gel Blaster?

14:42:20  24  A.    It's not Gel Blaster.

14:42:22  25  Q.    Okay.  Different than Gel Blaster?

CLINE - CROSS

14:42:24   1   A.   Uh-huh.

14:42:24   2   Q.   Okay.  Let's talk about the switch.

14:42:26   3   A.   Okay.

14:42:30   4   Q.   You would agree that, in the Mythic, the switch is above

14:42:33   5   the gearbox, right?

14:42:34   6   A.   Yes.  It's above and the rear of the gearbox.

14:42:39   7   Q.   Okay.  And in the Surge where you were proposing to put

14:42:42   8   the switch, that's behind the gearbox?

14:42:44   9   A.   Yeah.  It's above and at the rear of the gearbox.

14:42:47  10   Q.   There's a plane that goes between the gearbox and the

14:42:51  11   switch in the Surge, right?

14:42:53  12   A.   Okay.

14:42:53  13   Q.   Is that true?

14:42:55  14   A.   Well, I don't know.  Maybe you can describe the plane

14:42:58  15   you're talking about.

14:42:59  16   Q.   Okay.  That's all right, sir.

14:43:00  17   A.   Okay.

14:43:01  18   Q.   You'd also agree that in the Mythic the switch is

14:43:07  19   horizontal, right, sir?

14:43:10  20   A.   Yes.

14:43:10  21   Q.   And in the Surge the switch is, again, behind and

14:43:13  22   vertical?

14:43:14  23   A.   Correct.

14:43:14  24   Q.   And that's a difference, right, sir?

14:43:16  25   A.   It's a different orientation of the switch.

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

CLINE - CROSS

14:43:18   1    Q.   Okay.  And, again, what you -- the PISCA, what you call

14:43:23   2    the PISCA, it's tubular, right, sir?

14:43:26   3    A.   Part of it is.

14:43:29   4    Q.   Okay.

14:43:29   5    A.   On the Surge part of it is tubular, yep.

14:43:32   6    Q.   Okay.  And it makes contact with the switch perpendicular

14:43:37   7    is that right, sir?

14:43:38   8    A.   Yes.

14:43:38   9    Q.   In the Mythic you would agree that the interface portion,

14:43:44   10   that's not tubular, right?

14:43:47   11   A.   Yeah.  So the PISCA on the Mythic has a little different

14:43:52   12   shape.

14:43:52   13   Q.   And it doesn't make contact perpendicularly.  It comes in

14:43:57   14   parallel?

14:43:57   15   A.   Yes.

14:43:57   16   Q.   Because the switch orientation has been changed.

14:44:03   17   A.   Okay.

14:44:03   18   Q.   Almost done, sir.  Thank you for your patience.  I

14:44:08   19   appreciate it.

14:44:09   20        MR. HOFFMAN:  Could we move to admit Exhibit 41,

14:44:11   21   Your Honor?

14:44:12   22        THE COURT:  I don't know.  Can you?

14:44:13   23        MR. HOFFMAN:  I'd like to move to admit Exhibit 41,

14:44:15   24   Your Honor.

14:44:15   25        THE COURT:  All right.  Objection?

                          CLINE - CROSS

14:44:17   1              MR. DOYLE:  No objection, Your Honor.

14:44:18   2              THE COURT:  Exhibit Number 41 is admitted.

14:44:24   3    Q.  (BY MR. HOFFMAN) I'd like to go, if I could, one of the

14:44:28   4    exhibits you've looked at on your direct examination.

14:44:47   5              MR. HOFFMAN:  Your Honor, may I ask them if the

14:44:49   6    plaintiffs can put it up on the screen, it might be better if

14:44:52   7    they use their version, and it would probably be a little

14:44:54   8    cleaner.

14:44:54   9              THE COURT:  You can talk to the plaintiffs anytime

14:44:57  10    you want to talk to them.

14:44:57  11              MR. HOFFMAN:  Could you put up Exhibit 30 on the

14:44:59  12    screen, please?  Thank you.

14:45:03  13              THE COURT:  We're fairly cordial here.  You don't

14:45:06  14    have to ask permission to talk to your opposition.

14:45:09  15              MR. HOFFMAN:  Thank you, Your Honor.

14:45:23  16    Q.  You talked about, you would agree, sir, the NerfHaven

14:45:27  17    version of the Stampede, right?

14:45:28  18    A.  Yes.  So we were talking about this as the Darthskids

14:45:32  19    modification.

14:45:32  20    Q.  You mind if I call it the NerfHaven Stampede?

14:45:37  21    A.  That's fine.

14:45:38  22    Q.  And the NerfHaven Stampede, it was publicly available on a

14:45:42  23    website, right?

14:45:43  24    A.  Yes.

14:45:43  25    Q.  Well before Hasbro began the design of the Mythic, right?

CLINE - CROSS

14:45:47  1  A.   Yes.

14:45:47  2  Q.   And you were discussing with your counsel the differences

14:45:51  3  between the -- the NerfHaven Stampede and the Surge design; is

14:45:57  4  that right?

14:45:57  5  A.   Yes.

14:45:58  6  Q.   And you said it didn't have a PISCA right?

14:46:00  7  A.   That's correct.

14:46:01  8  Q.   To be clear, that's a term you made up, right?  Gel

14:46:06  9  Blaster invented the term PISCA, right?

14:46:08  10       MR. DOYLE:  Objection.  Sorry, Your Honor.

14:46:12  11  Objection.

14:46:13  12       THE COURT:  And the objection is?

14:46:15  13       MR. DOYLE:  And the objection is assumes facts not in

14:46:21  14  evidence and authentication.

14:46:27  15       THE COURT:  Mr. Hoffman, just restate your question.

14:46:30  16  Let me hear it again.

14:46:32  17  Q.   (BY MR. HOFFMAN) The word -- the term PISCA, P-I-S-C, that

14:46:35  18  abbreviation, that was made up by Gel Blaster, right.

14:46:38  19       MR. DOYLE:  Objection, Your Honor, and I object to

14:46:41  20  the form of the question.  He said PISCA and then he just said

14:46:45  21  P-I-S-C.  So maybe he can restate the question.

14:46:48  22       THE COURT:  I understand what he's talking about, but

14:46:50  23  try again, Mr. Hoffman.

14:46:51  24  Q.   (BY MR. HOFFMAN) Mr. Cline, the PISCA, P-I-S-C-A, that is

14:46:58  25  a term that was made up by Gel Blaster, right?

14:47:02   1   A.   It is an acronym for the descriptive clause of what that

14:47:07   2   is.

14:47:07   3   Q.   Okay.  But you -- Gel Blaster made up that term.  It

14:47:14   4   wasn't one known in the industry before you?

14:47:18   5   A.   Again, it's an acronym for a descriptive clause, so I

14:47:21   6   don't know that it's any kind of a formal term.

14:47:24   7   Q.   So a 2014 drawing is not going to use the word PISCA,

14:47:30   8   right?

14:47:31   9   A.   It might not.  Again, it's a descriptive term.  So if

14:47:35  10   there is a plunger-integrated switch contact arm on this

14:47:38  11   plunger system, then it could have been described as such.

14:47:43  12   Q.   So let's talk about the technology in this blaster.

14:47:45  13   A.   Okay.

14:47:45  14   Q.   You would agree that every cycle of the plunger in the

14:47:52  15   NerfHaven Stampede, the switch is pressed and released once,

14:47:56  16   right.

14:48:00  17   A.   So there's a -- that is potentially correct.  The element

14:48:04  18   of this wasn't clear to me based on what was provided on the

14:48:08  19   website, and that is that the stroke of the trigger is limited.

14:48:12  20   If the stroke of the trigger is not limited, then you would not

14:48:16  21   be able to say that.

14:48:20  22   Q.   Okay.  You analyzed the code for the NerfHaven Stampede?

14:48:25  23   A.   I looked over it.  I'm not a coder or an electrical

14:48:29  24   engineer, so that's not my background.

14:48:32  25   Q.   But I believe you refer to something in your declaration

CLINE - CROSS

14:48:35    1    as something called the bolt skid switch?

14:48:37    2    A.    Yeah.  In the photos --

14:48:38    3    Q.    Okay.

14:48:39    4    A.    -- the trigger switch gets renamed after the modification.

14:48:42    5    Q.    And the bolt skid switch?

14:48:44    6    A.    Bolt sled.

14:48:46    7    Q.    Bolt sled -- excuse me.  Bolt sled switch is pressed once

14:48:50    8    per firing cycle, correct?

14:48:52    9    A.    It would be held down during the firing cycle if the

14:48:57   10    trigger is not contacting the trigger lever.

14:49:01   11    Q.    And it would be pressed and released once per cycle,

14:49:06   12    correct.

14:49:07   13    A.    Pressed -- if the trigger is not contacting the trigger

14:49:10   14    lever, then yes.

14:49:11   15    Q.    Okay.  And when the NerfHaven Stampede is in

14:49:16   16    semiautomatic, it will use that signal from the bolt sled

14:49:23   17    switch to only fire one shot, right?

14:49:24   18    A.    Yeah.  That's my understanding.

14:49:26   19    Q.    And when it's in automatic mode, it will ignore that --

14:49:29   20    the signal from the bolt sled switch and fire until the trigger

14:49:34   21    is released?

14:49:35   22    A.    That's my understanding, yes.

14:49:37   23    Q.    So, functionally, it performs semi and auto?

14:49:40   24    A.    Yeah.  Functionally.  We also were talking about there are

14:49:43   25    other blasters that function similarly.  But it's a completely

14:49:47   1   different mechanism at play here.  When you compare the Mythic

14:49:51   2   internals and functionally what's happening with the interface

14:49:55   3   of the switch to the Surge, they're very much the same.  The

14:49:58   4   inside of the Stampede is very different, extra component, this

14:50:02   5   trigger lever arm contacts the trigger, and the piston system.

14:50:06   6   It's a very different layout.

14:50:07   7   Q.   But the NerfHaven Stampede has a switch that's used to

14:50:11   8   provide semi and auto, right?

14:50:14   9   A.   Yes.

14:50:14   10  Q.   Okay.  And the PISCA, it's been public for a year, right?

14:50:21   11  A.   The PISCA has been.  But without the PISCA switch and the

14:50:26   12  combination of them, it has no function.

14:50:28   13  Q.   But the PISCA has been public for a year, and a switch

14:50:31   14  that does semi and auto and gets pressed, that's been public

14:50:35   15  for at least five years, right?

14:50:40   16  A.   The only time they've been used together in the public

14:50:43   17  space is in the Gelfire Mythic.

14:50:46   18          MR. HOFFMAN:  No further questions, Your Honor.  Pass

14:50:48   19  the witness.

14:50:50   20          THE COURT:  Redirect?

14:50:51   21          MR. DOYLE:  Thank you, Your Honor.

14:51:22   22                    **REDIRECT EXAMINATION**

14:51:22   23  **BY MR. DOYLE:**

14:51:23   24  Q.   Mr. Cline, Mr. Hoffman asked you some questions in regard

14:51:26   25  to the Gel Blaster Surge; is that right, which has been marked

CLINE - REDIRECT                                              141

14:51:29   1   as Defendant's Exhibit 65?

14:51:31   2   A.    Yes.

14:51:32   3   Q.    Okay.  What I would like to do is bring this Surge up to

14:51:35   4   you and take it apart as it was and bring this one part up to

14:51:43   5   you.

14:51:43   6         Okay.  Do you see that?

14:51:51   7   A.    Yes.  I see it.

14:51:53   8   Q.    Okay.  Do you see where there's what he was calling the

14:52:01   9   PISCA that is coming out of the innards of that particular gun?

14:52:08  10   A.    Yeah.

14:52:09  11   Q.    Okay.

14:52:10  12   A.    Yes.  I see it.

14:52:11  13   Q.    If you didn't know about the trade secret, if you didn't

14:52:14  14   know about the physical firing mechanism that Gel Blaster came

14:52:17  15   up with and how it worked and you would have received that gun,

14:52:22  16   would you think that the trade secret has been disclosed

14:52:25  17   publicly, just looking at that?

14:52:28  18   A.    No.

14:52:29  19   Q.    And why not?

14:52:30  20   A.    It doesn't -- it doesn't have any function.  It doesn't --

14:52:37  21   it doesn't indicate what the function would be.

14:52:40  22   Q.    What does it look like to you?

14:52:41  23   A.    It's a protrusion out of the gearbox.

14:52:44  24   Q.    Does it look like a hood ornament?

14:52:47  25   A.    Kind of.

CLINE - REDIRECT

14:52:48  1   Q.   Okay.  Looking at that in isolation, would you have any
14:52:53  2   idea what it may be used for?
14:52:55  3   A.   Not immediately.  I would have to think about how it could
14:52:59  4   have been used.  No, I don't.  Yeah.
14:53:02  5   Q.   So do you believe that the trade secret -- in order to
14:53:08  6   identify the trade secret, you would need not only that
14:53:14  7   particular protrusion, but also a switch and a switch that
14:53:18  8   would be connected to some other aspect of the gun; is that
14:53:22  9   right?
14:53:22  10  A.   Yeah.  It would need a switch, and those components would
14:53:27  11  need to drive a particular functionality.
14:53:31  12  Q.   Okay.  So let's say you had that gun and you wanted to
14:53:34  13  operate it and you want to determine what the firing mechanism
14:53:37  14  was, okay?
14:53:38  15  A.   Uh-huh.
14:53:38  16  Q.   If you pull the trigger, would that tell you that, wow,
14:53:45  17  this could be a physical firing mechanism using that PISCA on
14:53:48  18  top?
14:53:48  19  A.   It does not.
14:53:49  20  Q.   Why not?
14:53:50  21  A.   There's no indication that there's a physical switch that
14:53:54  22  would be contacted in the cycling of the blaster.
14:53:58  23  Q.   So when you look at that and if you did pull the trigger,
14:54:00  24  what do you see?
14:54:01  25  A.   I would just see it cycling.  I would see the plunger

CLINE - REDIRECT

14:54:05  1  moving back and forth or the piece on top moving back and

14:54:09  2  forth.

14:54:09  3  Q.   Is it using a physical firing mechanism?

14:54:11  4  A.   No.

14:54:11  5  Q.   What's it using?

14:54:12  6  A.   It's using a timing method.

14:54:14  7  Q.   Oh.  Thank you very much.

14:54:18  8       Earlier counsel put up a video.  I believe it was

14:54:24  9  Mr. -- what was the name of that guy?  Mr. Everyone?

14:54:28  10  A.   Engineerable.

14:54:29  11  Q.   Mr. Engineerable.  That's right.  Have you ever seen that

14:54:35  12  video before?

14:54:36  13  A.   I have, yes.

14:54:37  14  Q.   And what's your understanding of when it came out?

14:54:41  15  A.   My understanding is that it came out roughly three weeks

14:54:44  16  ago.  I don't know the exact date.

14:54:46  17  Q.   Okay.  And is that after the Mythic was released --

14:54:50  18  A.   Yes.

14:54:50  19  Q.   -- publicly?

14:54:51  20  A.   Yes.

14:54:51  21  Q.   And when was the Mythic released publicly?

14:54:54  22  A.   The one I got was the end of September, so I assume that's

14:54:58  23  when it was publicly available.

14:55:00  24  Q.   And do you believe that when the Mythic was released

14:55:03  25  publicly that that disclosed Gel Blaster's trade secret?

CLINE - REDIRECT                                                144

14:55:08   1   A.   Yes.

14:55:08   2   Q.   Okay.  Do you know if this Mr. --

14:55:13   3        Say it again.

14:55:13   4   A.   Engineerable.

14:55:14   5   Q.   -- Engineerable.  Do you know if Mr. Engineerable has ever

14:55:19   6   looked at or analyzed Hasbro's Mythic gun?

14:55:23   7   A.   He has, yes.

14:55:23   8   Q.   Okay.  And if he had looked at Hasbro's Mythic gun, would

14:55:27   9   he have seen a PISCA-looking arm and also a PISCA switch?

14:55:37  10   A.   He has.  And there is a video that shows him identifying

14:55:41  11   those.

14:55:41  12   Q.   Okay.  So if he had that basic knowledge, do you think

14:55:44  13   that might -- that given that basic knowledge, would he then

14:55:49  14   know how the Surge was operating?

14:55:53  15   A.   Yeah.

14:55:53  16   Q.   Or perhaps could operate?

14:55:55  17   A.   Yes.  If -- if I had seen a Mythic and how it functions

14:56:00  18   with the PISCA and the switch and then saw the Gel Blaster, you

14:56:04  19   could then start making that connection because it's such a

14:56:07  20   similar feature, in the same location, and operating in the

14:56:12  21   same manner.

14:56:12  22   Q.   Is it your belief that he was able to make the comments he

14:56:15  23   did based on the Surge that doesn't even have a switch because

14:56:18  24   he had already looked at the Mythic and figured out the

14:56:22  25   physical firing mechanism that they ripped off in the Mythic?

14:56:26   1   A.   That would be my guess, yes.

14:56:27   2   Q.   All right.  Thank you very much.

14:56:32   3            MR. BROADAWAY:  No further questions, Your Honor.

14:56:35   4            THE COURT:  Recross, Mr. Hoffman?

14:56:36   5            MR. HOFFMAN:  Very briefly, Your Honor.

14:56:42   6            If we could bring up DX-72 again.  And, now,

14:57:10   7   Your Honor, we're at time stamp 8 minutes and 6 seconds.

14:57:17   8                    **RECROSS-EXAMINATION**

14:57:17   9   **BY MR. HOFFMAN:**

14:57:17  10   Q.   And see on the screen there's a physical switch that

14:57:18  11   controls the trigger.  Do you see that, sir?

14:57:21  12   A.   I do.

14:57:21  13   Q.   And there's two holes in that physical switch, you would

14:57:25  14   agree?

14:57:25  15   A.   Uh-huh.

14:57:26  16   Q.   There's two plastic posts, white plastic posts, that go up

14:57:29  17   through that switch.  We would agree, right?

14:57:33  18   A.   I see that.

14:57:33  19   Q.   All right.  And so a switch has two holes in it, and

14:57:38  20   plastic posts go through those holes in the Surge, correct?

14:57:42  21   A.   Yes.

14:57:42  22   Q.   Okay.  Now let's look at up the upper right-hand side of

14:57:46  23   the screen.  That's where you say the PISCA switch would go in

14:57:49  24   your design, correct?

14:57:53  25   A.   Yes.

14:57:54  1   Q.   There's a little part there with two plastic posts that to

14:57:57  2   me look the same spacing as the plastic posts used for the

14:58:06  3   switch in the trigger.  You would agree, right?

14:58:07  4   A.   The posts look similar, yes.

14:58:10  5   Q.   If I took a switch like you use in your blasters, would it

14:58:14  6   fit on those two posts in the upper corner?

14:58:16  7   A.   Uh, likely.

14:58:19  8           MR. HOFFMAN:  No further questions, Your Honor.  I

14:58:21  9   would like to admit -- I would like to move to admit DX-72,

14:58:25  10  which is this video, Your Honor.

14:58:39  11          MR. BROADAWAY:  No objection.

14:58:40  12          THE COURT:  Hasbro Exhibit 72 is admitted.

14:58:49  13          Further evidence from Gel Blaster?

14:58:53  14          MR. BROADAWAY:  Your Honor, we reserve our time for

14:58:55  15  cross, so no further evidence.

14:58:57  16          THE COURT:  All right.  Does Hasbro have witnesses?

14:59:00  17          MR. HOFFMAN:  Yes, Your Honor.

14:59:01  18          THE COURT:  All right.  You may call your first

14:59:04  19  witness.

14:59:04  20          MR. HOFFMAN:  Your Honor, Hasbro calls

14:59:07  21  Mr. Nicholas Tino.

14:59:46  22      (Witness sworn)

14:59:46  23          MR. HOFFMAN:  Your Honor, we have a binder to hand

14:59:48  24  out.

15:00:25  25          Your Honor, I'm ready to proceed.

TINO - DIRECT                                                      147

| | | |
|---|---|---|
| 15:00:26 | 1 | THE COURT:  You may. |
| 15:00:27 | 2 | **NICHOLAS TINO,** |
| 15:00:27 | 3 | having been first duly sworn, testified as follows: |
| 15:00:27 | 4 | **DIRECT EXAMINATION** |
| 15:00:27 | 5 | **BY MR. HOFFMAN:** |
| 15:00:27 | 6 | Q.   Good afternoon, sir. |
| 15:00:29 | 7 | A.   Good afternoon. |
| 15:00:30 | 8 | Q.   Could you introduce yourself to the court. |
| 15:00:32 | 9 | A.   Yes.  My name is Nicholas Tino. |
| 15:00:34 | 10 | Q.   And, sir, could you spell your name for the record. |
| 15:00:36 | 11 | A.   Yes.  It's N-i-c-h-o-l-a-s, space, T-i-n-o. |
| 15:00:47 | 12 | Q.   And what do you do for Hasbro, sir? |
| 15:00:49 | 13 | A.   I'm an engineering manager on the NERF business. |
| 15:00:52 | 14 | Q.   And can you tell us a little bit about your education. |
| 15:00:55 | 15 | A.   Yes.  I have a bachelor's of science in mechanical |
| 15:00:57 | 16 | engineering from the University of Massachusetts Amherst. |
| 15:01:01 | 17 | Q.   And when did you start working for Hasbro, sir? |
| 15:01:04 | 18 | A.   In 2014. |
| 15:01:07 | 19 | Q.   We're on the clock and time is ticking, so let me just ask |
| 15:01:11 | 20 | you, Mr. Tino:  Does the Mythic incorporate anything learned |
| 15:01:15 | 21 | from Gel Blaster during the due diligence? |
| 15:01:19 | 22 | A.   No. |
| 15:01:19 | 23 | Q.   And how do you know that? |
| 15:01:21 | 24 | A.   Because I was the product lead on developing the Gelfire |
| 15:01:25 | 25 | Mythic. |

TINO - DIRECT                                                              148

15:01:25  1    Q.    And, as the product lead, what was the process used to

15:01:29  2    develop the Mythic?

15:01:31  3    A.    It was a standard process that we typically use for

15:01:35  4    developing a blaster, although on an expedited timeline, but

15:01:39  5    not uncommon.  We start by utilizing -- looking at the existing

15:01:42  6    marketplace in the space.

15:01:44  7    Q.    Okay.  And we'll get back to that in a minute.

15:01:48  8          Before we start, sir, if you could turn in your

15:01:51  9    binder to tab 2, which is Exhibit 2.

15:02:00  10   A.    Yes.

15:02:02  11   Q.    Do you recognize Exhibit 2, sir?

15:02:05  12   A.    Yes, I do.

15:02:06  13   Q.    And do we see several NERF blasters in Exhibit 2?

15:02:11  14   A.    Yes.

15:02:11  15   Q.    And starting in the upper right-hand corner, there's the

15:02:15  16   Stampede.  Are you familiar with the Stampede?

15:02:18  17   A.    I see it in the upper left-hand corner, yes, the NERF

15:02:21  18   Stampede.

15:02:21  19   Q.    And when was the Stampede blaster released?

15:02:24  20   A.    I believe around approximately 2009.

15:02:26  21   Q.    And could you tell the Court a little bit about the

15:02:28  22   Stampede blaster.

15:02:29  23   A.    Yes.  It was a motorized plunger-based blaster that shot

15:02:33  24   foam darts.

15:02:34  25   Q.    And below that there's a Modulus.  Do you see that?

TINO - DIRECT

15:02:37  1   A.   Yes.

15:02:38  2   Q.   Are you familiar with the Modulus blaster?

15:02:40  3   A.   I am.

15:02:41  4   Q.   And how did the Modulus blaster work?

15:02:44  5   A.   It was a motorized blaster that shot foam darts.

15:02:48  6   Q.   Did the Modulus blaster have any particularly noteworthy

15:02:58  7   features?

15:02:59  8   A.   Yes.  It had the feature to select fire.

15:03:01  9   Q.   Okay.  I have a Modulus blaster.  I'd like to hand it to

15:03:04  10  you.

15:03:10  11  A.   Thank you.

15:03:10  12  Q.   And you said that the Modulus blaster had select fire.

15:03:15  13  What do you mean by "select fire," sir?

15:03:17  14  A.   I mean there's a switch that allows the user to select

15:03:21  15  multiple modes of fire, clearly marked by this visual icon

15:03:25  16  here: single shot, burst fire, and fully automatic.

15:03:29  17  Q.   And on single shot, it may seem obvious, but how many

15:03:32  18  rounds are fired?

15:03:33  19  A.   When the user pulls the trigger once, one round is fired.

15:03:37  20  Q.   And in burst how many shots are fired?

15:03:39  21  A.   Trigger pulled once, three shots are fired.

15:03:42  22  Q.   And then on full auto?

15:03:44  23  A.   As long as you're holding down the trigger, it continues

15:03:47  24  to fire.

15:03:48  25  Q.   And when did Hasbro release the Modulus?

TINO - DIRECT

150

15:03:50  1   A.   I believe it was around approximately 2012.

15:03:53  2   Q.   Okay.

15:03:54  3        MR. HOFFMAN:  Your Honor, if you want to look at the

15:03:56  4   Modulus?

15:03:57  5        THE COURT:  I can see it fine.

15:03:58  6        MR. HOFFMAN:  Thank you, Your Honor.

15:03:59  7   Q.   And then moving down there's the Elite 2.0 Carbine?

15:04:06  8   A.   2.0 Turbine, yes.

15:04:09  9   Q.   Turbine, yes.  Sorry.  Are you familiar with that?

15:04:11  10  A.   Yes.  Very.

15:04:12  11  Q.   You helped work on the Turbine blaster?

15:04:14  12  A.   Yes, I did.

15:04:15  13  Q.   Okay.  So we have on the left-hand side, it looks like,

15:04:19  14  blasters that fire darts; is that correct?

15:04:21  15  A.   Yes.

15:04:21  16  Q.   What do we see on the right-hand side of Exhibit 3?

15:04:24  17  A.   Multiple platforms that NERF makes that shoots balls.

15:04:29  18  Q.   Okay.  And can you describe the NERF blasters we see that

15:04:35  19  shoot balls.

15:04:35  20  A.   Yes.  Starting in the top right, it's the Rival platform,

15:04:39  21  and that shoots foam balls.  Moving down you see the Hyper

15:04:43  22  platform, and that shoots smaller rubber balls.  And then

15:04:47  23  moving down still, you see the Gelfire Mythic that shoots small

15:04:51  24  SAP balls.

15:04:53  25       MR. HOFFMAN:  Okay.  Now, I'd like to move to admit

TINO - DIRECT

15:04:56  1    Exhibit 2, Your Honor.

15:04:58  2                 MR. DOYLE:  No objection.

15:05:00  3                 THE COURT:  Hasbro Exhibit Number 2 is admitted.

15:05:06  4    Q.  (BY MR. HOFFMAN) You can set that aside, sir.

15:05:08  5          I'd like to talk a little bit about the development

15:05:10  6    process for blasters at Hasbro.

15:05:11  7    A.   Yes.

15:05:11  8    Q.   In your declaration in this case, you lay out the design

15:05:15  9    process for new blasters at Hasbro, right?

15:05:19  10   A.   Correct.

15:05:19  11   Q.   Did Hasbro follow its normal design process for the

15:05:24  12   Mythic?

15:05:24  13   A.   Yes, it did.  As I mentioned, maybe a little faster than

15:05:28  14   typical, but not out of the ordinary.

15:05:30  15   Q.   When did you start development of the Mythic?

15:05:33  16   A.   In November of 2021.

15:05:34  17   Q.   Why did you start development of the Mythic blaster?

15:05:38  18   A.   It was my understanding that discussions with Gel Blaster,

15:05:41  19   the company, were no longer moving forward, and my leadership

15:05:45  20   instructed me to create a brand new blaster.

15:05:48  21   Q.   And what did you think of that instruction?

15:05:50  22   A.   I was excited by it.  Always starting with a blank slate

15:05:54  23   and completely new blaster is the preferred route for any

15:05:58  24   product development team.

15:06:00  25   Q.   Okay.  I think you mentioned it earlier, but what was the

TINO - DIRECT

15:06:04  1   first thing you did when you decided -- when you started

15:06:07  2   developing the Mythic?

15:06:11  3   A.   We surveyed the landscape of what existed in the

15:06:13  4   marketplace to date and get an understanding where the Gelfire

15:06:16  5   Mythic can fit in and where we can improve upon it.

15:06:20  6   Q.   And why did you do that?

15:06:21  7   A.   Typically to make sure that we can understand what feature

15:06:25  8   sets and what performance levels would be the baseline for us

15:06:30  9   to move forward from.

15:06:31  10  Q.   And is there any particular blaster from the marketplace

15:06:34  11  that you looked at?

15:06:35  12  A.   Yes.  The Anstoy AKM-47.

15:06:38  13  Q.   I'd like to hand you a blaster.  It's marked as

15:06:58  14  Defendant's Physical Exhibit 1, and it has photos at

15:07:03  15  Exhibit 60.

15:07:08  16        Do you recognize the -- do you recognize the

15:07:10  17  Exhibit 1 blaster?

15:07:12  18  A.   Yes, I do.

15:07:12  19  Q.   And what kind of blaster is Exhibit 1?

15:07:18  20  A.   This is an Anstoy AKM-47.

15:07:21  21  Q.   And was the Anstoy AKM-47 available on the market publicly

15:07:22  22  when you started the design of the Mythic?

15:07:24  23  A.   Yes, it was.

15:07:25  24  Q.   Okay.  Can you open up the Anstoy blaster.

15:07:35  25  A.   Yes, I can.

TINO - DIRECT

15:07:35  1  Q.  Okay.  Are you familiar with the internals of the Anstoy

15:07:44  2  blaster?

15:07:44  3  A.  Yes, I am.

15:07:45  4  Q.  Okay.  Can you describe how the Anstoy blaster works.

15:07:52  5  A.  Yes.  Much like many of the mechanisms we've discussed

15:07:56  6  today so far, upon pull of this trigger, a switch is activated

15:08:01  7  that then notifies the motor to draw current and spin.  That

15:08:05  8  then spins a gear train, which then enacts upon a piston and

15:08:10  9  breech system that they pull back simultaneously and release in

15:08:13  10  sequence.  That allows a round to fall into place and then be

15:08:17  11  shot out the barrel as a projectile.

15:08:22  12          MR. PETIT:  Excuse me, David.  What tab is this?

15:08:26  13          MR. HOFFMAN:  Again, the picture of the physical

15:08:28  14  doesn't have a tab.  I haven't moved to admit it yet,

15:08:30  15  Your Honor.  We can show the pictures that are the picture

15:08:33  16  before we move to admit, if that I works for the Court.

15:08:37  17          THE COURT:  Well, we don't have a jury in the box.

15:08:39  18  I'll look at it, and if I sustain an objection, I won't

15:08:42  19  consider it.

15:08:42  20          MR. HOFFMAN:  Okay.  What's on the screen is

15:08:45  21  Defendant's Exhibit 60.  We can look through each of the

15:08:49  22  images.

15:09:12  23          Your Honor, I move to admit Defendant's Physical

15:09:14  24  Exhibit Number 1 and Exhibit 60.

15:09:24  25          MR. DOYLE:  Your Honor, we haven't seen this

TINO - DIRECT

15:09:26  1  particular exhibit.  We still don't see it in anything we've

15:09:29  2  been provided.  So we're going to object on the grounds of

15:09:34  3  authentication.

15:09:36  4          MR. HOFFMAN:  Your Honor, the physical exhibit is

15:09:38  5  with the witness, and the photographs have just -- that our

15:09:41  6  Exhibit 60 have just been shown to the entire courtroom.

15:09:44  7          THE COURT:  Well, let me ask, Mr. Doyle, do you want

15:09:48  8  additional time to look at the photographs or the exhibit?

15:09:52  9          MR. DOYLE:  Yes, Your Honor.  We'd like to look at

15:09:54  10  it.

15:09:54  11          THE COURT:  All right.  Then at this time we'll take

15:09:56  12  our afternoon recess.  We'll be in recess for 15 minutes.

15:10:00  13      (Recess)

15:10:01  14      (Open court)

15:26:54  15          THE COURT:  All right.  Mr. Hoffman, you may continue

15:26:56  16  your examination.

15:26:58  17          MR. HOFFMAN:  So physical Exhibit 4, which is shown

15:27:00  18  in Exhibit 63 and physical exhibit -- already got that one,

15:27:08  19  Your Honor.  Sorry.

15:27:09  20          I move to admit physical Exhibit 1, which is shown in

15:27:12  21  Exhibit 60 and physical Exhibit 3, which is shown in

15:27:16  22  Exhibit 62.

15:27:23  23          THE COURT:  All right.  So we've got 1, which is

15:27:25  24  shown in 50, and 3, which is shown where?

15:27:29  25          MR. HOFFMAN:  Physical 1 is shown in 60, Your Honor.

TINO - DIRECT

155

| 15:27:33 | 1 | THE COURT:  Now, what number are you saying: 50 or |
| 15:27:36 | 2 | 60? |
| 15:27:36 | 3 | MR. HOFFMAN:  Sixty, six-zero. |
| 15:27:37 | 4 | THE COURT:  All right.  Let me do one -- that one |
| 15:27:42 | 5 | first. |
| 15:27:42 | 6 | Mr. Doyle? |
| 15:27:43 | 7 | MR. DOYLE:  No objection, Your Honor. |
| 15:27:44 | 8 | THE COURT:  All right.  Hasbro Exhibits 1 and 60 are |
| 15:27:50 | 9 | admitted. |
| 15:27:51 | 10 | MR. HOFFMAN:  Yes, Your Honor. |
| 15:27:52 | 11 | THE COURT:  Now, what do we have next? |
| 15:27:53 | 12 | MR. HOFFMAN:  Physical 3 shown in Exhibit 62. |
| 15:28:06 | 13 | THE COURT:  Mr. Doyle? |
| 15:28:07 | 14 | MR. DOYLE:  No objection, Your Honor. |
| 15:28:08 | 15 | THE COURT:  All right.  Now you may proceed.  Well, |
| 15:28:12 | 16 | Hasbro's 3 and 62 are admitted.  Now you may proceed. |
| 15:28:16 | 17 | MR. HOFFMAN:  And also, Your Honor, Exhibit 63, which |
| 15:28:19 | 18 | is a picture of physical 4, we move to admit. |
| 15:28:29 | 19 | THE COURT:  All right.  Now you've got me confused, |
| 15:28:32 | 20 | because I have that I admitted Exhibit 4 and Exhibit 43, which |
| 15:28:38 | 21 | was a picture of that after I had originally written down what |
| 15:28:43 | 22 | you were trying to admit was 63. |
| 15:28:46 | 23 | MR. HOFFMAN:  Exhibit 43 is a photo of the same |
| 15:28:49 | 24 | device, but it is not the -- it's a collection of photos of |
| 15:28:56 | 25 | physical 4. |

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

15:28:56   1                THE COURT:  Well, Exhibit Number 4 is already in

15:28:58   2   evidence.  So you're moving to offer Exhibit 63; is that

15:29:04   3   correct?

15:29:05   4                MR. HOFFMAN:  Yes, Your Honor.

15:29:09   5                THE COURT:  Mr. Doyle?

15:29:10   6                MR. DOYLE:  No objection, Your Honor.

15:29:11   7                THE COURT:  All right.  Exhibit 63 for Hasbro is

15:29:14   8   admitted.

15:29:16   9                Now you may continue your direct examination.

15:29:20  10   Q.   (BY MR. HOFFMAN) Before we took the break, we were looking

15:29:22  11   at the Anstoy blaster, sir.

15:29:27  12   A.   Yes.

15:29:27  13   Q.   Okay.  And what was the Anstoy blaster used for during

15:29:30  14   Hasbro's design process?

15:29:32  15   A.   It served as a baseline reference for the mechanism.

15:29:36  16   Q.   And could you turn in your binder to tab 3, sir.

15:29:42  17   A.   Yes.

15:29:44  18   Q.   Do you recognize what we see in tab 3?

15:29:47  19   A.   Yes, I do.

15:29:48  20   Q.   All right.  Tab 3 is marked as Defendant's Exhibit 3.

15:29:51  21   What is Exhibit 3?

15:29:53  22   A.   This is the initial CAD drawing, a cross section, of the

15:29:58  23   Mythic blaster.

15:29:59  24   Q.   Okay.  Where did the external design, the -- the look of

15:30:06  25   the Mythic, where did that come from?

TINO - DIRECT

15:30:08  1    A.    It came from Hasbro's design team.

15:30:11  2    Q.    Okay.  So I'm going to hand you physical Exhibit 3.

15:30:21  3          And you have physical Exhibit 3, sir?

15:30:28  4    A.    Yes.

15:30:28  5    Q.    And is what we're looking at in Exhibit 3, is that in one

15:30:32  6    of the CAD drawings that was used to develop the Mythic?

15:30:38  7    A.    Yes.  These CAD drawings were the initial CAD drawings for

15:30:42  8    this blaster.

15:30:42  9          MR. HOFFMAN:  Move to admit Exhibit 3, Your Honor.

15:30:44  10          THE COURT:  I thought I'd already admitted Exhibit 3.

15:30:48  11          I thought you offered Exhibit 3 and Exhibit 62.

15:30:52  12          MR. HOFFMAN:  That was physical Exhibit 3.

15:30:55  13          THE COURT:  Well, I hope nobody appeals this, because

15:30:59  14    if this record goes to the Circuit, they're not going to have a

15:31:02  15    single idea anywhere of what we did.  We can't have two

15:31:06  16    Exhibit 3s.

15:31:09  17          MR. HOFFMAN:  Yes, Your Honor.

15:31:09  18          THE COURT:  We can't have a physical Exhibit 3 and

15:31:12  19    another Exhibit 3.  Everything has got -- the reason we have

15:31:16  20    exhibit numbers is somebody who looks at a record later will

15:31:22  21    know what we did.  So what are you offering?

15:31:26  22          MR. HOFFMAN:  Under the rules, can I -- with the

15:31:28  23    Circuit, can I change the number of the exhibit, Your Honor?

15:31:30  24          THE COURT:  Yes.  But you've got to make sure I

15:31:33  25    understand what -- which of the exhibits you're changing

TINO - DIRECT                                                  158

15:31:36   1   numbers on.

15:31:37   2            MR. HOFFMAN:  All right.  I'd like to change the --

15:31:44   3   what is on the screen right now to exhibit -- defendant's

15:31:49   4   Exhibit 300.

15:31:53   5            THE COURT:  All right.  Exhibit Number 300 is what I

15:31:56   6   believe the witness has described as a CAD drawing of the

15:32:03   7   Mythic; is this correct?

15:32:04   8            THE WITNESS:  Yes.  Correct, sir.

15:32:05   9            THE COURT:  All right.  Is there an objection to

15:32:10  10   Exhibit 300?

15:32:12  11            MR. DOYLE:  Your Honor, because we didn't object to

15:32:16  12   Exhibit 3, we won't object to renaming it Exhibit 300.

15:32:22  13            THE COURT:  All right.  Exhibit 300 is admitted.

15:32:28  14            MR. HOFFMAN:   This is now 300.

15:32:28  15            MR. DOYLE:  Right.  And I just said we didn't object

15:32:31  16   to that.  We won't object to it being renamed Exhibit 300.

15:32:34  17            THE COURT:  All right.  It's in.

15:32:39  18   Q.  (BY MR. HOFFMAN) Mr. Tino, how did you create what we see

15:32:43  19   in the CAD drawing in Exhibit 300.

15:32:45  20   A.  We took a reference item that we discussed earlier, the

15:32:48  21   Anstoy AKM-47 mechanism, to understand the general sizing of

15:32:52  22   the components and the number of components and meshed it with

15:32:55  23   our initial design input from our NERF design team.

15:32:59  24   Q.  Okay.  Can you explain in Exhibit 300 what comes from the

15:33:06  25   initial Anstoy design, and what was designed by NERF, Hasbro?

TINO - DIRECT

15:33:09  1  A.   So looking at the top image here, you can see starting

15:33:13  2  from the top and moving downward, there's an area for a gel

15:33:18  3  round to enter the breech area.  There's a breech, a piston,

15:33:23  4  and a spring assembly.  Those all match very closely to the

15:33:32  5  Anstoy item.

15:33:33  6         Then below that you can see we made some changes and

15:33:33  7  modification to location of these components to better fit our

15:33:35  8  form factor.  So the gear train was laid out horizontally and

15:33:39  9  elongated, and the motor was moved from the handle back behind

15:33:43  10  the rest of the assembly.

15:33:47  11  Q.   Is anything that's in this drawing, did any of it come

15:33:49  12  from Gel Blaster?

15:33:50  13  A.   No.

15:33:51  14  Q.   Is there any part of this CAD drawing that shows what

15:33:55  15  you've now heard today referred to as a PISCA?

15:34:02  16  A.   As a PISCA?

15:34:04  17  Q.   Correct?

15:34:04  18  A.   No.

15:34:04  19  Q.   Okay.  At this point in the design process, did Hasbro yet

15:34:08  20  have a method for providing semi and automatic fire?

15:34:13  21  A.   No.

15:34:13  22  Q.   After you had merged the starting point of the Anstoy with

15:34:20  23  Hasbro's external design, what did you do next?

15:34:24  24  A.   We looked at a select fire feature.

15:34:28  25  Q.   Okay.  And select fire features are the semi and the auto

TINO - DIRECT

| | | |
|---|---|---|
| 15:34:31 | 1 | that we talked about? |
| 15:34:32 | 2 | A.   Correct. |
| 15:34:40 | 3 | Q.   Can you explain at a general level in the industry, how |
| 15:34:40 | 4 | does select fire work? |
| 15:34:42 | 5 | A.   So as we discussed previously and mentioned with the |
| 15:34:44 | 6 | Modulus blaster, there's usually some input by the user to |
| 15:34:47 | 7 | select multiple modes.  Those modes typically include a single |
| 15:34:51 | 8 | shot, perhaps a burst, and then a full auto. |
| 15:34:56 | 9 | Q.   And how is the single shot and the full auto accomplished? |
| 15:35:02 | 10 | A.   There's various ways to accomplish it, three common |
| 15:35:06 | 11 | mechanisms known in the industry, I would say. |
| 15:35:08 | 12 | Q.   What are three common mechanisms? |
| 15:35:10 | 13 | A.   One would be a physical switch.  Another would be a |
| 15:35:13 | 14 | noncontact or IR switch, and a third would be a timing method. |
| 15:35:18 | 15 | Q.   Okay.  When you originally designed the Mythic, did you |
| 15:35:21 | 16 | have a preference for which method to use? |
| 15:35:25 | 17 | A.   Not necessarily.  I knew they all could function very |
| 15:35:29 | 18 | similarly. |
| 15:35:29 | 19 | Q.   And when you were considering pricing, did you have a |
| 15:35:32 | 20 | recommendation about which system to use? |
| 15:35:33 | 21 | A.   Yes.  From a cost standpoint, the timing method is the |
| 15:35:36 | 22 | lowest cost. |
| 15:35:37 | 23 | Q.   So did you originally propose using a timing method? |
| 15:35:40 | 24 | A.   Yes.  That was my proposal to the team. |
| 15:35:43 | 25 | Q.   Did the Mythic ultimately use timing? |

TINO - DIRECT

15:35:46  1   A.   No, it did not.

15:35:47  2   Q.   And why not?

15:35:48  3   A.   Upon discussion with the rest of my development team, our

15:35:52  4   electronics engineer was more familiar with the physical switch

15:35:54  5   and using that to detect the location of a component.  So

15:35:57  6   taking his expertise in that area, I aligned with that decision

15:36:01  7   to move forward.

15:36:02  8   Q.   In your mind, how important is it whether you use timing

15:36:06  9   or a physical switch to provide the ability to fire single shot

15:36:08  10  or auto?

15:36:09  11  A.   Not important.

15:36:10  12  Q.   And at that point, did Hasbro have experience using

15:36:15  13  physical switches?

15:36:16  14  A.   Yes.

15:36:17  15  Q.   Okay.  If you could turn in your binder to tab 6.

15:36:33  16  A.   Yes.

15:36:38  17          MR. HOFFMAN:  And that is an exhibit that is marked

15:36:41  18  as Defendant's Exhibit 6, but I'm going to change it to

15:36:47  19  Exhibit 5, Your Honor, to prevent a conflict.

15:36:54  20  Q.   Do you recognize Exhibit 5?

15:36:56  21  A.   Yes, I do.

15:36:57  22  Q.   And what is Exhibit 5?

15:36:58  23  A.   This is a cross section of a CAD drawing of the NERF

15:37:02  24  Stampede.

15:37:02  25  Q.   And can you explain how the NERF Stampede worked.

TINO - DIRECT

15:37:06  1   A.   Yes.  Very similar to a lot of the devices we've discussed

15:37:09  2   today.  There is a trigger which indicates a signal to a

15:37:12  3   switch.  That switch then tells the motor to run.  That motor

15:37:16  4   drives a gear train, which then drives a piston and breech

15:37:20  5   assembly, to then be released at the end of the stroke,

15:37:24  6   blasting a projectile.

15:37:24  7   Q.   Okay.  And how does that -- how does the Piston operation

15:37:31  8   compare with what's used in the Mythic?

15:37:33  9   A.   Very similar functionally.

15:37:35  10   Q.   Okay.

15:37:37  11        MR. HOFFMAN:  Your Honor, I move to admit Exhibit 5.

15:37:44  12        MR. DOYLE:  I'm sorry.  Now I'm confused.  You move

15:37:47  13   to admit Exhibit 5, which is listed as Exhibit 6?

15:37:52  14        MR. HOFFMAN:  Yes.  I've changed the designator so we

15:37:55  15   don't reuse a number.

15:37:58  16        THE COURT:  He's moving to admit what you're looking

15:38:01  17   at.  It's just now called 6.

15:38:05  18        MR. DOYLE:  Five.

15:38:06  19        MR. HOFFMAN:  Five.

15:38:07  20        THE COURT:  Five, yes.

15:38:08  21        MR. DOYLE:  I do not object to Defendant's Exhibit 5.

15:38:16  22        THE COURT:  Exhibit Number 5 is admitted.

15:38:19  23   Q.   (BY MR. HOFFMAN) Mr. Tino, there are two highlighted

15:38:21  24   pieces in here.  There's a green component and a red component.

15:38:24  25   Do you recognize those?

TINO - DIRECT

15:38:25  1  A.   Yes, I do.

15:38:26  2  Q.   What are those?

15:38:27  3  A.   I would call the red component a physical switch and the

15:38:32  4  green component a rocker.

15:38:33  5  Q.   And during the firing cycle, can you explain how the

15:38:38  6  rocker and the physical switch are used in the Stampede

15:38:41  7  blaster.

15:38:42  8  A.   Yes.  When the trigger is pulled, that rocker indicates

15:38:46  9  the movement downwards and towards the switch, depressing that

15:38:51 10  switch, then telling the motor to run and the firing cycle to

15:38:55 11  continue as I explained before.  Upon the completion of a

15:38:58 12  cycle, whether the user is holding that trigger or not, that

15:39:03 13  piston will continue until it ends its cycle and releases that

15:39:08 14  switch.

15:39:09 15  Q.   So is it correct that once per cycle, the Stampede presses

15:39:12 16  the physical switch?

15:39:13 17  A.   Correct.

15:39:13 18  Q.   Okay.  Now, did the Stampede offer the ability to select

15:39:17 19  between single fire and auto?

15:39:19 20  A.   No, it did not.

15:39:20 21  Q.   Okay.  And why didn't it?

15:39:22 22  A.   At the time it was a different landscape of product, but

15:39:26 23  there are a couple of other functional reasons why it wasn't

15:39:29 24  necessary.  This blaster has a very low rate of fire, so it was

15:39:33 25  very simple for the consumer to press the trigger once at a

TINO - DIRECT

15:39:37   1   relatively simple speed and it would only fire once, as well as

15:39:43   2   all the other necessary other equipment, physical components

15:39:49   3   and electronic components, needed were not worth the cost

15:39:53   4   tradeoff here.

15:39:54   5   Q.   If you could turn to tab 7 in your binder.  It's

15:39:57   6   Defendant's Exhibit 7.  Do you recognize Defendant's Exhibit 7?

15:40:04   7   A.   Yes, I do.

15:40:05   8   Q.   What is Exhibit 7?

15:40:06   9   A.   It's a post from a NERF enthusiast website called

15:40:10   10   NerfHaven.

15:40:11   11          MR. HOFFMAN:  Your Honor, I move to admit Exhibit 7.

15:40:45   12          MR. DOYLE:  And may I just ask one question,

15:40:47   13   Your Honor?  This NerfHaven, this is coming from a website?

15:40:50   14          MR. HOFFMAN:  It's the -- coming from a website, it's

15:40:52   15   the same exhibit that was with the briefing.

15:40:55   16          MR. DOYLE:  Okay.  Is this the Darthskids?

15:40:58   17          MR. HOFFMAN:  It is by an individual naming

15:41:00   18   themselves Darthskids, yes.

15:41:03   19          MR. DOYLE:  Okay.  And you're actually calling this

15:41:06   20   Defendant's Exhibit 7, right?

15:41:07   21          MR. HOFFMAN:  Yes.

15:41:08   22          MR. DOYLE:  Okay.  No objection.

15:41:09   23          THE COURT:  All right.  Defendant's Exhibit Number 7

15:41:11   24   is admitted.

15:41:16   25   Q.   (BY MR. HOFFMAN) What is the NerfHaven website, Mr. Tino.

TINO - DIRECT

15:41:18   1   A.   It's an enthusiast website for fans of the NERF brand,

15:41:24   2   where they discuss and share modifications and upgrades and

15:41:26   3   things they've performed on NERF blasters.

15:41:29   4   Q.   And have you reviewed the modifications that were

15:41:32   5   published to the NerfHaven website by Darthskids in Exhibit 7?

15:41:37   6   A.   Yes, I have.

15:41:38   7   Q.   And have you -- have you reviewed the code that was

15:41:40   8   provided?

15:41:41   9   A.   Yes, I have.

15:41:42   10   Q.   Okay.  Can you explain how the NerfHaven Stampede, how

15:41:51   11   that blaster operated?

15:41:53   12   A.   Yes.  They took the existing NERF Stampede, added some

15:41:57   13   additional electronic components, and updated some code to

15:42:02   14   allow it to have a select fire option.  It did so by adding an

15:42:07   15   external switch for a user to select a mode, but then utilized

15:42:12   16   that same switch we discussed earlier, highlighted in red, to

15:42:16   17   determine the number of cycles completed.  So when in a single

15:42:22   18   fire mode, it looked for only one depression of that switch and

15:42:26   19   then finished.  And in a burst fire mode, it looked for

15:42:31   20   multiple depressions of that switch before terminating the

15:42:35   21   current to the motor.

15:42:37   22   Q.   And how does the operation of the NerfHaven Darthskids

15:42:42   23   Stampede compare to what you did and designed into the Mythic?

15:42:45   24   A.   Functionally the same.

15:42:47   25   Q.   Can you explain that?

TINO - DIRECT

15:42:48  1   A.   Yes.   It's using a physical switch to determine the number

15:42:51  2   of completed cycles to then dictate when the motor is powered

15:43:00  3   or not.

15:43:00  4   Q.   So, with a single shot, can you compare the operation of

15:43:04  5   the NerfHaven Stampede to the operation of the Mythic?

15:43:13  6   A.   Yes.   In the NerfHaven Stampede you would pull the trigger

15:43:17  7   once, and it would run a complete cycle, therefore, depressing

15:43:17  8   the switch only one time, and then cutting off power to the

15:43:21  9   motor.   The same is true in the Mythic.   You would pull the

15:43:23 10   trigger once, it would run a cycle one time, indicated by the

15:43:27 11   depression of the switch one time.

15:43:32 12   Q.   Can you turn in your binder to tab 8.   Do you recognize

15:43:36 13   Defendant's Exhibit 8?

15:43:39 14   A.   Yes, I do.

15:43:40 15   Q.   Is Defendant's Exhibit 8 a chart showing the operation of

15:43:44 16   the NerfHaven Stampede that you provided with your declaration?

15:43:49 17   A.   Yes, it is.

15:43:49 18        MR. HOFFMAN:   Your Honor, I move to admit Defendant's

15:43:51 19   Exhibit 8.

15:44:09 20        MR. DOYLE:   No objection, Your Honor.

15:44:10 21        THE COURT:   Defendant's Exhibit 8 is admitted.

15:44:15 22   Q.   (BY MR. HOFFMAN) If you could turn in your binder, sir, to

15:44:17 23   tab 10, Defendant's Exhibit 10.   Do you recognize what's in

15:44:25 24   Exhibit 10?

15:44:25 25   A.   Yes, I do.

TINO - DIRECT

15:44:26  1    Q.   And what is exhibit 10?

15:44:28  2    A.   This is a screenshot of a YouTube video explaining the

15:44:31  3    modification to a NERF Stampede.  It's by somebody named

15:44:35  4    Captain Xavier, who is well known among the enthusiast

15:44:40  5    community.  I can see that has over 140,000 subscribers to a

15:44:43  6    YouTube channel that just talks about NERF modifications.

15:44:47  7    Q.   So 140,000 subscribers about NERF blasters?

15:44:53  8    A.   Correct.

15:44:53  9    Q.   Have you watched the entire video?

15:44:55  10   A.   Yes, I have.

15:44:56  11   Q.   And what do we see in the image that is in Defendant's

15:45:00  12   Exhibit 10?

15:45:01  13   A.   So in the particular image, you can see a switch that's

15:45:05  14   being used to indicate a complete fire cycle in this particular

15:45:08  15   modification.  So that black piece right in the center of the

15:45:12  16   screen and right in the center of the yellow housing of the

15:45:15  17   blaster is a physical switch that is engaged by this orange

15:45:22  18   horizontal bar that you see.

15:45:23  19        Every time the piston assembly, which is not present

15:45:27  20   in this image, on the right moves forward to complete a cycle,

15:45:30  21   that horizontal bar also moves forward, depressing the physical

15:45:34  22   switch one time and then is returned back to its home state

15:45:38  23   when the piston returns, so it's able to determine when a cycle

15:45:42  24   is complete.

15:45:42  25   Q.   And how does the physical switch shown in the Captain

TINO - DIRECT

15:45:48  1  Xavier video in Exhibit 10 from 2016, how does that compare to

15:45:53  2  the operation of the Mythic?

15:45:55  3  A.   Functionally the same.

15:45:56  4  Q.   Okay.  Now, in the Stampede the physical switch is located

15:46:01  5  near the front of the firing mechanism; is that right?

15:46:04  6  A.   Correct.

15:46:04  7  Q.   Why is it there?

15:46:06  8  A.   Design constraints.  It's where there's space in the

15:46:08  9  blaster.

15:46:10  10         MR. HOFFMAN:  Your Honor, I'll move to admit

15:46:12  11  Exhibit 10.

15:46:20  12         MR. DOYLE:  No objection.

15:46:20  13         THE COURT:  Exhibit 10 is admitted.

15:46:24  14  Q.   (BY MR. HOFFMAN) Could you turn in your binder to

15:46:26  15  Exhibit 9, sir, tab 9.

15:46:32  16  A.   Yes.

15:46:32  17  Q.   Do you recognize Exhibit 9?

15:46:34  18  A.   Yes, I do.

15:46:35  19  Q.   And what is Exhibit 9?

15:46:36  20  A.   That is a cross section of the CAD drawing for the NERF

15:46:39  21  Elite 2.0 Turbine.

15:46:41  22  Q.   And when was the 2.0 Turbine released?

15:46:45  23  A.   Approximately 2020.

15:46:47  24  Q.   Before you started the design of the Mythic?

15:46:49  25  A.   Yes.

TINO - DIRECT

15:46:49  1   Q.   And did the Elite 2.0 Turbine have a physical switch?

15:46:53  2   A.   It did.

15:46:54  3   Q.   Okay.  And where in the Exhibit 9 is the physical switch?

15:47:00  4   A.   The red highlighted piece in this exhibit is the physical

15:47:03  5   switch.

15:47:04  6   Q.   Is the physical switch in the Turbine, where is it

15:47:11  7   located?

15:47:12  8   A.   Above the mechanism that pushes the dart forward.

15:47:16  9   Q.   So in the Elite 2.0 Turbine, the switch is above?

15:47:20  10  A.   Correct.

15:47:20  11  Q.   How does the location of the physical switch in the Elite

15:47:24  12  2.0 Turbine compare to where you placed the switch in the

15:47:27  13  Mythic?

15:47:28  14  A.   Similar location.

15:47:29  15  Q.   Okay.  Talk about the design of the Mythic itself.

15:47:40  16          MR. HOFFMAN:  Excuse me.  Before I do that,

15:47:41  17  Your Honor, I move to admit Defendant's Exhibit 9.

15:47:47  18          MR. DOYLE:  No objection, Your Honor.

15:47:48  19          THE COURT:  Hasbro Exhibit 9 is admitted.

15:47:52  20  Q.   (BY MR. HOFFMAN) And let's talk briefly, sir, about the

15:47:54  21  Mythic design itself.  If you could turn to tab 12 in your

15:48:15  22  binder.  Defendant's Exhibit 12, do you recognize that?

15:48:16  23  A.   Yes, I do.

15:48:16  24  Q.   Is that an image of the Mythic?

15:48:18  25  A.   Yes.  The internals of the Mythic blaster.

TINO - DIRECT

170

15:48:21  1          MR. HOFFMAN:  Move to admit Exhibit 12, Your Honor.

15:48:26  2          MR. DOYLE:  No objection, Your Honor.

15:48:29  3          THE COURT:  Exhibit 12 is admitted.

15:48:29  4    Q.  (BY MR. HOFFMAN) All right.  Where is the physical switch

15:48:30  5    in the Mythic located?

15:48:31  6    A.   Above the piston assembly.

15:48:33  7    Q.   And that's similar to the Elite 2.0 Turbine?

15:48:37  8    A.   Yes.

15:48:37  9    Q.   Okay.  And why did you choose to put the physical switch

15:48:40  10   on top of the plunger mechanism?

15:48:43  11   A.   Again, design constraints of the rest of the externals of

15:48:46  12   the blaster.  That's where there was space to do so.

15:48:49  13   Q.   And how is the switch in the Mythic oriented?

15:48:52  14   A.   Horizontally.

15:48:53  15   Q.   And is there a reason it's horizontal?

15:48:56  16   A.   Yes.  Durability concerns.

15:48:57  17   Q.   Can you explain why that horizontal orientation addresses

15:49:03  18   durability concerns?

15:49:04  19   A.   Yes.  As we discussed earlier, there's designs where you

15:49:08  20   can perpendicularly impact that switch.  That's very

15:49:12  21   detrimental to the switch's life span, as it's a direct impact.

15:49:16  22   By moving the switch horizontally, it interacts in a more

15:49:21  23   progressive manner along that switch's lever, extending the

15:49:25  24   life of the part.

15:49:33  25   Q.   Sir, in 2021 Hasbro was in discussions with Gel Blaster.

TINO - DIRECT

15:49:37   1   Do you remember that?

15:49:37   2   A.   Yes.

15:49:38   3   Q.   What was your involvement in those discussions?

15:49:39   4   A.   To provide due diligence from an engineering perspective.

15:49:42   5   Q.   And did Gel Blaster send you physical prototype samples

15:49:46   6   for its blasters?

15:49:46   7   A.   Yes, it did.

15:49:47   8   Q.   And looking back or thinking back on that, did anything in

15:49:50   9   particular catch your attention?

15:49:54   10  A.   Yes.  One thing in particular was that the samples

15:49:57   11  provided did not match other documentation provided with that

15:50:00   12  sample.

15:50:01   13  Q.   And what do you mean that the samples didn't match the

15:50:04   14  documentation?

15:50:05   15  A.   Particularly looking at the electronics schematic, there's

15:50:08   16  a switch present in that schematic that was not in the physical

15:50:12   17  sample.

15:50:12   18  Q.   And did you raise that difference with Gel Blaster?

15:50:18   19  A.   Yes, we did.

15:50:18   20  Q.   And what did they tell you?

15:50:20   21  A.   They informed us that their manufacturing partners had

15:50:23   22  found a different solution that was more effective and a better

15:50:26   23  solution, so they weren't going to move forward with the

15:50:29   24  switch.

15:50:29   25  Q.   Did you understand that Gel Blaster would be using the

15:50:35  1   physical switch in their implementations?

15:50:38  2   A.    No.

15:50:38  3   Q.    All right.  How -- how does Gel Blaster currently provide

15:50:46  4   the semi and auto feature in their blasters?

15:50:51  5   A.    Via timing method.

15:50:52  6          MR. HOFFMAN:  Okay.  Pass the witness, Your Honor.

15:51:04  7                         **CROSS-EXAMINATION**

15:51:04  8   **BY MR. DOYLE:**

15:51:46  9   Q.    Your name is Mr. Tino?  Tino or Tito?

15:51:50  10  A.    Tino, T-i-n-o.

15:51:52  11  Q.    Okay.  Thank you.  Apologies.

15:51:57  12         So, Mr. Tino, you were part of the Hasbro team that

15:52:01  13  had been working with Gel Blaster in 2021?

15:52:05  14  A.    Yes.  I was the engineer in charge of due diligence.

15:52:08  15  Q.    Okay.  And did you receive any Gel Blaster confidential

15:52:15  16  information?

15:52:15  17  A.    We treated all information provided as confidential,

15:52:19  18  though it was never expressly said so to us on the development

15:52:23  19  team or market --

15:52:26  20  Q.    What information did you look at?

15:52:28  21  A.    Physical samples, digital files ranging from CAD and

15:52:32  22  schematics.

15:52:33  23  Q.    So you did look at CAD --

15:52:34  24  A.    Yes.  We looked at CAD.

15:52:37  25  Q.    -- schematics?

TINO - CROSS

15:52:38  1   A.   Yep.

15:52:38  2   Q.   And did you look at CAD schematics of the physical firing

15:52:41  3   mechanism?

15:52:42  4   A.   I'm sure I did, yes.

15:52:43  5   Q.   Okay.  And that physical firing mechanism, did you see

15:52:50  6   what we're calling the PISCA, the plunger-integrated switch

15:52:54  7   contact arm?

15:52:55  8   A.   Likely.  It was over two years now.

15:52:57  9   Q.   Sure.  And did you see a PISCA switch?

15:53:02  10  A.   Similarly likely, and we did notice a switch was missing,

15:53:07  11  so ...

15:53:07  12  Q.   But in the CAD drawing, was there a switch there?

15:53:11  13  A.   May have been, yes.

15:53:12  14  Q.   May have been or?

15:53:13  15  A.   Again, many years ago.  I can't say exactly.  It's been a

15:53:17  16  year-plus since I've seen any sort of CAD drawing.

15:53:20  17  Q.   But you did see CAD drawings showing the physical firing

15:53:24  18  mechanism of Gel Blaster, right?

15:53:27  19  A.   Yes.

15:53:27  20  Q.   Okay.  And is it your understanding that that physical

15:53:35  21  firing mechanism has not been implemented in any Gel Blaster

15:53:40  22  guns that have been released to the market?

15:53:42  23  A.   That's my understanding.

15:53:43  24  Q.   Okay.  And -- okay.  Strike that.

15:53:48  25         Now, you provided testimony about the modification of

TINO - CROSS

| | | |
|---|---|---|
| 15:53:57 | 1 | NERF Stampede; is that right? |
| 15:53:59 | 2 | A.   Yes. |
| 15:53:59 | 3 | Q.   And did Hasbro modify the NERF Stampede? |
| 15:54:02 | 4 | A.   No. |
| 15:54:03 | 5 | Q.   Who did that? |
| 15:54:05 | 6 | A.   Numerous people.  We discussed two different variations, |
| 15:54:11 | 7 | one by Darthskids and one by Captain Xavier. |
| 15:54:13 | 8 | Q.   Do you know who Darthskids is? |
| 15:54:15 | 9 | A.   No, I do not. |
| 15:54:16 | 10 | Q.   Do you have any idea who he is? |
| 15:54:19 | 11 | A.   Nope. |
| 15:54:19 | 12 | Q.   Is he an engineer? |
| 15:54:21 | 13 | A.   I do not know. |
| 15:54:22 | 14 | Q.   Is it typical for Hasbro to go look on the Internet and |
| 15:54:27 | 15 | look for people like Mr. Darthskids who might have modified |
| 15:54:31 | 16 | your devices? |
| 15:54:32 | 17 | A.   Yes.  We do monitor the Internet for modifications. |
| 15:54:36 | 18 | Q.   And do you use that in your design efforts to design new |
| 15:54:40 | 19 | products? |
| 15:54:41 | 20 | A.   Sometimes it's inspiration, yes. |
| 15:54:43 | 21 | Q.   Is it ever more than inspiration?  Do you actually use |
| 15:54:47 | 22 | that particular design modification you find on the Internet? |
| 15:54:50 | 23 | A.   Usually the modifications are very crude and rudimentary. |
| 15:54:53 | 24 | But, conceptually, we do look at what's available and what |
| 15:54:55 | 25 | people are doing. |

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

TINO - CROSS

15:54:56   1   Q.   Did you try to reach Mr. Darthskids?

15:54:58   2   A.   No.

15:54:58   3   Q.   You didn't have any questions for Mr. Darthskids?

15:55:01   4   A.   No.

15:55:02   5   Q.   When did you become aware of the Mr. Darthskids

15:55:06   6   modifications?

15:55:07   7   A.   During preparation for this -- this testimony.

15:55:10   8   Q.   During -- so for the first time you became aware of

15:55:15   9   Mr. Darthskids' modification to the Stampede was in preparation

15:55:19   10   for this testimony?

15:55:20   11   A.   Yes.  I hadn't seen it previously.

15:55:23   12   Q.   So is it fair to say that Mr. Darthskids' modification was

15:55:27   13   not used as part of your design process to develop a physical

15:55:32   14   firing mechanism for the Mythic?

15:55:35   15   A.   That would be correct.

15:55:35   16   Q.   Okay.  Wasn't used at all?

15:55:38   17   A.   Correct.

15:55:38   18   Q.   In fact, you had no access to it at the time?

15:55:40   19   A.   We had access, but didn't know about it.

15:55:43   20   Q.   Okay.  Good.  How about the Stampede?  Did you look at the

15:55:47   21   Stampede as part of your design effort for the Hasbro Mythic?

15:55:51   22   A.   Not particularly.  But we very much have 30 years of

15:55:56   23   experience in blasters, and that's one of those blasters that

15:56:00   24   we look upon.

15:56:01   25   Q.   Yeah.  But did you use the Stampede to design your mythic

TINO - CROSS

15:56:05  1  physical firing mechanism?

15:56:07  2  A.   No.

15:56:07  3  Q.   Okay.  So I think you've testified you didn't know who

15:56:19  4  Mr. or Mrs. -- or Ms. Darthskids was, right?

15:56:23  5  A.   Correct.

15:56:24  6  Q.   So Mr. Darthskids or Mrs. Darthskids didn't provide you

15:56:29  7  any CAD drawings for a physical firing mechanism, right?

15:56:32  8  A.   No.

15:56:33  9  Q.   Okay.

15:56:36  10  A.   They also didn't need to.  There was no physical changes

15:56:40  11  to the mechanism.

15:56:41  12  Q.   Sure.  You're familiar, obviously, with the Hasbro Mythic?

15:56:48  13  A.   Yes.  Very.

15:56:49  14  Q.   And were you heavily designed -- strike that.

15:56:52  15       Were you heavily involved in the design of the Hasbro

15:56:55  16  Mythic?

15:56:55  17  A.   Yes.

15:56:56  18  Q.   And when did that effort start?

15:56:57  19  A.   November of 2021.

15:56:59  20  Q.   November of 2021?

15:57:01  21  A.   Correct.

15:57:01  22  Q.   And when did you stop looking at the information -- all

15:57:06  23  that information you received from Gel Blaster?

15:57:09  24  A.   By the end of October of 2021.

15:57:12  25  Q.   And how did you remove all that from your mind?

TINO - CROSS

```
15:57:17   1   A.   I can't physically remove it from my mind.

15:57:20   2   Q.   Right.  What I'd like to do is provide to you -- I'm

15:57:32   3   trying to get these exhibits correct before we do this.  We had

15:57:35   4   marked this as Plaintiff's Exhibit Number 26.

15:57:42   5           MR. DOYLE:  Can we bring this up on the screen?

15:57:51   6   There it is.

15:57:52   7   Q.   Are you familiar with that diagram, sir?

15:57:54   8   A.   Yes.

15:57:54   9   Q.   What is it?

15:57:55  10   A.   It's the internals of a section of the mythic.

15:57:59  11   Q.   The Hasbro Mythic?

15:58:01  12   A.   Correct.  The Hasbro NERF Gelfire Mythic.

15:58:04  13   Q.   Right.  Designed and developed by Hasbro; is that right?

15:58:07  14   A.   Correct.

15:58:08  15   Q.   Do you see at the very top there's an arm protruding from

15:58:14  16   the plunger?  Do you see that?

15:58:16  17   A.   Yes.

15:58:16  18   Q.   And it goes straight up from the plunger and then it moves

15:58:20  19   to the left, does it not, at a 90-degree angle?

15:58:23  20   A.   Yes.

15:58:27  21   Q.   Okay.  And then, as it moves from right to left, it

15:58:33  22   contacts a switch.  That is a switch there that we're looking

15:58:36  23   at; is that correct?

15:58:38  24   A.   It is.

15:58:38  25   Q.   And is the switch the part that's almost right next to the
```

15:58:47   1   arm -- the protruding arm --

15:58:50   2   A.   Yes.

15:58:50   3   Q.   -- in that diagram?

15:58:52   4        It's black, and I think it has a -- what is that

15:58:54   5   silver part?

15:58:56   6   A.   It's a metallic lever arm.

15:58:59   7   Q.   Lever arm.  And so what happens when the protruding arm,

15:59:04   8   which is on the plunger, contacts that --

15:59:08   9        What did you call it again?

15:59:09   10  A.   Lever arm.

15:59:11   11  Q.   -- lever arm?  What happens?

15:59:12   12  A.   It then pushes on a physical switch progressively as it

15:59:18   13  moves past.

15:59:19   14  Q.   Okay.  And what happens when that switch is contacted?

15:59:24   15  A.   Once it's then released, it sends a signal to the motor to

15:59:29   16  stop functioning if it's in single shot mode.  If it's in

15:59:33   17  semiautomatic mode or -- and if it's in fully automatic mode,

15:59:37   18  it ignores the input from that switch.

15:59:40   19  Q.   Okay.  Do you agree that there's a switch that the arm

15:59:50   20  contacts as the plunger system moves towards the back or the

15:59:56   21  rear of the plunger -- of the gun; is that right?

15:59:59   22  A.   Correct.

15:59:59   23  Q.   So now I'd just like to ask you some questions on how the

16:00:05   24  Mythic operates.

16:00:06   25       Let's assume that the Mythic is in single shot mode.

TINO - CROSS

| | | |
|---|---|---|
| 16:00:10 | 1 | Can we do that?  Thank you. |
| 16:00:11 | 2 | What's first step in the whole firing process? |
| 16:00:19 | 3 | A.   The trigger is pulled, the firing trigger. |
| 16:00:21 | 4 | Q.   Okay.  And what happens after the trigger is pulled? |
| 16:00:27 | 5 | A.   Assuming we're in single shot mode, once the trigger is |
| 16:00:31 | 6 | pulled, it sends a signal to the circuitry to then provide |
| 16:00:35 | 7 | power to the motor.  The motor then spins up, powering the gear |
| 16:00:39 | 8 | train you see here.  That gear train -- |
| 16:00:41 | 9 | Q.   Let's just slow down.  Why don't we go one step at a time. |
| 16:00:44 | 10 | A.   Sure. |
| 16:00:45 | 11 | Q.   You mind that?  My brain doesn't move that quickly |
| 16:00:48 | 12 | anymore? |
| 16:00:48 | 13 | So you said you pull the trigger back.  Does it |
| 16:00:53 | 14 | contact any element? |
| 16:00:55 | 15 | A.   Yes.  And -- and activates a switch. |
| 16:00:58 | 16 | Q.   So it contacts an electronic switch? |
| 16:01:00 | 17 | A.   Correct. |
| 16:01:00 | 18 | Q.   Great.  And what happens then? |
| 16:01:04 | 19 | A.   As mentioned, it then sends a signal to the electronics. |
| 16:01:09 | 20 | Q.   Sends a signal to the electronics? |
| 16:01:12 | 21 | A.   Yes. |
| 16:01:14 | 22 | Q.   And what do you call the electronics? |
| 16:01:17 | 23 | A.   A PCB. |
| 16:01:17 | 24 | Q.   Is that an electronic board? |
| 16:01:19 | 25 | A.   Yes. |

TINO - CROSS

16:01:20    1    Q.   Okay.  Thank you.  And once the board gets that signal,

16:01:24    2    what does it do?

16:01:25    3    A.   It informs the motor to draw current.

16:01:28    4    Q.   To draw current.  And what does that mean, to draw

16:01:33    5    current?

16:01:33    6    A.   To power up to be able to spin.

16:01:35    7    Q.   Is that the same as starting the motor?

16:01:38    8    A.   Yes.

16:01:38    9    Q.   Okay.  And then what happens then?  What does the motor do

16:01:42   10    as it relates to the gearbox?

16:01:44   11    A.   It drives the gear train.

16:01:46   12    Q.   Does it turn the gears?

16:01:48   13    A.   Yes.

16:01:48   14    Q.   Okay.  So if we're looking here at the gears, can you

16:01:54   15    identify the gears in this particular drawing?

16:01:56   16    A.   Just where they specifically are?

16:01:58   17    Q.   Yeah.

16:01:58   18    A.   Just across from metallic cylinder you see here, which is

16:02:03   19    the motor, to the right of that is a series of gears.

16:02:05   20    Q.   Okay.  The round things with the edges on it?

16:02:07   21    A.   Yes.  With teeth.

16:02:08   22    Q.   With teeth.  And once they start moving, what happens

16:02:14   23    then?

16:02:17   24    A.   So they move progressively, and then once you get to the

16:02:20   25    final gear, that gear engages what's called a rack, the piston,

TINO - CROSS

16:02:26  1  and breech.

16:02:28  2  Q.   Do the gears act to move the plunger assembly towards the

16:02:33  3  rear of the Mythic?

16:02:35  4  A.   Yes.

16:02:35  5  Q.   Okay.  So those gears are moving, the plunger starts going

16:02:40  6  backwards, right --

16:02:41  7  A.   Yes.

16:02:42  8  Q.   -- or towards the rear?

16:02:43  9  A.   Along with the breech.

16:02:44  10  Q.   And as the plunger moves back, that protruding arm on top

16:02:51  11  of the plunger will contact that switch, right?

16:02:55  12  A.   Yes.  It begins to make contact.

16:02:58  13  Q.   Okay.  And once that switch gets contacted, does the

16:03:05  14  switch signal or communicate with the electronic board that one

16:03:09  15  shot has occurred?

16:03:10  16  A.   Not at that point in time.

16:03:12  17  Q.   Okay.  When -- at what point in time?

16:03:15  18  A.   Once the -- the gear train has driven the plunger all the

16:03:19  19  way back and released it, once it's fully released and returned

16:03:24  20  back to its home position, it then sends a signal that that

16:03:28  21  switch has been depressed.

16:03:30  22  Q.   Okay.  Good.  Will the motor shut off at that point in

16:03:36  23  time?

16:03:36  24  A.   In single fire mode, it will, yes.

16:03:38  25  Q.   Yeah.  And that means another fire is not coming out --

TINO - CROSS

| | | |
|---|---|---|
| 16:03:41 | 1 | A.    Correct. |
| 16:03:41 | 2 | Q.    -- another gellet is not going to come out; is that right? |
| 16:03:45 | 3 | A.    Yes. |
| 16:03:45 | 4 | Q.    And so you just described the operation of the Mythic |
| 16:03:48 | 5 | firing mechanism, right? |
| 16:03:49 | 6 | A.    Yes. |
| 16:03:50 | 7 | Q.    And do you understand that's identical to the operation of |
| 16:03:55 | 8 | the physical firing mechanism of the Gel -- as shown in the |
| 16:03:59 | 9 | Gel Blaster CAD drawings? |
| 16:04:01 | 10 | A.    It could be considered identical. |
| 16:04:04 | 11 | Q.    Okay. |
| 16:04:06 | 12 | A.    It's also identical to the -- |
| 16:04:07 | 13 | Q.    Identical, right? |
| 16:04:09 | 14 | A.    The process is identical?  Is that what you're asking. |
| 16:04:12 | 15 | Q.    Yeah. |
| 16:04:12 | 16 | A.    Yes.  The flow of events is the same. |
| 16:04:15 | 17 | Q.    Okay.  And you would agree that the physical firing |
| 16:04:20 | 18 | mechanism of the Gel Blaster included that protruding -- a |
| 16:04:25 | 19 | protruding arm coming off the plunger, right? |
| 16:04:28 | 20 | A.    To my knowledge, that's never been sold by Gel Blaster. |
| 16:04:32 | 21 | Q.    You've never been what? |
| 16:04:32 | 22 | A.    That's never been sold by Gel Blaster. |
| 16:04:35 | 23 | Q.    That's not what I'm asking. |
| 16:04:35 | 24 | A.    You said the Gel Blaster -- you said the Gel Blaster |
| 16:04:38 | 25 | product. |

TINO - CROSS

16:04:38  1   Q.   Thank you.  I stand corrected.  I apologize.

16:04:45  2          In the CAD drawings, are you familiar with a

16:04:48  3   protrusion that comes up from the plunger and points backwards

16:04:55  4   toward the rear of the -- of the gun?

16:04:58  5   A.   I'm familiar that there is publicly available Gel Blasters

16:05:02  6   that do that.

16:05:03  7   Q.   Sure.  But have you seen CAD drawings that show that?

16:05:07  8   A.   Again, I may have.  It was over two years ago now.

16:05:10  9   Q.   Okay.  And are you familiar with the fact that when that

16:05:15  10  travels backwards after a shot, that's going to touch a switch?

16:05:22  11  A.   Can you clarify?  What is touching a switch in what

16:05:25  12  blaster?

16:05:25  13  Q.   The protruding arm touches a switch.

16:05:29  14  A.   In which blaster are we referring?

16:05:31  15  Q.   We're referring again to the computer-aided design

16:05:35  16  drawings that we've been discussing today.

16:05:38  17  A.   Yeah.  I can't specifically say.  I haven't seen those CAD

16:05:41  18  drawings for a Gel Blaster.

16:05:42  19  Q.   You haven't seen them before?

16:05:43  20  A.   I haven't seen them today.

16:05:45  21  Q.   Oh.  I'm sorry.  I'm sorry.

16:05:49  22          I'd like to please provide Mr. Tino with what's been

16:05:57  23  marked as Plaintiff's Exhibit 24.  Can you take a look at that,

16:06:09  24  sir.

16:06:09  25  A.   Yes.  I see this.

TINO - CROSS

```
16:06:11   1              MR. DOYLE:  Can we get that up on the screen.

16:06:13   2   Q.   Okay.  Do you see that arm at the very top of the plunger?

16:06:17   3   A.   Yes, I do.

16:06:18   4   Q.   Okay.  And it protrudes backwards, right?

16:06:22   5   A.   Yes.

16:06:22   6   Q.   And so would you agree that when the trigger is pulled,

16:06:26   7   that a signal is sent to the motor and the motor starts the

16:06:31   8   gears?

16:06:32   9   A.   Yes.

16:06:32  10   Q.   Okay.  And when the gears start, the whole plunger

16:06:36  11   assembly is going to go towards the back or the rear of the

16:06:40  12   Gel Blaster.  Do you see that?

16:06:42  13   A.   Yes.

16:06:42  14   Q.   Okay.  And when that happens, you see that this arm that

16:06:46  15   we've been calling the PISCA on top of the plunger, right?

16:06:50  16   A.   Yes.

16:06:50  17   Q.   And when that moves back, do you see a switch?

16:06:54  18   A.   I do.

16:06:54  19   Q.   And we've been calling that the PISCA switch, right?

16:06:58  20   A.   Yes.

16:06:58  21   Q.   And when that hits that switch, it's going to indicate

16:07:04  22   there's a signal then sent from the switch to the motor.  Do

16:07:07  23   you understand that?

16:07:08  24   A.   I can assume that's what would happen.

16:07:11  25   Q.   Okay.  And the motor shuts off?
```

TINO - CROSS

16:07:13  1   A.   Yes.  Without knowing -- without seeing the code, I can't

16:07:16  2   say.  But that could be an assumption.

16:07:18  3   Q.   Right.  And as you sit here today, you don't recall if

16:07:24  4   you've seen this CAD drawing?

16:07:26  5   A.   This drawing is a rendering, I believe, not a CAD drawing.

16:07:30  6   Q.   Have you seen a CAD drawing that looks like this?

16:07:33  7   A.   I may have over two years ago.

16:07:35  8   Q.   Over two years ago.  Well, was it in the summer of 2021?

16:07:42  9   A.   Yes.  Approximately two years ago.

16:07:44  10  Q.   Well, aren't we January of 2022?

16:07:47  11  A.   I apologize for my timeline.  Not quite.  Sometime in mid

16:07:50  12  to late 2021.

16:07:52  13  Q.   Okay.  Fantastic.  So Mr. Hoffman went through all these

16:08:03  14  different versions of guns, and I'm going to try to use the

16:08:10  15  correct exhibit numbers.

16:08:14  16       So we're going to start with Exhibit 300, which is

16:08:20  17  under Tab 3 in your book.

16:08:35  18       So what was this again?

16:08:36  19  A.   This is the initial CAD drawing of our Gelfire Mythic.

16:08:40  20  Q.   Sure.  Is this the -- the CAD drawing that ended up being

16:08:45  21  used to develop the Gelfire Mythic?

16:08:48  22  A.   Yes.  This was the first CAD drawing, so it was used to

16:08:52  23  develop the Mythic, yes.

16:08:53  24  Q.   But it's not the final?

16:08:54  25  A.   Correct.  Not the final, yes.

TINO - CROSS

16:08:56  1   Q.   Okay.  And when you look at this, do you see that

16:09:00  2   protruding arm in this particular diagram?

16:09:03  3   A.   There is no protruding arm in that diagram.

16:09:06  4   Q.   Yeah.  But the actual final Mythic that sold has a

16:09:09  5   protruding arm, right?

16:09:10  6   A.   Correct.

16:09:11  7   Q.   Okay.  And do you see a switch that gets contacted by a

16:09:18  8   protruding arm?

16:09:18  9   A.   No, I do not.

16:09:19  10  Q.   It's not in here, is it?

16:09:20  11  A.   Correct.

16:09:21  12  Q.   Okay.  So that was added later?

16:09:23  13  A.   Yes.

16:09:23  14  Q.   Okay.  So it's not in this drawing.

16:09:27  15       All right.  Let's move over to Defendant's Exhibit 5

16:09:32  16  if we could.  I'm sorry.  Tab 6.  It's Defendant's Exhibit 5.

16:09:48  17       Do you got it?

16:09:48  18  A.   Yes, I do.

16:09:49  19  Q.   And what was this again?

16:09:53  20  A.   This is a CAD drawing with some highlighted pieces of the

16:09:56  21  NERF Stampede.

16:09:57  22  Q.   Okay.  And I think you already testified that the Hasbro

16:10:01  23  Mythic is not based on -- or was not designed and developed

16:10:05  24  based on this?

16:10:06  25  A.   Correct.

TINO - CROSS

| | | |
|---|---|---|
| 16:10:06 | 1 | Q.   Okay.  Does this particular -- is this Darthskids', or is |
| 16:10:16 | 2 | this Hasbro Stampede? |
| 16:10:17 | 3 | A.   This is the Hasbro Stampede. |
| 16:10:18 | 4 | Q.   This is the old Hasbro Stampede.  Is there a plunger arm |
| 16:10:23 | 5 | or an arm that protrudes from the plunger going backwards in |
| 16:10:27 | 6 | this particular? |
| 16:10:28 | 7 | A.   No. |
| 16:10:28 | 8 | Q.   Not there at all, right? |
| 16:10:30 | 9 | A.   No. |
| 16:10:31 | 10 | Q.   Is this a switch that a plunger arms contacts in this |
| 16:10:35 | 11 | particular design? |
| 16:10:37 | 12 | A.   Not directly. |
| 16:10:38 | 13 | Q.   Not there, right? |
| 16:10:40 | 14 | A.   There is a switch to the plunger. |
| 16:10:42 | 15 | Q.   There are switches in there, but there's no switch that a |
| 16:10:46 | 16 | plunger coming off of the -- I mean, the arm coming off of the |
| 16:10:51 | 17 | plunger is going to go back and hit, right? |
| 16:10:52 | 18 | A.   Correct. |
| 16:10:54 | 19 | Q.   So this is not your final design either, is it? |
| 16:10:57 | 20 | A.   It is not. |
| 16:10:58 | 21 | Q.   But it's Mr. Darthskids' -- strike that. |
| 16:11:00 | 22 |      It's the Stampede, correct? |
| 16:11:04 | 23 | A.   Right. |
| 16:11:04 | 24 | Q.   Lets run -- let's run on over to Defendant's Exhibit 7. |
| 16:11:13 | 25 |      What was this again? |

TINO - CROSS

16:11:14  1    A.    The post on NerfHaven to modify a Stampede to add select

16:11:19  2    fire.

16:11:19  3    Q.    And this is what this Darthskids did, right?

16:11:22  4    A.    Correct.

16:11:23  5    Q.    Right.  And you've already testified that you didn't use

16:11:25  6    this in the development of the Hasbro Mythic; is that correct?

16:11:31  7    A.    We do not, no.

16:11:32  8    Q.    Now, looking at this, can you just point to me where there

16:11:34  9    is an arm on top of the plunger?

16:11:40  10   A.    There is no arm on top.

16:11:41  11   Q.    There is no arm?

16:11:42  12   A.    Yeah.

16:11:43  13   Q.    And there's no arm going backwards that ever contacts a

16:11:46  14   switch, right?

16:11:47  15   A.    Correct.

16:11:47  16   Q.    Okay.  Let's move off of that, too.

16:11:51  17          Finally, I believe -- and this was new to us --

16:12:00  18   Defendant's Exhibit 9.  I believe it's called the NERF Elite

16:12:06  19   Turbine.  And in this drawing I believe you testified that this

16:12:13  20   thing in red is a physical switch, right?

16:12:15  21   A.    Yes, it is.

16:12:15  22   Q.    Okay.  Is that physical switch contacted by an arm that

16:12:21  23   rests on top of a plunger looking backwards?

16:12:25  24   A.    No.

16:12:26  25   Q.    Why is that?

TINO - REDIRECT

16:12:27   1   A.   This blaster utilizes a pusher and flywheel system.

16:12:32   2   Q.   So there's no plunger arm, right?

16:12:35   3   A.   Correct.

16:12:36   4   Q.   There's no PISCA.

16:12:41   5        THE COURT:  Just pull one of those away from the

16:12:43   6   other one -- pull one of them away.  Now just talk into one.

16:12:50   7        I think the feedback occurs when the two mics are put

16:12:53   8   together.

16:12:54   9        MR. DOYLE:  No more questions.  Thank you.

16:13:02   10        THE COURT:  Redirect?

16:13:03   11        MR. HOFFMAN:  Quickly, Your Honor.

16:13:08   12                    **REDIRECT EXAMINATION**

16:13:08   13   **BY MR. HOFFMAN:**

16:13:08   14   Q.   Mr. Tino, you testified about the flow of events in the

16:13:11   15   Mythic.  Do you recall that?

16:13:12   16   A.   Yes.

16:13:13   17   Q.   How did the flow of events in the Mythic compare to the

16:13:18   18   NerfHaven Stampede?

16:13:19   19   A.   Should be very similarly.

16:13:21   20   Q.   And how did the flow of events in the Mythic compare to

16:13:25   21   the Captain Xavier Stampede with additional switch?

16:13:30   22   A.   Very similar, if not identical.

16:13:33   23   Q.   Thank you.

16:13:38   24        THE COURT:  Anything additional, Mr. Doyle?

16:13:40   25        MR. DOYLE:  I do.  I do.  That was the Xavier.  What

TINO - RECROSS

| | | |
|---|---|---|
| 16:13:44 | 1 | defendant's -- what exhibit are you referring to? |
| 16:13:48 | 2 | MR. HOFFMAN:  Captain Xavier is Exhibit 10. |
| 16:14:02 | 3 | **RECROSS-EXAMINATION** |
| 16:14:02 | 4 | **BY MR. DOYLE:** |
| 16:14:02 | 5 | Q.   Who is Captain Xavier? |
| 16:14:05 | 6 | A.   A well-known modder, as we would call them, in the |
| 16:14:10 | 7 | enthusiast community for NERF. |
| 16:14:12 | 8 | Q.   Work for Hasbro? |
| 16:14:13 | 9 | A.   No. |
| 16:14:13 | 10 | Q.   You guys ever taken anything from him and used it to |
| 16:14:17 | 11 | design your blasters? |
| 16:14:18 | 12 | A.   Not that I'm aware of. |
| 16:14:20 | 13 | Q.   Okay.  Looking at this, is there a physical arm on top of |
| 16:14:27 | 14 | the plunger? |
| 16:14:29 | 15 | A.   No. |
| 16:14:30 | 16 | Q.   Is there any type of arm on top of the plunger that goes |
| 16:14:35 | 17 | back and contacts a switch to show that a fire has been shot |
| 16:14:39 | 18 | from the blaster? |
| 16:14:40 | 19 | A.   No. |
| 16:14:41 | 20 | Q.   All right.  Thank you. |
| 16:14:50 | 21 | THE COURT:  Mr. Hoffman? |
| 16:14:53 | 22 | MR. HOFFMAN:  Your Honor, Hasbro calls |
| 16:14:55 | 23 | Mr. Adam Kleinman. |
| 16:15:02 | 24 | THE COURT:  You may step down. |
| 16:15:03 | 25 | (Witness sworn) |

| | | |
|---|---|---|
| 16:15:27 | 1 | MR. BARKAN:  Good afternoon, Your Honor. |
| 16:15:27 | 2 | David Barkan again. |
| 16:15:30 | 3 | **ADAM KLEINMAN,** |
| 16:15:30 | 4 | having been first duly sworn, testified as follows: |
| 16:15:30 | 5 | **DIRECT EXAMINATION** |
| 16:15:30 | 6 | **BY MR. BARKAN:** |
| 16:15:30 | 7 | Q.   Good afternoon Mr. Kleinman? |
| 16:15:32 | 8 | A.   Good afternoon. |
| 16:15:32 | 9 | Q.   Please introduce yourself to the court. |
| 16:15:34 | 10 | A.   My name is Adam Kleinman.  I'm the senior vice president |
| 16:15:37 | 11 | and general manager of NERF. |
| 16:15:39 | 12 | THE COURT:  And how do you spell your last name? |
| 16:15:41 | 13 | THE WITNESS:  It's K-l-e-i-n-m-a-n. |
| 16:15:49 | 14 | THE COURT:  Thank you. |
| 16:15:50 | 15 | Q.   (BY MR. BARKAN) How long have you been with Hasbro? |
| 16:15:52 | 16 | A.   This would be my 14th year. |
| 16:15:54 | 17 | Q.   And how long have you been involved with blaster products? |
| 16:15:57 | 18 | A.   I started on the NERF business at the end of 2019. |
| 16:16:00 | 19 | Q.   Has the Mythic product been successful? |
| 16:16:03 | 20 | A.   Yes. |
| 16:16:03 | 21 | Q.   Have customers' reviews been positive? |
| 16:16:07 | 22 | A.   Yes.  It has over a four-star rating. |
| 16:16:10 | 23 | Q.   Now, in those customer reviews, have customers talked |
| 16:16:14 | 24 | about the performance of the Mythic with respect to its |
| 16:16:18 | 25 | multiple firing modes? |

16:16:20   1   A.   Not particularly to the firing modes.  They talk about

16:16:22   2   the -- we're I think the only ones that have the ability to

16:16:27   3   swap out batteries, we have an extendable stock.  They talk

16:16:30   4   about our hopper.  But our firing mode is no different than any

16:16:33   5   other blaster on the market.

16:16:35   6   Q.   Okay.  In terms of performance?

16:16:37   7   A.   We're lower on performance.  We fire at a lower speed than

16:16:42   8   other blasters at a similar rate of fire.

16:16:45   9   Q.   Have any of those reviews compared Mythic's firing control

16:16:49  10   to other competitor products' firing control?

16:16:51  11   A.   I mean, we have comparisons between the Mythic and the

16:16:56  12   Surge, for example.  In many cases, they prefer the Surge.  No

16:17:00  13   one particularly calls out anything internally.  They just talk

16:17:04  14   about whether it's semiauto or full auto.

16:17:07  15   Q.   Is it fair to say, Mr. Kleinman, that to whatever extent

16:17:12  16   the Mythic is using a switch mechanism and firing control, that

16:17:15  17   has not led to customers particularly being impressed with the

16:17:19  18   firing performance of the Mythic?

16:17:21  19   A.   Yeah.  That's a fair statement.  We don't market it.  We

16:17:27  20   don't show the internals of our Blaster.  We don't break it

16:17:29  21   apart into our marketing campaigns.  So it would be very hard

16:17:34  22   for consumers to know that there were any differences.

16:17:35  23   Q.   Okay.  In your job do you regularly review market share

16:17:38  24   data?

16:17:38  25   A.   Yes, I do.  Of course.

KLEINMAN - DIRECT                                    193

```
16:17:40   1   Q.   Where do you get that data from?
16:17:42   2   A.   We work with a third party that Hasbro subscribes to
16:17:46   3   called NPD.
16:17:47   4   Q.   Does NPD track market share in the gel ball blaster
16:17:51   5   market?
16:17:51   6   A.   Yes.
16:17:51   7   Q.   And what were the relative market shares of the top
16:17:54   8   players in the gel ball blaster market in the fourth quarter of
16:17:58   9   2022?
16:17:59  10   A.   Gel Blaster, the brand, was number one at about 47
16:18:06  11   percent, I believe.  There are some slight nuances on market
16:18:08  12   share data based on items that are suppressed or not
16:18:14  13   suppressed, which are exclusives.  SplatRBall I believe was
16:18:16  14   somewhere around 25 percent, NERF was around 15, and Prime Time
16:18:20  15   was around 11 1/2 percent.
16:18:23  16   Q.   When you say NERF, you mean Hasbro?
16:18:25  17   A.   Hasbro's, yes.  But NERF is the brand.
16:18:28  18   Q.   Okay.  So in the market share data that you reviewed for
16:18:31  19   the fourth quarter of 2022, Gel Blaster was number one?
16:18:35  20   A.   That is correct.
16:18:35  21   Q.   With about the three times the market share of Hasbro?
16:18:38  22   A.   That is correct.
16:18:39  23   Q.   Okay.  Now, if Hasbro left the gel ball market tomorrow,
16:18:48  24   would Gel Blaster, the company, still have competition for gel
16:18:51  25   ball blasters?
```

KLEINMAN - DIRECT

16:18:52   1    A.    Yes, of course.  SplatRBall, Prime Time Toys, which has

16:18:56   2    recently expanded their distribution, as well as a plethora of

16:19:00   3    brands that are on Amazon and coming into the market.

16:19:02   4    Q.    All right.  I'd like to turn now to the negotiations with

16:19:05   5    Gel Blaster in 2021.  Were you involved in those?

16:19:12   6    A.    Yes, I was.

16:19:12   7    Q.    What were your goals in those discussions?

16:19:15   8    A.    Overall, we found a partner that we, you know, wanted to

16:19:19   9    move forward with, and our goal was to do a deal.

16:19:21   10   Q.    Were you optimistic initially?

16:19:23   11   A.    Yes.  Very.

16:19:24   12   Q.    What changed?

16:19:26   13   A.    Number one change was the patents.  You know, we

16:19:29   14   reviewed -- found that the products that the Gel Blaster team

16:19:34   15   that the team believed was infringing current patents in the

16:19:38   16   market, and that led us to the reason that we couldn't move

16:19:40   17   forward -- we couldn't go forward with the product line that

16:19:44   18   would infringe patents.

16:19:45   19   Q.    Did Hasbro make a revised or second offer to Gel Blaster

16:19:48   20   after the patent issue arose?

16:19:50   21   A.    Yes, we did.

16:19:51   22   Q.    Why?

16:19:52   23   A.    Well, I think it's really important when you're

16:19:54   24   negotiating to be transparent.  And as we went through the due

16:19:57   25   diligence process, as we got further into an understanding of

16:20:00    1   the patents, which takes quite some time -- as mentioned

16:20:03    2   earlier, we hired outside counsel to review -- we could no

16:20:06    3   longer -- you know, as we are going through it, we couldn't

16:20:11    4   take a market share position -- we couldn't take an equity

16:20:14    5   stake in a company that we couldn't sell.  There wouldn't be

16:20:17    6   any value in that.

16:20:18    7           So as we re-looked at it, we made the offer

16:20:20    8   contingent that we actually were still going through due

16:20:23    9   diligence and an understanding that, you know, that was an

16:20:25   10   offer, but once we complete due diligence, then we would move

16:20:28   11   to a binding term sheet.  At that point it was still a

16:20:30   12   nonbinding offer.

16:20:32   13   Q.   Okay.  Even at the reduced valuation, why did Hasbro not

16:20:35   14   proceed?

16:20:36   15   A.   It all came down to the patents.  We couldn't move

16:20:38   16   forward.  At the end of the day, at the advice of our counsel,

16:20:42   17   our internal legal time, there was just too much risk based on

16:20:46   18   the strength of the patents.

16:20:47   19   Q.   Were you here this morning when Mr. Guinn testified?

16:20:50   20   A.   Yes, I was.

16:20:51   21   Q.   Do you recall him describing a discussion in which he said

16:20:54   22   that Gel Blaster and Hasbro discussed the possibility of

16:20:58   23   approaching the patent owner Spin Master to get a license?

16:21:01   24   A.   Yes.  I -- we had discussion, I believe -- actually, I

16:21:06   25   know for a fact Steve Starobinsky was in that room for that

KLEINMAN - DIRECT

16:21:11  1  discussion.  Steve brought up the fact that he had already had

16:21:14  2  discussions with Spin Master, that they were entering the

16:21:16  3  market.  So while we would have loved to have talked to Spin

16:21:19  4  Master, you know, toy companies -- toy companies talk, we

16:21:23  5  couldn't approach a company that we were told was entering the

16:21:26  6  market, telling them effectively that we're bringing a

16:21:28  7  competitive product to the market against what Steve had told

16:21:31  8  us they were bringing to market.

16:21:33  9  Q.   Okay.  You speak very fast, and there was a lot in there.

16:21:35  10  A.   I'm sorry.  I'll slow it down.

16:21:36  11  Q.   So let me break it down.

16:21:37  12       Who is Mr. Starobinsky?

16:21:38  13  A.   I believe he is the chief revenue officer for Gel Blaster.

16:21:42  14  Q.   What did he tell Hasbro about the possibility of

16:21:45  15  approaching Spin Master?

16:21:47  16  A.   He said that he had spoken to Spin Master; that they were

16:21:52  17  entering the market that; that they prefer to work with us.

16:21:56  18  But that was a clear indication that a competitor was entering

16:22:00  19  the market, so Hasbro could not approach that competitor.

16:22:03  20  Q.   And did what Mr. Starobinsky tell Hasbro impact Hasbro's

16:22:07  21  decision whether to speak to Spin Master at that time?

16:22:11  22  A.   100 percent.

16:22:13  23  Q.   Now, at a later point in time, Hasbro did approach Spin

16:22:16  24  Master, correct?

16:22:17  25  A.   That is correct.

KLEINMAN - DIRECT

16:22:17 1   Q.   How had the situation changed so that some number of

16:22:20 2   months later, Hasbro could approach spin master for a license?

16:22:23 3   A.   Yeah.  So as part of my job, I continuously manage --

16:22:26 4   monitor the industry.  And one of the things that I was doing

16:22:31 5   was searching Gel Blaster.  Because we thought Spin Master was

16:22:33 6   coming to market, we knew that the outdoor and sports buyer

16:22:38 7   would be setting in April.  So anyone coming to market, you

16:22:41 8   would usually start to see leaks in that February, March time

16:22:44 9   frame, just because somehow the people, the influencers that

16:22:49 10  cover NERF and our products, tend to find leaks.

16:22:53 11       Through my search I came across a news article that

16:22:56 12  talked about an issue with the Orbeez challenge with

16:22:59 13  SplatRBall, in that a spokesperson from Spin Master mentioned

16:23:03 14  that they were not manufacturing -- did not plan to manufacture

16:23:07 15  and were not manufacturing gel-based blasters at that time.  It

16:23:12 16  would be very odd for anyone who was entering the market two

16:23:16 17  months later to have a spokesperson say that they were not

16:23:20 18  manufacturing at a time they'd have to be.  They would have to

16:23:23 19  have product on the water.

16:23:24 20       So at that time we made the decision to approach Spin

16:23:27 21  Master, because we believed that they -- you know, different

16:23:30 22  from what we originally heard, we at that point believed that

16:23:33 23  they probably were not entering the market.

16:23:35 24  Q.   Now, do you also recall Mr. Guinn talking about a meeting

16:23:39 25  with Hasbro, Gel Blaster, and Walmart?

KLEINMAN - DIRECT

16:23:41  1   A.   Yes.  That was correct.

16:23:42  2   Q.   Are you familiar with that meeting?

16:23:44  3   A.   Yes.  I prepared a lot of the documents for that meeting.

16:23:47  4   Q.   Are you familiar with Hasbro's relationship with Walmart,

16:23:51  5   generally?

16:23:52  6   A.   Yes.  We have phenomenal relationships with Walmart.  We

16:23:56  7   have a team that's down there all the time that lives down

16:23:59  8   there.  We have top-to-top meetings with their executives.  So

16:24:02  9   we have very strong relationships with Walmart.  They're one of

16:24:06  10  our biggest customers.

16:24:07  11  Q.   Did the meeting Mr. Guinn described with Walmart play any

16:24:10  12  role whatsoever in Hasbro at a later time securing Mythic

16:24:17  13  business with Walmart?

16:24:18  14  A.   It did not.  We actually distribute our product through a

16:24:22  15  different buyer.  The buyer that buys the Mythic is the same

16:24:25  16  buyer that buys the rest of the NERF products.  We're not

16:24:29  17  actually in the same aisle as Gel Blaster, so we don't actually

16:24:31  18  work with that buyer.  We could have had we wanted to, but we

16:24:35  19  made the recommendation to go into the NERF aisle with the rest

16:24:38  20  of our NERF planogram.

16:24:40  21  Q.   When you say "buyer," what do you mean by "buyer" in this

16:24:44  22  context?

16:24:44  23  A.   This is the person that works for Walmart that actually

16:24:47  24  makes the decisions of which products they're going to put on

16:24:50  25  planogram.

| | |
|---|---|
| 16:24:51 | 1 |

Q.   All right.  Let me turn to a different topic,

Mr. Kleinman.  If Hasbro were to be required to stop selling

the Mythic tomorrow, would there be a financial impact?

A.   Yes, there would.

Q.   Did you detail the projected financial impact of that in

your confidential declaration that was filed under seal?

A.   Yes, I did.

Q.   And Hasbro considers the specific financial amounts to be

highly confidential?

A.   Yes.  We don't disclose -- as a public company, we don't

disclose private information on products or brands.

Q.   Okay.  In addition to the financial loss detailed in your

declaration, would an order requiring Mythic to -- or requiring

Hasbro to stop selling Mythic impact Hasbro's inventory

management?

A.   Yes.  Obviously, there's both inventory that's owned by

the retailers, and then we have a significant amount of

domestic inventory.  So all of that -- we'd have to pay to

destroy all of that.  So we'd lose both what we paid for to

bring it in as well as the cost to destroy it.

Q.   Would there be nonfinancial impact on Hasbro from an order

requiring Hasbro to stop selling the Mythic?

A.   Yes.  You know, one of the things that we place a lot of

value on is our quality.  It's one of the things that we're

most known for.  And when you ask consumers and ask parents,

16:26:04  1  quality is one of reasons that they pick NERF over other

16:26:08  2  brands.

16:26:09  3          Unfortunately, there have been recalls in this

16:26:11  4  category from Gel Blaster.  So us removing a product from the

16:26:15  5  shelf, to the consumer it would look like a recall and would

16:26:18  6  have recourse against the rest of our business and would

16:26:21  7  tarnish the NERF brand.

16:26:22  8  Q.   Okay.

16:26:24  9          MR. PETIT:  I'm going to object to that as

16:26:26  10  speculation, Your Honor.

16:26:29  11          THE COURT:  Well, the court will disregard the part

16:26:31  12  of the answer that was speculative.

16:26:34  13          MR. BARKAN:   Okay.

16:26:35  14          THE COURT:  So the objection is sustained.

16:26:36  15  Q.   (BY MR. BARKAN) Mr. Kleinman, has Hasbro had any safety

16:26:40  16  issues with the Mythic?

16:26:41  17  A.   No, we have not.

16:26:42  18  Q.   Okay.  All right.  Now, Mr. Kleinman, what's a planogram?

16:26:50  19  A.   That is the physical retail space for our products.

16:26:52  20  Q.   And what does it refer to, the planogram itself?

16:26:56  21  A.   It's the shelves.  I mean, the shelves at Walmart, they're

16:27:00  22  called planograms.  Or any big box or any retailer.

16:27:03  23  Q.   Okay.  How far in advance are the planograms locked down

16:27:07  24  and set in place?

16:27:08  25  A.   Pretty -- pretty far in advance.  Fall is already locked.

KLEINMAN - DIRECT                                           201

| | | |
|---|---|---|
| 16:27:13 | 1 | Spring of 2024 is already in discussion and will lock pretty |
| 16:27:19 | 2 | shortly.  And we start to do those previews quite soon.  So |
| 16:27:23 | 3 | it's around 12 months or so in advance. |
| 16:27:28 | 4 | Q.   What would happen to that shelf space if Hasbro was not |
| 16:27:32 | 5 | able to sell the Mythic? |
| 16:27:33 | 6 | MR. PETIT:  Objection: speculation based on what a |
| 16:27:35 | 7 | retailer is going to do if Hasbro is forced to pull product off |
| 16:27:38 | 8 | the shelf. |
| 16:27:39 | 9 | MR. BARKAN:  Your Honor, I can lay the foundation |
| 16:27:39 | 10 | that this witness has. |
| 16:27:39 | 11 | THE COURT:  The objection is sustained.  Lay the |
| 16:27:41 | 12 | foundation. |
| 16:27:43 | 13 | Q.   (BY MR. BARKAN) Mr. Kleinman, in your role, how often do |
| 16:27:45 | 14 | you deal with retailers? |
| 16:27:49 | 15 | A.   All the time. |
| 16:27:50 | 16 | Q.   And what's your experience in dealing with the management |
| 16:27:52 | 17 | of shelf space for toy products with retailers? |
| 16:27:55 | 18 | A.   Can you just give me a breakdown? |
| 16:27:57 | 19 | Q.   Sure.  Have you had experience with situations in which a |
| 16:28:01 | 20 | retailer had to replace shelf space from one product with |
| 16:28:04 | 21 | another product? |
| 16:28:06 | 22 | A.   Yes.  You know, it's pretty standard practice.  When you |
| 16:28:11 | 23 | do it further out -- it's relatively infrequent when you have |
| 16:28:15 | 24 | to do it on short notice.  When you do that, the retailer has |
| 16:28:18 | 25 | to scramble.  They either have to find something that's the |

16:28:22  1  exact same size, because the planogram space is finite, which

16:28:26  2  is very difficult.  They have to -- you know, there's a lot of

16:28:30  3  things that actually have to happen.  They have to get that

16:28:33  4  item into their system.  So it puts a lot of strain on the

16:28:37  5  retailer.

16:28:37  6  Q.   Okay.  Based on your experience working closely with

16:28:40  7  retailers and with buyers at retailers, if Hasbro had to

16:28:43  8  suddenly remove its products from the retailer shelves, would

16:28:47  9  that make it more difficult for Hasbro to convince retailers to

16:28:51 10  take its products?

16:28:53 11          MR. PETIT:  I renew my objection as to speculation,

16:28:54 12  Your Honor.

16:28:55 13          MR. BARKAN:  It's well within his expertise.

16:28:57 14          THE COURT:  I will allow him to answer based on his

16:29:00 15  personal knowledge and based on his experience.

16:29:05 16  A.   Can you repeat the question?  Sorry.

16:29:07 17  Q.   Sure.  Based on your personal experience, if Hasbro were

16:29:11 18  required to remove the product from the shelf, would that make

16:29:13 19  it more difficult for you to convince a retailer to take your

16:29:17 20  product in the future?

16:29:19 21  A.   Yes.  You know, there would certainly be significantly

16:29:23 22  more questions around the product.  We'd have to prove that we

16:29:26 23  wouldn't have any of these issues in the future.  So it would

16:29:30 24  certainly make it much more difficult.

16:29:32 25  Q.   Okay.  Has Hasbro incurred any sunk costs related to the

                                KLEINMAN - DIRECT                          203

16:29:36   1   Mythic?

16:29:36   2   A.   Yes.  Material costs.  We buy -- we bought batteries and

16:29:41   3   ICs in advance.  Tooling costs.  We tooled -- spent a

16:29:47   4   significant amount on tooling for the Mythic.  So, yes, there

16:29:50   5   were significant sunk costs.

16:29:51   6   Q.   And if Hasbro were not able to sell the Mythic, would it

16:29:55   7   be able to repurpose that material to use in another product?

16:29:58   8   A.   It depends what it is.  Most of it likely not.  There's a

16:30:02   9   potential that the ICs could be, but it depends on the

16:30:04  10   operation of the other item.  Obviously, tooling would not be

16:30:07  11   able to be used.

16:30:08  12   Q.   Thank you, Mr. Kleinman.

16:30:09  13        MR. BARKAN:  I have no further questions, Your Honor.

16:30:11  14   I pass the witness.

16:30:12  15        THE COURT:  Cross-examination, Mr. Doyle?

16:30:15  16        MR. PETIT:  It's going to be me, Your Honor,

16:30:16  17   Will Petit.  I'm mindful of the time.  Is there any way I can

16:30:19  18   get from the Court the time remaining for both sides?

16:30:22  19        THE COURT:  I didn't hear you.  You're going to have

16:30:25  20   to speak into a microphone.

16:30:25  21        MR. PETIT:  I'm sorry.  If we could get the time

16:30:27  22   remaining from both sides.  I want to be mindful of the time

16:30:30  23   and the Court's time.

16:30:30  24        THE COURT:  Yes.  You 15 minutes left, and Hasbro has

16:30:33  25   10 minutes left.

KLEINMAN - CROSS

16:30:37   1          MR. PETIT:  May I have a few minute to get set up?

16:30:39   2          THE COURT:  A very few minutes.

16:30:41   3          MR. PETIT:  Yes, Your Honor.

16:30:42   4          THE COURT:  Because at five o'clock I'm going to get

16:30:44   5   up and walk out.

16:30:45   6          MR. PETIT:  I don't blame you.

16:31:23   7          And, Your Honor, again for the court reporter, this

16:31:24   8   is Will Petit.

16:31:25   9                     **CROSS-EXAMINATION**

16:31:25  10   **BY MR. PETIT:**

16:31:25  11   Q.   Mr. Kleinman, you were personally involved in discussions

16:31:31  12   with Gel Blaster back in August, September, October, November

16:31:34  13   2021, correct?

16:31:36  14   A.   Yes.  That is correct.

16:31:38  15   Q.   Okay.  And you're aware that Hasbro and Gel Blaster

16:31:45  16   entered into a mutual confidentiality agreement in August of

16:31:47  17   2021, correct?

16:31:47  18   A.   I don't know the exact timing, but I'm aware that we

16:31:51  19   entered into that agreement.

16:31:51  20   Q.   Okay.  And you've reviewed that agreement before today,

16:31:54  21   right?

16:31:54  22   A.   Have I -- I haven't reviewed it, you know, in detail, but

16:31:58  23   I have seen it before today.

16:31:59  24   Q.   You're aware that, pursuant to that agreement, Hasbro

16:32:02  25   could only use information that Gel Blaster supplied to Hasbro

16:32:06   1   for the purpose of evaluating a transaction between the two

16:32:09   2   parties and no other purpose, right?

16:32:11   3   A.   I believe we walked through the confidential piece of it.

16:32:15   4   Obviously, information outside of that was fair game, as we

16:32:18   5   kind of talked about earlier.

16:32:19   6   Q.   Okay.  Are you suggesting in any way to the Court that Gel

16:32:25   7   Blaster's design files for unreleased products were not treated

16:32:30   8   as confidential by Hasbro?

16:32:32   9   A.   I am not suggesting that.

16:32:33  10   Q.   Okay.  Did you treat them as confidential?

16:32:35  11   A.   Yes.  But I personally can't open those files.

16:32:38  12   Q.   Okay.  Do you know whether others at Hasbro treated those

16:32:42  13   as confidential?

16:32:43  14   A.   It is my understanding that they did, yes.

16:32:53  15           MR. PETIT:  I'd like to bring up what is marked as

16:32:54  16   Plaintiff's Exhibit 19.

16:33:08  17           And, Your Honor, may I approach the witness as well?

16:33:09  18           THE COURT:  Do you remember what I said earlier.

16:33:10  19           MR. PETIT:  Just making sure it applied to me, too.

16:33:12  20           THE COURT:  I haven't changed my mind.

16:33:14  21           MR. PETIT:  Thank you.

16:33:14  22           THE WITNESS:  Just make sure he doesn't get hostile

16:33:17  23   with me, Your Honor.

16:33:25  24   Q.   (BY MR. PETIT) Mr. Kleinman, this is an e-mail from

16:33:29  25   Mr. Listenberger, who works with you, correct?

KLEINMAN - CROSS

16:33:31  1   A.   That is correct.

16:33:35  2   Q.   Do you recognize this e-mail?

16:33:36  3   A.   I mean, I don't have, like, a memory of it.  I mean, yes,

16:33:41  4   but I don't, like, recall this e-mail off the top of my head.

16:33:44  5   Q.   You were here for Mr. Doyle's opening statement in which

16:33:49  6   he displayed a section or excerpt of this e-mail where

16:33:52  7   Mr. Listenberger agrees with Mr. Guinn that, hey, we're working

16:33:55  8   as one team now, right?

16:33:57  9   A.   Yes.  I was here for that.

16:33:59  10  Q.   And in this e-mail there's a bunch of information that's

16:34:02  11  being requested by Mr. Listenberger of Gel Blaster.  Do you see

16:34:07  12  that?

16:34:07  13  A.   Yes, I do.

16:34:08  14  Q.   Okay.  And also in here, Mr. Listenberger identifies the

16:34:12  15  core Hasbro team members.  Do you see that?

16:34:14  16  A.   Yes, I do.

16:34:15  17  Q.   Is there anybody listed there that are core Hasbro team

16:34:21  18  members for purposes of a transaction between the two companies

16:34:24  19  that were not involved in the development, manufacture, or sale

16:34:26  20  of the Mythic?

16:34:28  21  A.   Are you asking if there's anyone else?

16:34:31  22  Q.   If there's anybody in that list that were core Hasbro team

16:34:35  23  members, as between discussions between the two parties, that

16:34:39  24  are not involved with the manufacture, development, or sale of

16:34:41  25  the Mythic?

16:34:43  1   A.   Well, at some point Maggie left the company, so I'm not

16:34:50  2   sure what her involvement was and what the timing was.  I don't

16:34:54  3   think Kristin was involved.  I'm not quite sure.

16:35:00  4   Q.   So sitting here today, you don't know of anybody for sure

16:35:03  5   that wasn't involved with the -- also involved with the

16:35:05  6   development, manufacture, or sale of the Mythic?

16:35:08  7   A.   There was an extensive list beyond what you have here.

16:35:14  8   Q.   But all of these people were involved in both the

16:35:16  9   conversations between the two parties and also the manufacture,

16:35:20  10  development, and sale of the Mythic?

16:35:21  11  A.   As I said, I'm unsure if they all were.

16:35:27  12  Q.   Okay.  Was Mr. Tino?

16:35:29  13  A.   I think from today's discussion, I believe Nick Tino would

16:35:32  14  have been involved in both.

16:35:34  15  Q.   Mr. Listenberger?

16:35:35  16  A.   Mr. Listenberger is an executive, so he would have

16:35:40  17  overseen elements of it, but he probably wouldn't be involved

16:35:45  18  at a detailed level.

16:35:45  19  Q.   Mr. Borowiec?

16:35:47  20  A.   I don't remember if Jacob stayed on as the QA lead.  We

16:35:51  21  have multiple QA leads.  It is likely that he did, but I can't

16:35:55  22  confirm that.

16:35:56  23  Q.   Okay.  Now, earlier in your direct examination, and as

16:36:05  24  Hasbro has been saying throughout, the reason why Hasbro, you

16:36:10  25  claim, did not go forward with the deal with Gel Blaster was

16:36:13   1   because of the patents; is that right?

16:36:14   2   A.   That is a critical element, yes.

16:36:16   3   Q.   Well, that is the one thing that you testified that

16:36:21   4   changed, was your understanding of the patents; is that right?

16:36:26   5   A.   Yes.  But that element also changed the financial picture,

16:36:30   6   which Colin stated earlier, that they wouldn't accept those

16:36:33   7   finances.  So it's sort of snowball effect from the lead issue,

16:36:37   8   which is the patent.

16:36:38   9             MR. PETIT:  And before I go forward, Your Honor, I

16:36:40   10   would like to offer Exhibit 19 as evidence.

16:36:47   11             MR. HOFFMAN:  No objection, Your Honor.

16:36:48   12             MR. PETIT:  Now I'm going to show --

16:36:48   13             THE COURT:  Gel Blaster 19 is admitted.

16:36:52   14             MR. PETIT:  My apologies, Your Honor.

16:36:54   15             I've marked as Plaintiff's Exhibit 34 a new document.

16:36:57   16   This has now been uploaded to the system, but the Court does

16:37:01   17   not have that in the Court's binder.  And I'll represent to the

16:37:10   18   Court this is what was called by the parties the no-shop

16:37:15   19   agreement that also includes the deal terms.

16:37:22   20   Q.   Are you familiar with this agreement, Mr. Kleinman?

16:37:26   21   A.   I'll need a second to review it.

16:37:29   22   Q.   I only have one?

16:37:31   23   A.   Well, you gave me a big document that I hadn't seen until

16:37:34   24   right now.

16:37:35   25   Q.   While you're looking at that, Mr. Kleinman, you negotiated

16:37:43   1   the deal terms with Gel Blaster, correct?

16:37:46   2   A.   That's actually not correct.

16:37:48   3   Q.   You weren't part of those negotiations?

16:37:51   4   A.   I was not here.  I was part of the original negotiations.

16:37:54   5   A team came to Austin for further negotiations.  I was not a

16:37:57   6   part of that team.

16:37:59   7   Q.   Okay.  Did you hear Mr. Guinn's testimony about the

16:38:03   8   reservation or the escrow of money to be put aside out of the

16:38:10   9   money that Hasbro was going to pay Gel Blaster for purposes of

16:38:13  10   legal proceedings related to patent claims?

16:38:15  11   A.   Yes.  I did hear that.

16:38:16  12   Q.   Okay.  Do you see on page -- the last page of this exhibit

16:38:20  13   under paragraph E, are those the escrowed legal proceedings --

16:38:28  14   escrowed money for legal proceedings?

16:38:30  15   A.   Yes.

16:38:31  16   Q.   And according to this no-shop letter and those deal terms,

16:38:37  17   that was contemplated by the parties on August 30th, 2021,

16:38:41  18   correct?

16:38:41  19   A.   That is correct.

16:39:09  20   Q.   Hasbro and Gel Blaster walked away from one another at

16:39:12  21   either the end of October of 2021 according to Hasbro and

16:39:17  22   beginning of November of 2021 according to Gel Blaster.  Is

16:39:20  23   that fair?

16:39:21  24   A.   I can speak to the Hasbro piece.  Yes, I think that was

16:39:24  25   the testimony, so it sounds correct.

KLEINMAN - CROSS

16:39:26  1  Q.    Now, you claim the reason was because of the Spin Master

16:39:31  2  patent.   So is it your testimony before the Court that, at the

16:39:33  3  end of October 2021, Hasbro intended to get a license to the

16:39:38  4  Spin Master patents?

16:39:39  5  A.    No.   That is not my testimony.

16:39:41  6  Q.    Okay.   In fact, because you didn't get a license to the

16:39:44  7  Spin Master patents until May 2022, correct?

16:39:48  8  A.    I don't know when the timing was.   I think we'd started

16:39:51  9  discussions around March or April when we actually signed an

16:39:55  10  agreement.   I can't be sure of.

16:39:56  11  Q.    And so if -- if Hasbro didn't intend to get a license to

16:40:00  12  the Spin Master patents, but they walked away from the deal

16:40:03  13  with Gel Blaster because of the Spin Master patents, what did

16:40:07  14  Hasbro intend to do at that time?

16:40:09  15  A.    What do you mean?

16:40:10  16  Q.    With respect to developing its own noninfringing,

16:40:13  17  gel-based blaster?

16:40:15  18  A.    Well, we did two things.   One is we took the risk that we

16:40:20  19  could come up with a noninfringing gel round by the time we

16:40:25  20  launched.   So we basically took on the financial risk.   And at

16:40:29  21  that same time, we codeveloped a noninfringing gel round that

16:40:33  22  we could bring to market.

16:40:35  23  Q.    Okay.

16:40:35  24  A.    That was the -- that was the intent.   We didn't actually

16:40:39  25  end up getting there because, as I stated, in February the

16:40:42  1  conversation for us changed and we were able to start a

16:40:45  2  negotiation with Spin Master.

16:40:46  3  Q.   And did Hasbro hire a consultant to develop that

16:40:50  4  nongel-based round, Materic?

16:40:56  5  A.   We partnered with Materic.  We haven't actually brought a

16:40:59  6  nongel -- it's still a gel-based round.  I think you're talking

16:41:04  7  about the definition of super-absorbent polymers.  But it would

16:41:09  8  still be a gel-based round?

16:41:10  9  Q.   Okay.  And who introduced Hasbro to Materic?

16:41:14  10  A.   At the time Colin and I were both introducing each other

16:41:17  11  to different companies.  I introduced them to Covia Renewables,

16:41:21  12  and Colin introduced us to Materic.

16:41:24  13  Q.   In your declaration you state that if the Mythic or other

16:41:33  14  gel-based blaster was removed from the market, then Hasbro

16:41:37  15  would not have another gel-based blaster in the market.

16:41:40  16  A.   That's not what I said.

16:41:42  17  Q.   In your declaration you didn't?

16:41:44  18  A.   I didn't say if we didn't have the Mythic, we wouldn't

16:41:46  19  have anything.  I said that that item wouldn't be in market.

16:41:49  20  Q.   Because the fact is you still have another gel-based

16:41:52  21  blaster, the Legion, that has been introduced to the market; is

16:41:55  22  that correct?

16:41:56  23  A.   That is correct.

16:41:56  24  Q.   And that gel-based blaster does not use the physical

16:42:00  25  firing mechanism; is that true?

16:42:01  1  A.   Well, it's a completely different blaster.  It's also not

16:42:04  2  a battery-operated blaster.  It's a piston spring blaster.

16:42:08  3  Q.   Okay.

16:42:14  4           MR. PETIT:  I'm going to pass the witness.

16:42:16  5           MR. HOFFMAN:  I have no further examination,

16:42:17  6  Your Honor.

16:42:18  7           THE COURT:  You may step down.

16:42:19  8           THE WITNESS:  Thank you, Your Honor.

16:42:29  9           THE COURT:  Any further witnesses from Hasbro?

16:42:32  10          MR. HOFFMAN:  No, Your Honor.

16:42:33  11          THE COURT:  All right.  Gel Blaster has five minutes

16:42:39  12  for argument, and Hasbro has 10.  I'll ask a question.  It

16:42:43  13  doesn't go against your time.  Mr. Petit, did you intend to

16:42:47  14  offer Exhibit 34?

16:42:53  15          MR. PETIT:  Yes, Your Honor, we did.

16:42:54  16          THE COURT:  Is there objection to it?

16:42:56  17          MR. HOFFMAN:  No, Your Honor.

16:42:56  18          THE COURT:  Exhibit Number 34 is admitted.

16:43:05  19          MR. PETIT:  Thank you, Your Honor.

16:43:11  20          THE COURT:  You may proceed.

16:43:13  21          MR. DOYLE:  Sorry, Your Honor?

16:43:14  22          THE COURT:  I'll give you a bit of advice.  I don't

16:43:16  23  think you need to hold back for rebuttal any of your five

16:43:20  24  minutes.  I think you'd be more effective if you just use your

16:43:24  25  five minutes.

16:43:26  1          MR. DOYLE:  I will.

16:43:26  2          THE COURT:  And let me tell you both what I'm most

16:43:29  3  interested in.  What we've heard evidence on today, obviously,

16:43:32  4  is the request for preliminary injunction.

16:43:36  5          The way I see it, the request for preliminary

16:43:39  6  injunction involves whether the confidentiality agreement was

16:43:43  7  violated and whether Hasbro used materials from the CAD

16:43:50  8  documents or perhaps other things that were provided under the

16:43:55  9  confidentiality agreement to design and sell the Mythic.  And

16:44:00 10  taken down to an even more granular point is the PISCA.

16:44:05 11          So what I would be most interested in from both of

16:44:11 12  you is what proof has been presented to me that that occurred

16:44:15 13  today and what proof lacks proving that up from the other side.

16:44:21 14          MR. DOYLE:  Thank you, Your Honor.

16:44:22 15          THE COURT:  So that's where I'm focused at this time.

16:44:25 16          MR. DOYLE:  That's where I'm focused, then.

16:44:27 17          THE COURT:  All right.  Then we're on the same page.

16:44:28 18          MR. DOYLE:  But I am waiting for my slides.  They're

16:44:31 19  not on the screen now.  Okay.  I'll go up here.  I've only got

16:44:36 20  five minutes.

16:44:38 21          THE COURT:  I wont turn your time on until you get

16:44:40 22  your slides up.

16:44:40 23          MR. DOYLE:  All right.

16:44:44 24          Okay, Your Honor.  Let's go through this.  The first

16:44:50 25  slide, likelihood of success on the merits, breach of

16:44:53  1  confidentiality agreement, a broad confidentiality agreement.

16:44:56  2  It covered all of this information that we provided to them was

16:45:00  3  confidential.  We've already discussed the fact that the trade

16:45:03  4  secret PFM was kept under lock and key, and those CAD drawings

16:45:08  5  which show the whole outline of the house, we provided to them.

16:45:12  6          This is simple.  There's that PISCA arm and there's a

16:45:16  7  switch, and they interoperate to do an extremely effective job

16:45:21  8  to allow the firing mechanism to shoot and also to record those

16:45:25  9  shots.  They stole it.  Theirs is identical.

16:45:28  10          Okay.  Forgive me.  Not identical, because they took

16:45:31  11  the switch and they turned it on its side instead of going up

16:45:34  12  and down.  That's it.  You know, that's a *de minimis* change.

16:45:39  13  They have it.  They got it under the NDA.  They then used it.

16:45:43  14  And that is the foundation for everything we're going to do for

16:45:47  15  the next two or three years with respect to the blaster.

16:45:49  16          Irreparable harm.  Can we move to the next slide?

16:45:56  17  This isn't working.

16:45:59  18          So it's undisputed that there was a mutual

16:46:00  19  confidentiality agreement that was duly executed.  We showed

16:46:04  20  you the terms that said they could not use it outside of just

16:46:08  21  looking at a transaction with Gel Blaster.  They did.  They

16:46:13  22  took it and they used it in their Mythic, and that's why they

16:46:16  23  got to market so fast.

16:46:17  24          It's undisputed that Hasbro received Gel Blaster's

16:46:22  25  entire playbook, which took Gel Blaster 10 years to generate,

16:46:25    1    including CAD files with the PFM.  They got that, they received

16:46:30    2    it.  That's undisputed.  They took those CAD files -- they took

16:46:36    3    those CAD files, and they incorporated it into their Mythic.

16:46:40    4    We have shown that.  It was easy to see.  It's there.

16:46:43    5         Today they put all these other guns up there.  I

16:46:46    6    mean, we couldn't even track the exhibit numbers.  But I know

16:46:49    7    one thing:  There was no arm on the top of the plunger, and

16:46:53    8    there was no switch that that arm hits.  So all of that stuff

16:46:57    9    was just a bunch of red herrings to cover.  It's not there.  We

16:47:03   10    win on this.

16:47:04   11         Going next to the -- it's a trade secret.  It's not

16:47:10   12    in the public debate.  They've shown nothing that this was in

16:47:13   13    the public domain.  The only thing they refer to is an old

16:47:17   14    Surge that had the arm sticking out of it all by itself looking

16:47:22   15    like a hood ornament.  Our own engineer testified he wouldn't

16:47:27   16    know what the heck you did with that.  Their only evidence of

16:47:28   17    that was going to the Internet and showing some guy who thought

16:47:30   18    that you could put a switch there and use it.  But that same

16:47:33   19    guy had already seen the Hasbro Mythic.  He knew how to do it

16:47:37   20    because they disclosed our trade secret, and this gentleman on

16:47:42   21    the Internet saw it.  That's how he figured out what we were

16:47:47   22    going to do.

16:47:47   23         He now, like everybody else, thinks they're the

16:47:50   24    innovator.  They're not.  We are.  This is valuable.  You heard

16:47:53   25    a lot of testimony on the advantages of this, and all that

16:47:57  1   future testimony [sic] we're going to do, we gave them in a

16:48:00  2   provisional patent application that they've got in their arms

16:48:03  3   and I'm sure they're introducing it in their new guns.

16:48:06  4           Their entire defense, as I just discussed, is an

16:48:09  5   entire game of misdirection.  I got up here, and we think a

16:48:13  6   matter of five minutes, was able to cross-examine their

16:48:16  7   engineer who admitted not one -- not one of those prior uses

16:48:21  8   they're looking at, first of all, they weren't used in the

16:48:23  9   design of the Hasbro Mythic to create a physical firing

16:48:27 10   mechanism.  He admitted that.  Some guy on the Internet named

16:48:32 11   Darthskids?  Who the heck is that?  What they did do is they

16:48:35 12   took the identical design, and they to put it in their gun to

16:48:38 13   get to market quick.

16:48:39 14           The capability.  PISCA on its own has no

16:48:42 15   functionality.  It's the hood ornament.  We already discussed

16:48:45 16   that.

16:48:46 17           Can you go to the next slide?

16:48:47 18           So the breach of the -- there's trade secret

16:48:50 19   misappropriation.  Your Honor, you did -- did you want to hear

16:48:54 20   on irreparable harm?

16:48:55 21           THE COURT:  No.  I think the -- the thrust of this is

16:48:57 22   likelihood of success on the merits.

16:49:00 23           MR. DOYLE:  Yeah.  And we succeed.  We have this, and

16:49:04 24   they took this and they came up and tried to say they took it

16:49:08 25   out of the public uses.  It's not there.  And that is the

16:49:11  1   foundation, because it accurately records shots and it's going

16:49:15  2   to allow us to do everything we want to do over the next two

16:49:18  3   years.

16:49:19  4          We need relief.  We need it now, Your Honor.  I know

16:49:21  5   your court is very backed up, but this can't wait for a year or

16:49:26  6   we're going to be down to 2 percent market share.

16:49:29  7          Your Honor, thanks for the indulgence of the Court.

16:49:32  8   It was a pleasure to be here today.

16:49:33  9          THE COURT:  And I don't think we're backed up.  I

16:49:36  10  just don't think we can go forward.

16:49:41  11         MR. DOYLE:  I understand, Your Honor.

16:49:42  12         THE COURT:  All right.  Thank you.

16:49:44  13         All right.  Let me hear the close for the defendant.

16:49:58  14         MR. HOFFMAN:  Your Honor, to go to your question,

16:50:04  15  there is no evidence here that Hasbro used the Gel Blaster CAD

16:50:09  16  file to design its blasters.  The evidence is quite the

16:50:14  17  opposite.  If the Gel Blaster CAD file had been used, then when

16:50:19  18  you look at Hasbro's design documents, the ones Mr. Tino

16:50:22  19  testified about, we would see that in the CAD file.

16:50:25  20         But what we see is the Anstoy blaster.  The design

16:50:28  21  process that Mr. Tino testified to was that the Anstoy blaster

16:50:33  22  was incorporated into a completely different outer shell that

16:50:37  23  Hasbro designed.  And then, as you heard, he wanted to use a

16:50:40  24  timing feature, but an engineer on the design team, actually, a

16:50:44  25  gentleman in the Far East, recommend using a switch because

16:50:47  1    that is something that Hasbro has done time and time before.

16:50:50  2             Contrary to what my colleague would assert, it does

16:50:55  3    matter what's known in the art.  That goes to whether or not

16:51:01  4    anything in here is a trade secret.  And what we've seen today

16:51:04  5    is lots of energy and being upset and saying that we showed

16:51:08  6    them everything.  But when you watch as the case developed, in

16:51:11  7    the morning it was everything, and then a little later in the

16:51:15  8    morning, it was the PISCA and the switch, which is a small,

16:51:18  9    small part.

16:51:19  10            And then when it came out that the switch -- the

16:51:21  11   PISCA, excuse me -- was on sale and known for a year, then it

16:51:25  12   changes to the switch.  And then when it becomes undisputable

16:51:31  13   through Mr. Cline's testimony that switches were used to

16:51:34  14   provide this exact same function in blasters for years, then it

16:51:38  15   becomes right back to, okay, it's the switch.

16:51:46  16            Well -- excuse me.  When the PISCA is known, then it

16:51:49  17   becomes the switch.  And when you know the switch is known,

16:51:51  18   then it swings back around to the PISCA.  It's just a constant

16:51:54  19   cycle.  Nothing here is a trade secret.

16:51:57  20            And the assertion that now all of a sudden this

16:52:02  21   switch is the most vitally important thing, it's completely

16:52:07  22   belied by the record.  It's not a vitally important thing.

16:52:10  23   It's something that's known in the art.  Their own internal

16:52:12  24   documents show they had no interest in pursuing this.  They've

16:52:16  25   shown no independent evidence that this PISCA and switch are

16:52:20   1   important in the slightest in their discussions.  And that's

16:52:26   2   because they were publicly known blasters -- blaster designs.

16:52:29   3        I think it's critically important to look at what was

16:52:36   4   in their public blaster.  That PISCA, which, again, all morning

16:52:43   5   was identified as being a critically important feature, is

16:52:47   6   public.  It's not a trade secret.  It can't be a trade secret.

16:52:50   7   It can't be confidential.  It was well known to anybody who

16:52:54   8   opened up a blaster.

16:52:57   9        THE COURT:  Well, what do you define as the PISCA?

16:53:01  10        MR. HOFFMAN:  The PISCA --

16:53:02  11        THE COURT:  The little arm at the right angle?

16:53:04  12        MR. HOFFMAN:  That's the arm with the right angle,

16:53:06  13   Your Honor.

16:53:06  14        THE COURT:  Well, an awful lot of what was shown in

16:53:09  15   evidence didn't have that in there.  So how -- what did I see

16:53:14  16   over the course of the day that shows that was something that

16:53:18  17   was well known in the art?

16:53:19  18        MR. HOFFMAN:  What did you see, Your Honor?  The --

16:53:21  19   what you saw was their own public product that had that exact

16:53:27  20   arm.  They put that product on sale, you heard Mr. Cline

16:53:32  21   testify, before Hasbro even began designing its product.  So

16:53:37  22   there's nothing unique about that arm shape.  It's simply an

16:53:41  23   arbitrary design choice.  It's just a way to push the switch.

16:53:44  24        But even if that arbitrary shape made a difference,

16:53:49  25   that arbitrary shape is not -- it can't be a trade secret.  It

16:53:54   1  was admitted to be made public to anyone who wants to look at

16:54:00   2  it.  And, again, we can debate about that video, and I guess

16:54:04   3  they speculate that Engineerables was somehow informed.  But

16:54:10   4  it's clear that they were putting out a blaster that someone in

16:54:14   5  the art can look at and come to a conclusion that it works the

16:54:18   6  same way.

16:54:19   7          It's all there from the PISCA.  It was a known

16:54:25   8  feature a year before -- a year ago.

16:54:34   9          Do you have any further questions?

16:54:36  10          THE COURT:  I have no further questions, Your Honor.

16:54:38  11          MR. DOYLE:  Your Honor can I have 15 seconds of

16:54:39  12  rebuttal? Ten? Five?

16:54:41  13          MR. HOFFMAN:  And I know you -- do I have any more

16:54:44  14  time remaining?

16:54:44  15          THE COURT:  Yeah.  You have a little more.

16:54:46  16          MR. HOFFMAN:  I know you're not as interested in --

16:54:48  17          THE COURT:  Mr. Doyle, if you hadn't said anything,

16:54:50  18  he was going to waive the rest of his time.

16:54:53  19          MR. DOYLE:  Well, I'm going to ask him if he'll give

16:54:54  20  me just a little bit of his time, because he's a nice attorney.

16:54:58  21          MR. HOFFMAN:  Your Honor, I know you are not as

16:55:00  22  interested as much in the secondary factors, but I do think

16:55:03  23  they're important.  And I'll just simply note that, again, we

16:55:06  24  see in the e-mail that this not a feature that they're using,

16:55:12  25  it's not a feature they're planning on using in any document

16:55:15   1   that we see until this case happened and they found this

16:55:18   2   essentially as a reason to file this motion.  It's -- there's

16:55:23   3   no record of this being significant or them suffering any

16:55:27   4   irreparable harm.

16:55:28   5         We have provided quantifiable evidence of the harm.

16:55:32   6   They have not.  And so I do think the remaining factors should

16:55:37   7   be considered and also tilts in our favor.

16:55:41   8         THE COURT:  All right.

16:55:43   9         MR. HOFFMAN:  And I will -- I won't cede my time,

16:55:46   10  your Honor.  I'd like to go home.

16:55:48   11        MR. DOYLE:  You will not cede your time, Counsel?

16:55:52   12        MR. HOFFMAN:  How much time do I have left?

16:55:54   13        THE COURT:  Three minutes.

16:55:55   14        MR. DOYLE:  I'll only take 20 seconds.

16:55:58   15        MR. HOFFMAN:  The question for you, Your Honor, it's

16:55:59   16  your court.  Do you want me to provide my time?

16:56:04   17        THE COURT:  I'm not going to tell you-all how to

16:56:07   18  demean yourselves as the professionals you are.  If you would

16:56:08   19  like to cede some time, you may cede some time.

16:56:10   20        MR. HOFFMAN:  I will provide the 20 seconds.

16:56:12   21        MR. DOYLE:  Thank you so much, counsel.  I owe you.

16:56:16   22        THE COURT:  Cherish the moment, Mr. Hoffman.

16:56:19   23        MR. DOYLE:  Cherish the moment.  That was good.  I

16:56:21   24  will do something good, too.

16:56:22   25        Your Honor, I just want to say, right from the very

16:56:26  1  beginning, we call it the PISCA arm or the PISCA switch.  It

16:56:31  2  ain't this.  That's a hood ornament.  This works with this.

16:56:36  3  Bang, bang, it runs.  You pull the trigger.  We went through

16:56:39  4  the whole process.  You pull the trigger switch, gears turn,

16:56:43  5  the plunger goes backwards.  You've got that arm, and then that

16:56:47  6  arm hits the switch.  And that records the shot very

16:56:50  7  accurately.

16:56:51  8        THE COURT:  Well, I will tell you I have perceived

16:56:54  9  this argument to be the action, not the two unrelated things.

16:57:01  10  That the arm is what triggers the switch, and it's the process

16:57:06  11  is what I'm looking at.

16:57:07  12        MR. DOYLE:  Thank you, Your Honor.  I'm sitting.

16:57:10  13        MR. HOFFMAN:  Your Honor, no more argument.  But

16:57:12  14  could I have -- given that we have a considerable amount of

16:57:15  15  additional evidence, Hasbro would propose that we provide

16:57:18  16  post-hearing briefing.  Can we take the evidence and apply it

16:57:21  17  to the facts for the Court?

16:57:23  18        THE COURT:  Well, I'll do that semi.  Let me say a

16:57:26  19  little something here.  One, I want us to make sure we know

16:57:30  20  what I'm going to consider in reaching my decision.  I'm not

16:57:34  21  going to rule from the bench.  I know that Gel Blaster is in a

16:57:37  22  hurry.  We're not going to take a year to rule on this.  We're

16:57:40  23  going to rule on it quickly, but I'm not going to rule from the

16:57:43  24  bench.

16:57:43  25        All right.  What I'm considering today is everything

16:57:46   1   I've heard for purposes of the preliminary injunction.  I'm

16:57:50   2   considering all the exhibits that have been introduced, and I'm

16:57:55   3   considering the declarations that were attached to the

16:57:59   4   pleadings because the declarations have been talked about.

16:58:01   5        Now, does anybody want to bring up anything else

16:58:05   6   that's already been filed or put in the record that I've left

16:58:09   7   out that you want us to consider in reaching our decision,

16:58:14   8   because I want you to know and I want this record to be clear

16:58:18   9   what the court has in front of it when it considers whether I'm

16:58:22  10   going to grant a a preliminary injunction or not.

16:58:25  11        MR. PETIT:  We would ask, Your Honor, that the

16:58:27  12   exhibits attached to our motion and our reply brief also be

16:58:31  13   considered.  And they are electronically part of the record.

16:58:34  14        THE COURT:  And how about you, Mr. Hoffman?

16:58:35  15        MR. HOFFMAN:  Your Honor, we'd also like all of the

16:58:37  16   exhibits attached to be provided -- I mean, considered.  I

16:58:41  17   would ask, Your Honor, that there was a reply which added

16:58:44  18   conditional additional information, so I think it could be

16:58:47  19   helpful to the Court for us to provide a briefing that

16:58:50  20   addresses the evidence provided here but also provide Hasbro a

16:58:54  21   chance to provide some briefing on that.

16:58:56  22        THE COURT:  All right.  I'm going to consider all of

16:58:58  23   the exhibits that are attached to all of the pleadings that

16:59:01  24   have been filed by both parties.

16:59:03  25        Now, I don't want additional briefing.  You've

16:59:06  1  briefed it well.  What I will entertain, because I think it

16:59:11  2  would be helpful, is in outline form, no argument, because I

16:59:16  3  know what your argument is.  You don't have to paint the

16:59:20  4  picture of where we are.  Just each of you, if you want to,

16:59:24  5  file in outline form what you think supports the strongest

16:59:36  6  documents you have or evidence that you have that you want us

16:59:38  7  to look at that supports your position.  Bear in mind, I'm also

16:59:41  8  considering all of the slides that you've gotten in, so -- that

16:59:46  9  you've shown me that I have copies of.

16:59:48  10      But take no more than three pages.  You can do it in

16:59:54  11  letter form or you can do it in pleading form.  You can file it

16:59:58  12  or you can just send it to us, however you want it, about where

17:00:01  13  you want us to concentrate in this body of evidence.  I think

17:00:05  14  you -- if you just play by my rules and just give me an

17:00:09  15  outline, you can do it in three pages.

17:00:11  16      MR. DOYLE:  Yes, Your Honor.

17:00:11  17      THE COURT:  And you can even sign it within those

17:00:14  18  three pages.

17:00:14  19      MR. PETIT:  May I ask a clarifying question?

17:00:16  20      THE COURT:  Yes.

17:00:16  21      MR. PETIT:  Are you just referring to documentary

17:00:17  22  evidence, or are you referring also to testimony?

17:00:19  23      THE COURT:  No.  Testimony is fine.  You know, I just

17:00:24  24  want you to know, because we've heard a lot today, this is a

17:00:28  25  fascinating area, I can tell you, from my point of view.  I've

17:00:32   1   thought for the entire 50-plus years I've practiced law, one of

17:00:35   2   the really best things about practicing law is you get to learn

17:00:39   3   about things you would never just take a rainy Saturday and go

17:00:42   4   to the library and learn about.  I didn't know anything about

17:00:45   5   this whole industry out there until we went through it today.

17:00:50   6            But, no, just take -- just direct us and copy one

17:00:54   7   another with it, to where you want us to go.  And how long do

17:00:58   8   you think it will take you to get that in?

17:01:01   9            MR. DOYLE:  We can do that -- it's up to you,

17:01:03  10   Your Honor.

17:01:03  11            THE COURT:  No.  How fast -- you have to write it for

17:01:06  12   me.  I'm not going to tell you how fast you should write it.

17:01:10  13   When do you want to file those outlines?

17:01:11  14            MR. HOFFMAN:  Your Honor, we do need a transcript to

17:01:12  15   do this, ideally.

17:01:34  16            THE COURT:  All right.  Ms. Rodriguez?

17:01:35  17      (Discussion between counsel and court reporter)

17:01:35  18            THE COURT:  All right.  And so can you file something

17:01:39  19   by Tuesday or Wednesday?  You know, if you get the record

17:01:43  20   Friday, when can you have your position paper?

17:01:46  21            MR. DOYLE:  Tuesday.  We can get it to you on

17:01:48  22   Tuesday.

17:01:48  23            MR. HOFFMAN:  The parties are also litigating heavily

17:01:51  24   in the ITC, Your Honor.  There are depositions scheduled pretty

17:01:53  25   much every day coming up.  Would it be possible to get it to

17:01:56  1   you the following Friday, you know, a week to provide the

17:02:00  2   chart?

17:02:02  3            THE COURT:  All right.  I'll give you a week.  I know

17:02:05  4   you-all are eager, but three days is not going to bring down

17:02:09  5   the empire.

17:02:09  6            MR. DOYLE:  I think that's fair.

17:02:10  7            THE COURT:  So get me your outlines by Friday, a

17:02:13  8   week.

17:02:15  9            MR. DOYLE:  Yes, Your Honor.

17:02:15  10           THE COURT:  And Ms. Rodriguez can charge you anything

17:02:18  11  she wants to for the record.

17:02:26  12       (Laughter)

17:02:26  13           MR. DOYLE:  I hope we gave you enough time.

17:02:26  14           THE COURT:  She's good.

17:02:29  15           Anything else while we're all here?

17:02:31  16           MR. BROADAWAY:  Your Honor, do you want to hear on

17:02:33  17  the other -- you know, the motion to stay.

17:02:35  18           THE COURT:  No.  I believe, based on everything I've

17:02:43  19  read and what I've heard today, I can rule on those things.

17:02:47  20           Expedited discovery is obviously moot.  We don't need

17:02:49  21  to worry about that.  I've got a decision to make.  I'm

17:02:58  22  definitely going to stay the patent part of this case until you

17:03:01  23  get through in Washington.  I just haven't decided whether I'm

17:03:03  24  going to stay the rest of it.  I have that in front of me, and

17:03:04  25  I can rule on that without argument because I pretty much know

17:03:09  1  where you-all stand on that.  And the question about bringing

17:03:10  2  in the third party, I don't need argument on that.

17:03:14  3          I can tell you I'm leaning toward not allowing the

17:03:21  4  third party until we see what happens on your parallel patent

17:03:25  5  proceeding, and then we'll see what's still alive after the

17:03:30  6  international office gets its stuff out.  Then I'll decide

17:03:35  7  where I'm going with the patent stuff.

17:03:37  8          MR. BROADAWAY:  So one question, Your Honor.  Can

17:03:39  9  discovery open in this case?  One of the things that's been an

17:03:41  10  issue is that the plaintiff has attempted to have a 26(f)

17:03:45  11  conference so we can start the discovery process.  And

17:03:48  12  Defendants have taken the position that, because of their

17:03:50  13  motion to stay, they don't have to participate in discovery

17:03:53  14  yet.

17:03:53  15          So can discovery open in this case?

17:03:56  16          THE COURT:  I will make a ruling on that in the order

17:04:00  17  where I rule on those ancillary motions.

17:04:05  18          MR. BROADAWAY:  Okay.

17:04:05  19          MR. DOYLE:  Thank you, Your Honor.

17:04:06  20          THE COURT:  Because you-all have just sat here and

17:04:07  21  told me you've got enough to do between now and a week from

17:04:10  22  Friday.  And then when I start thinking about it again, then

17:04:17  23  I'll decide about discovery.

17:04:19  24          MR. DOYLE:  Just so the record is clear --

17:04:20  25          THE COURT:  I'm getting an impression that you-all,

17:04:22  1   for all the lawyers in this room, both sides only has one case.

17:04:29  2   And, you know, a lot of times when I get lawyers here, I find

17:04:29  3   you have more than one case you want to work on.  But this

17:04:34  4   sounds like it's consuming all of your time.

17:04:36  5            MR. DOYLE:  No, Your Honor.  We think this thing is

17:04:37  6   ripe for resolution.

17:04:43  7            THE COURT:  It is ripe for resolution.

17:04:43  8            MR. DOYLE:  Thank you.

17:04:43  9            THE COURT:  But go talk to your Congress about

17:04:47  10  getting me three more judges.

17:04:47  11           MR. DOYLE:  You know what?  I will?

17:04:47  12           THE COURT:  All right.  We need them.

17:04:48  13           MR. HOFFMAN:  I'll just note, Your Honor, on the

17:04:50  14  26(f) conference, that wasn't exactly accurate.  We were

17:04:53  15  waiting for you to issue an order for the initial conference.

17:04:55  16           THE COURT:  I understand.  Don't -- you know, I was

17:04:59  17  on your side of the bench for a long damn time.  I understand

17:05:02  18  what comes up in discussions and things.

17:05:04  19           It's really important to you, and it just kind of

17:05:06  20  goes right over my head because I was -- or right by my head.

17:05:11  21  You know, lawyers have a hard job, contrary to what the media

17:05:15  22  thinks.  You're under a lot of pressure.  You carry not only

17:05:20  23  your own pressures around, you carry around the pressures of

17:05:22  24  your clients.  I understand how people can get crossways over

17:05:26  25  Rule 26 conferences and things like that.  Don't worry about

17:05:29  1    it.  I point no fingers at anyone on that.

17:05:32  2             So let's proceed on what we just discussed.  You-all

17:05:36  3    did a good job today.  We got a lot in in a day.  I appreciate

17:05:40  4    your efforts on this.

17:05:41  5             Everybody have a happy New Year and a good remainder

17:05:44  6    of your day.

17:05:46  7             (End of transcript)

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1    **UNITED STATES DISTRICT COURT      )**

2    **WESTERN DISTRICT OF TEXAS          )**

3         I, Arlinda Rodriguez, Official Court Reporter, United

4    States District Court, Western District of Texas, do certify

5    that the foregoing is a correct transcript from the record of

6    proceedings in the above-entitled matter.

7         I certify that the transcript fees and format comply with

8    those prescribed by the Court and Judicial Conference of the

9    United States.

10        WITNESS MY OFFICIAL HAND this the 27th day of

11   January 2023.

12

13                                    /S/ Arlinda Rodriguez
                                      Arlinda Rodriguez, Texas CSR 7753
14                                    Expiration Date:  10/31/2023
                                      Official Court Reporter
15                                    United States District Court
                                      Austin Division
16                                    501 West 5th Street, Suite 4152
                                      Austin, Texas 78701
17                                    (512) 391-8791

18

19

20

21

22

23

24

25